# Exhibit 7

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| K.M. | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION FILE NO.: |
| | : | |
| v. | : | **<u>1:23-cv-0190-TWT</u>** |
| | : | |
| CPA HOTELS OF ATLANTA, LLC; | : | |
| and RED ROOF FRANCHISING, LLC | : | |
| | : | |
| Defendants. | : | |

# COMPLAINT

Matthew B. Stoddard
M. Janine Bell
THE STODDARD FIRM
1534 N Decatur Road
Atlanta, GA 30307
P: 470-467-2200
matt@legalhelpga.com
janine@legalhelpga.com

**Attorneys for Plaintiff**

**TABLE OF CONTENTS**

Introduction....................................................................................................3

The Parties.......................................................................................................4

Procedural Issues............................................................................................4

K.B. Is Trafficked for Sex at the Inn…........................................................................6

COUNT 1: TVPRA Civil Beneficiary Claims Against CPA Hotels......................8

COUNT 2: TVPRA Vicarious Liability Claims Against Red Roof……….......17

A. Actual Agency…………………………………………………………17

B. Apparent Agency……………………………………………………22

C. Aiding and Abetting…………………………………………………23

D. Joint Venture Liability………………………………………………25

Proximate Cause and Damages.....................................................................27

Prayer for Relief............................................................................................29

## INTRODUCTION

1. This lawsuit, brought by a sex trafficking victim against a Red Roof Inn franchisee and franchisor, seeks damages under the Trafficking Victims Protection Reauthorization Act (TVPRA). *See* 18 U.S.C. § 1595(a) (stating that a sex trafficking victim "may bring a civil action against . . . whoever knowingly benefits . . . from participation in a venture which that person knew or should have known has engaged in an act in violation of the" TVPRA.); *see also Doe #1 v. Red Roof Inn, Inc.*, 21 F.4th 714 (11th Cir. 2021); *Ricchio v. McLean*, 853 F.3d 55 (1st Cir. 2017).

2. From approximately June of 2015 until approximately December of 2015, a Red Roof Inn hotel located at 4430 Frederick Drive SW, Atlanta, GA 30336 (the "Inn") was:

a. owned by Defendant CPA Hotels of Atlanta, LLC ("CPA Hotels"), and

b. jointly operated and managed by Defendant CPA Hotels and Red Roof Franchising, LLC ("Red Roof").

3. During this ownership and management, Plaintiff K.M. was repeatedly trafficked for sex at the Inn by DeAngelo Brown a/k/a Meatball ("Meatball").

4. The Inn was a notorious hotspot for illicit activity that had been attracting sex trafficking and prostitution ventures for years, and all Defendants knew it.

**THE PARTIES**

5. Plaintiff K.M. is a resident and citizen of Atlanta, Georgia.

6. Plaintiff K.M. consents to the jurisdiction of this Court.

7. Defendant CPA Hotels is an administratively dissolved Georgia for profit limited liability company that owned and helped manage the Inn.

8. Red Roof is a foreign for-profit corporation that helped manage the Inn.

**PROCEDURAL ISSUES**

9. Given the nature of the case, K.M. is identified in this Complaint by her initials to prevent public disclosure of her name. Plaintiff's counsel has either previously disclosed K.M.'s full name to defense counsel or will immediately upon identification of defense counsel. When filing this Complaint, Plaintiff's counsel also filed a Motion for Protective Order seeking Court permission for K.M. to proceed anonymously. Upon information and belief, Defendant will consent to K.M. proceeding without publicly disclosing her names.

10. As an administratively dissolved corporation, Defendant CPA Hotels can be served through "any person, who, as an agent or officer of such corporation,

was subject to be[ing] served as its officer or agent at the time of dissolution." O.C.G.A. § 14-4-161(b). At least some of those persons are:

a. Amish Patel: 1310 Boyd Ave NW, Atlanta, GA 30318

b. Parismal Patel: 286 Robin Road SE, Marietta GA 30067

c. Chhitel Patidar: 3909 Savanna, Marietta GA 30066.

It is also believed that these individuals are currently operating out of an office located at 400 Galleria Parkway SE, Suite 1140, Atlanta, GA 30339.

11. Defendant CPA Hotels was properly served with process in this matter.

12. Defendant CPA Hotels is subject to the jurisdiction and venue of this Court.

13. Defendant Red Roof can be served through its registered agent Corporation Service Company at 2 Sun Court, Suite 400, Peachtree Corners, GA 30092.

14. Defendant Red Roof waived service and all prerequisites have been met such that Defendant Red Roof was properly served and this case cannot be dismissed for reasons related to service.

15. Defendant Red Roof is subject to the jurisdiction and venue of this Court.

16. Jurisdiction is proper in this Court under 28 U.S.C. § 1331 (federal question jurisdiction) because this matter concerns the Trafficking Victims Protection Reauthorization Act which is a law of the United States.

17. Venue is proper in this Court because a substantial part of the events or omissions giving rise to the claims asserted in this action occurred in Atlanta, Fulton County, Georgia which is within the Northern District of Georgia's Atlanta Division. *See* 28 U.S.C. § 1391.

**K.B. IS TRAFFICKED FOR SEX AT THE INN**

18. In early 2015, K.M. and Meatball were living at the Inn together.

19. When not at work, Meatball would spend time with other residents including multiple men who were selling young girls and women for sex at the Inn.

20. Meatball then lost his job.

21. After further discussions with these other residents, Meatball believed that he too could sell young girls and women for sex at the Inn.

22. The other residents then showed Meatball how they were brazenly operating sex trafficking ventures at the Inn.

23. Meatball, armed with this knowledge, then told K.M. she would be sold for sex at the Inn.

24. From approximately June 2015 until approximately December of 2015, Meatball sold K.M. for sex at the Inn.

25. K.M. was required to have sex with men in exchange for money, that money would go to Meatball, and Meatball would use the money to pay rent so that K.M. could again be forced have sex with men at the Inn.

26. Meatball threatened violence on K.M. if K.M. did not continue to perform sex work at the Inn.

27. Meatball frequently beat K.M. at the Inn including in the rooms and in the parking lot.

28. For a large portion of the trafficking, K.M. was pregnant.

29. In late October, K.M. had a child, and then the trafficking continued.

30. Meatball told K.M. that he would take her young child away if she did not continue to have sex with men for money.

31. On multiple occasions, Defendants' employees – including the Inn manager – observed K.M. getting hit, kicked, and beat in the front lobby of the Inn.

32. Sometimes Meatball would take K.M.'s photo identification to the front office and use her photo identification to rent the rooms, and other times Meatball would rent the rooms directly.

33. Regardless of whose name the room was in, Meatball was the person who provided the money and handled the transaction.

34. Meatball's trafficking of K.M. took place throughout the hotel including in the rooms, in the parking lot, and in other common areas of the hotel.

35. Meatball was very controlling and rarely left K.M. alone.

34. Eventually, in either December of 2015 or January of 2016, Meatball left K.M. alone.

35. While alone, K.M. called her mother who came and picked K.B. up.

36. K.M. had escaped.

**COUNT 1: TVPRA CIVIL BENEFICIARY CLAIM AGAINST CPA HOTEL**

37. The Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1595(a) ("TVPRA") provides a civil cause of action to victims like K.M. against "whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known" violated the TVPRA.

38. Defendant CPA Hotels "knowingly benefited" from K.B.'s trafficking because:

a. Meatball rented rooms at the Inn;

b. Defendant CPA Hotels collected revenue from the room rentals; and

c. K.M. was forced to have sex in those rooms and the common areas.

39. Defendant CPA Hotels took part in a common undertaking involving risk or profit with the trafficker(s) because:

a. Plaintiff's trafficker(s) would pay in cash for one night at a time, booking the next night's stay before check-out time;

b. Defendant CPA Hotels directly rented rooms to people it knew or should have known were engaged in sex trafficking including the trafficking of Plaintiff;

d. Defendant CPA Hotels was directly renting rooms to the same trafficker(s) – Plaintiff's trafficker(s);

e. Defendant CPA Hotels had commercial dealings with Plaintiff's trafficker(s) and then continued to rent rooms to Plaintiff's trafficker(s).

f. Defendant CPA Hotels had a continuous business relationship with Plaintiff's trafficker(s) such that Defendant established a pattern of conduct with those trafficker(s).

g. After renting the room for the first night, Plaintiff's trafficker(s) had prior commercial dealings with Defendant CPA Hotels and then reinstated those dealings.

h. Defendant CPA Hotels associated with Plaintiff's trafficker(s) in an effort to force Plaintiff to serve Defendant CPA Hotels' business objectives.

i. Defendant CPA Hotels owned, operated, and maintained the hotel in question.

40. The criminal portion of the TVPRA states, in relevant part, that "whoever knowingly . . . recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person . . . knowing . . . that means of force, threats of force, fraud, or coercion . . . will be used to cause the person to engage in a commercial sex act, or that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act shall be punished . . ." under the TVPRA. 18 U.S.C. §1591(a).

41. Plaintiff's trafficker's undertaking with Defendant CPA Hotels violated the TVPRA with respect to Plaintiff because:

a. Meatball recruited K.M. to participate in commercial sex acts at Defendant's hotel by, among other reasons, stating that he would take care of her and then making her work as a prostitute;

b. Meatball harbored K.M. at Defendant's hotel for the purpose of K.M. participating in commercial sex acts at the property;

c. Meatball maintained K.M. at Defendant's hotel for the purpose of K.M. participating in commercial sex acts at the hotel;

d. The commercial sex acts occurred at Defendant's hotel in rooms and Defendant's common area which were rented by Meatball;

e. Meatball used force, threats of force, and coercion to cause K.M. to participate in commercial sex acts at Defendant's property;

f. Meatball threatened K.M. with violence and used this tactic to cause K.M. to engage in commercial sex acts at Defendant's property;

g. Meatball struck and was violent with K.M. when she refused to engage in commercial sex acts at Defendant's property;

h. Meatball coerced K.M. to participate in commercial sex acts at Defendant's property by threatening K.M. with physical harm if she did not continue to engage in commercial sex acts at Defendant's property;

i. Meatball knowingly, recruited, enticed, harbored, transported, advertised, maintained, and solicited K.M. to engage in commercial sex acts in the hotel rooms that Meatball rented from Defendant;

j. Buyers came to Defendant's hotel, purchased the "right" to have sex with K.M. from Meatball, and then the buyers raped K.M. in Defendant's hotel; and

k. Other actions to be proven at trial.

42. The venture in which Defendant CPA Hotels participated affected interstate commerce for numerous reasons including the sale and use of condoms, the purchase and use of cleaning supplies from out of state, the use of credit cards to post online advertisements through websites for selling K.M. in commercial sex acts, the use of the internet to post sex advertisements, the use of interstate highways to transport K.M. to the hotels by her trafficker(s) (and her associates), and other reasons to be proven at trial.

43. Defendant CPA Hotels had actual or constructive knowledge that the undertaking violated the TVPRA, i.e., Defendant CPA Hotels had actual or

constructive knowledge that K.M. was being trafficked for sex. *See* Fed. R. Civ. P. 9(b)("knowledge and other conditions of a person's mind may be alleged generally); *Sun Life Assurance Co. of Can. v. Imperial Premium Fin., LLC*, 904 F.3d 1198, 1215 (11th Cir. 2018) (same).

44. Defendant CPA Hotels directed, operated, supervised, monitored, managed, and/or employed all employees, managers, housekeepers, and other staff at its hotel at all relevant times, giving Defendant CPA Hotels specific and direct knowledge of sex trafficking, including the sex trafficking that victimized K.M., and other crimes at the Inn during the relevant period.

45. K.M.'s victimization followed a pattern that was readily observable and should have been obvious to Defendant's hotel employees based on information available to the public at large and to the hotel industry.

46. Defendant CPA Hotels knew or should have known of the existence and prevalence of sex trafficking at budget motels and its illegality because of industry knowledge such as:

a. the passage of the Trafficking Victims Protection Act in 2000, and the United Nations' Palermo Protocol to Prevent, Suppress, and Punish Trafficking in Persons, Especially Women and Children also in 2000.

b. the implementation of the Tourism Child Protection Code of Conduct (the "Code") by End Child Prostitution and Trafficking (ECPAT-USA) which outlines well-established best practices for

the hospitality industry to combat sex trafficking, and identifies six simple steps hotels can take to prevent child sex trafficking.

c. extensive private sector / non-profit publications informing the public that motels were a hotbed of sex trafficking

d. extensive federal / state / local government testimony and press quotations informing the public that low income motels were a particular hotbed of sex trafficking, and

e. the general nature of Defendant's business involving renting private rooms cheaply by the day with each room having a bed where trafficking could occur.

47. Defendant CPA Hotels had actual knowledge of the publicly available online reviews from Google, My Business, Priceline, Trip Advisor, etc. in which customers reported allegations of prostitution, sex trafficking, and other illicit activities occurred at the Inn including reviews that state:

a) Street walkers. Drug dealers. . . Not safe at night or day. . .

b) . . .Prostitutes hanging on the corners outside the hotel. . .

c) . . .There are drug dealers and prostitutes as soon as u get to the hotel

d) Not a place for kids. . .prostitutes around the area

e) . . .pretty sure there's prostitutes coming in and out of the hotel

f) The[re] were mainly dealers, users, and prostitutes. . .

g) Approached by a prostitute before I made it to the front door. . .

h) This is the worst hotel in the country. . . crack dealers and heroin dealers and prostitutes. . .

i) Worst hotel I've stayed in. . .all throughout the night prostitutes went door to door

j) Neighbors have sex and bang on the walls all night, drugs on the floor. . .prostitutes walk up to adults and kids. . .

k) Don't go here. Prostitution paradise.

l) Absolutely horrible. . .prostitutes outside, had some gangbangers flash a gun at me. . .Stay away. Numerous people checked out as soon as they checked in (including myself)

m) . . .there's a drug dealer and a prostitute that work the corner behind the hotel. . .

n) Had prostitutes hanging out at the main entrance. . .looked like a drug dealer hang out.

o) Quite horrible. . .prostitutes and crackheads always around. . .

p) I would never stay in. . [this] motel again! Not only isn't it safe but its freaking prostitute everyone and everyone seems to be on drugs. . .

q) . . .LOTS of hookers around

r) . . .Drugs hookers trashy. . .hookers everywhere

s) Worst hotel I've ever stayed at. . .they had hookers in the lobby

t) . . .hookers are walking [around]. . .

u) Wasn't happy. . .hookers at door.

v) Most horrible place I've ever been. Every time my husband left the room without me, he was confronted by hookers asking if he needed a date, their pimps lingered outside the hotel entrance. Visible drug exchanges all day long.

w) VERY run down. . .hookers and drug dealers all over the place. . .

x) . . .there was hookers outside and guys outside selling drugs. . .

y) . . .hookers out front trying to get with you as you walk in. . .

z) . . .Hookers and weed everywhere. . .

aa). . .hookers and pimps in the parking lot

bb) . . hookers, pimps, drug deals. . .

cc) This place is the stereotypical movie cliché of a motel in the bad section of town which is headquarters for the hookers, strippers, and dealers. . .

dd) . . .hookers, thugs. . .

ee) . . .hooker in lobby then parking lot, during daytime. . .

ff) . . .Courtney the manager is always drunk, she drinks on the job, she has sexual relations with the young guys. . .

48. Defendant CPA Hotels had actual or constructive knowledge of law enforcement activity reporting widespread prostitution, sex trafficking, and other illicit activities occurring at Defendant's hotel.

49. Based on the numerous arrests, investigations, and police reports, Defendant CPA Hotels knew or should have known of the sex trafficking and prostitution ventures operating out of its hotel prior to Plaintiff's sex trafficking.

50. Regarding K.M., Defendant CPA Hotels and/or its employees observed

the vast majority of the evidence that the Department of Homeland Security ("DHS") posts as guidelines to identify and prevent of sex trafficking for hotel staff to be vigilant in observing including:

a. persons who show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior;

b. persons who lack freedom of movement or are constantly monitored;

c. persons who have no control over or possession of money or ID;

d. persons who dress inappropriately for their age or have lower quality clothing compared to others in their party;

e. requests for room or housekeeping services (additional towels, new linens, etc.), but denial of hotel staff entry into the room;

f. the presence of multiple computers, cell phones, pagers, credit card swipers, or other technology in the room;

g. extended stay with few or no personal possessions in the room;

h. excessive amounts of sex paraphernalia in rooms (condoms, lubricant, lotion, etc.);

i. the same person reserves multiple rooms;

j. a room is rented hourly, less than a day, or for an atypical extended stay;

k. attempts to sell items to or beg from patrons or staff;

l. cars in the parking lot regularly parked backward, so the license plates are not visible;

m. loitering and solicitation of male patrons; and

n. persons asking staff or patrons for food or money.[1]

51. Regarding K.M., Defendant CPA Hotels and/or its employees observed the vast majority of the evidence that the organization End Child Prostitution and Trafficking (ECPAT-USA) has listed as specific indicators of human trafficking that hotel staff should recognize to combat trafficking including: paying for rooms using cash, paying for multi-day stays one day at a time, escorts various men into the room and lingers until they leave, watching the door, room is frequented by different men, insists on little or no housekeeping, excessive requests for towels and sheets, wearing the same attire or attire that is revealing or inappropriate for the weather, excess lingerie, discarded condoms and lubricants, use of websites with adult classified ads and possessing few personal belongings.[2]

**COUNT 2: TVPRA VICARIOUS LIABILITY**
**CLAIM AGAINST DEFENDANT RED ROOF**

52. Defendant Red Roof is liable under the law for the actions and inactions of Defendant CPA Hotels.

**COUNT 1(A)**
**ACTUAL AGENCY**

[1] U.S. Dep't of Homeland Security, *Human Trafficking and the Hospitality Industry*, available at https://www.dhs.gov/blue-campaign/hospitalityindustry (last visited Feb 10, 2022).
[2] *See* ECPAT-USA, *Human Trafficking Indicators*, available at https://www.ecpatusa.org/s/ECPATUSA_hotelindicatorsheets.pdf (last visited Feb 11, 2022).

53. Upon information and belief, Defendant Red Roof acknowledged that Defendant CPA Hotels would act on behalf of Defendant Red Roof in operating and managing the Inn because:

a. Defendant Red Roof provided Defendant CPA Hotels with its trademark, brand system, signage and other similar items such that Red Roof's name was on the door and the Inn was called a "Red Roof Inn"

b. Defendant Red Roof agreed to receive money from Defendant CPA Hotels for Defendant Red Roof aiding in the management and operation of the facility.

c. Defendant Red Roof helped Defendant CPA Hotels advertise rooms for rent at the Inn using the Red Roof system and that advertising referred to the hotel as a "Red Roof Inn."

d. Defendant Red Roof's marketing materials described the location as a Red Roof property.

54. Upon information and belief, Defendant CPA Hotels accepted the undertaking of operating and managing the Inn on behalf of Red Roof because:

a. Defendant CPA Hotels cooperated with Defendant Red Roof and received the equipment Defendant Red Roof provided and placed the equipment, trademarks, brand marks, signage and other similar features throughout the Inn;

b. Defendant CPA Hotels paid Red Roof Royalty fees equal to a percentage of gross room revenue.

c. Defendant CPA Hotels paid Red Roof Marketing and Reservation Contribution Fees equal to a percentage of gross room revenue.

d. Defendant CPA Hotels paid Red Roof RediCard Preferred Member Program fees equal to a percentage of gross room revenue.

55. Upon information and belief, Defendant Red Roof controlled the actions of Defendant CPA Hotels because:

a. Defendant Red Roof required Defendant CPA Hotels to use the business name for the Inn that Defendant Red Roof chose.

b. Defendant Red Roof trained the Defendant CPA Hotels manager, chose the training program, and provided Defendant CPA Hotels no input in how the manager would be trained.

c. Defendant Red Roof required Defendant CPA Hotels to upgrade the Inn at Red Roof's direction including making structural, remodeling, redecoration, and other similar changes chosen by Defendant Red Roof.

c. Defendant Red Roof provided training programs to all of Defendant CPA Hotels employees who worked at the Inn – training explaining how the Defendant CPA Hotel employees must do their jobs.

d. Defendant Red Roof required Defendant CPA Hotel to use Defendant Red Roof software (including its Fidelio Software and its Accel Reservation System) to run the hotel including for keeping track of which hotel rooms were vacant or occupied and including what information on guests would be requested and stored.

e. Defendant Red Roof required Defendant CPA Hotel to allow Defendant Red Roof employees to enter the premises at any time unannounced to evaluate whether Defendant CPA Hotels employees were properly doing their jobs.

f. Defendant Red Roof required Defendant CPA Hotels to provide free lodging for Defendant Red Roof employees.

g. Defendant Red Roof required Defendant CPA Hotels to provide monthly reports to Defendant Red Roof on whether the hotel was being run how Defendant Red Roof wanted it run.

h. Defendant Red Roof required Defendant CPA Hotels to construct, convert, equip, and furnish the Inn in the way that Defendant Red Roof wanted.

i. Defendant Red Roof determined the hours that Defendant CPA Hotels would keep the Inn open for business and directed that Defendant CPA Hotels could NOT close the Inn for any holidays.

j. Defendant Red Roof had the power to change the management "System" that it was requiring at the Inn and Defendant CPA Hotels did not have that power.

k. Defendant Red Roof required Defendant CPA Hotels to offer certain goods for sale at the Inn and required Defendant CPA Hotels to not offer any goods for sale that Defendant Red Roof had not approved.

l. Defendant Red Roof chose the location and length of the training that Defendant CPA Hotel managers had to undergo and Defendant CPA Hotels did not have the ability to refuse said training. Further, all new managers and all "designees" also had to attend said training under the same terms.

m. Defendant Red Roof required all Defendant CPA Hotels to be trained to Defendant Red Roof's "System" and at a time and location chosen by Defendant Red Roof.

n. Defendant Red Roof required Defendant CPA Hotels to offer a certain number of rooms available for rental each night and did not allow Defendant CPA Hotels to increase or decrease the

number of rooms offered for rental.

o. Defendant Red Roof did not allow Defendant CPA Hotels to do any business at the Inn other than business that Defendant Red Roof agreed was allowed.

p. Defendant Red Roof made all decisions on fixtures, furnishings, equipment, décor item (including signs, posters, and other property identification items) and supplies and did not allow Defendant CPA Hotels to deviate from those decisions.

q. Defendant Red Roof directed Defendant CPA Hotels regarding what renovations needed to be done and Defendant CPA Hotels had to comply.

r. Defendant Red Roof chose all suppliers such that Defendant CPA Hotels did not have the ability to purchase anything from anyone without Defendant Red Roof's approval, and Defendant Red Roof could even revoke its approval of a supplier and tell Defendant CPA Hotels could not no longer purchase any supplies from a certain source.

s. Defendant Red Roof required Defendant CPA Hotels to report all incidents involving safety, security, and public relations and to discuss a response with Defendant Red Roof before saying anything to the press

t. Defendant Red Roof created policies and procedures concerning how Defendant CPA Hotels dealt with all guests and required Defendant CPA Hotels employees to follow those policies.

u. Defendant Red Roof required Defendant CPA Hotels to perform its accounting in certain ways that Defendant Red Roof directed, maintain its books for a period of years as directed by Defendant Red Roof, and submit those books each year and upon any request to Defendant Red Roof.

v. Defendant Red Roof could force Defendant CPA Hotels to

produce and allow for copying all books, records, tax returns, and could require Defendant CPA Hotels to undergo an independent audit.

w. Defendant Red Roof required Defendant CPA Hotels to provide a percentage of gross revenue for Marketing and Reservation Contribution to Defendant Red Roof and then Defendant Red Roof could spend that money in its sole discretion however necessary to develop and operate the Defendants' reservation system.

x. Defendant Red Roof required Defendant CPA Hotels to get Defendant Red Roof's approval for all advertising and promotional materials related to the Inn.

y. Defendant Red Roof had the ability to fire Defendant CPA Hotels if Defendant CPA Hotels did not strictly comply with the System that Defendant Red Roof set up for managing the Inn.

z. Defendant Red Roof also required that Defendant CPA Hotels could not send potential customers to any hotel or motel other than a one that Defendant Red Roof approved.

**COUNT 2(B)**
**<u>APPARENT AGENCY</u>**

56. Defendant CPA Hotels reasonably appeared to be an agent of Defendant Red Roof.

57. Defendant Red Roof made representations to K.M. and the world at large including:

a. Providing years of advertising to develop a Red Roof Trademark with which K.B was familiar, and which had secondary meaning for a large reputable hotel chain which followed the law.

b. Having the Red Roof signs and marks located at the Inn which communicated to K.B that the facility was, in fact, a large reputable hotel chain which followed the law.

c. Calling the Inn a Red Roof property.

58. Defendant Red Roof's representations caused K.M. to reasonably believe that Defendant CPA Hotels was authorized to act for Defendant Red Roof's benefit because:

a. K.M. was never informed that the hotel was owned or managed by anyone other than Defendant Red Roof and K.M. reasonably believed that Defendant Red Roof did, in fact, own and manage the Inn.

b. the signage, internet advertising, and statements made led K.M. and the general public to believe that the hotel was owned and managed by Defendant Red Roof.

59. While reliance is not required, Defendant Red Roof's actions induced Plaintiff's detrimental, justifiable reliance upon the appearance of the agency relationship because:

a. Upon first choosing to stay the Inn with Meatball, and prior to her trafficking, K.M. had more power in the relationship dynamic and the jury could, therefore, find that K.M. could have escaped the situation or directed Meatball to another hotel at this time, and that K.M. did not do so because she felt comfortable and safe with Meatball at the Inn because it was a large hotel brand she knew of and she therefore assumed it would be a safe place to be.

**COUNT 2(C)**

Case 1:23-cv-02041-MLB Document 1-1 Filed 03/05/23 Page 24 of 32

## AIDING AND ABETTING

60. "Whoever. . .aids, abets. . .[or] induces [] commission" of "an offense against the United States" "is punishable as a principal." 18 U.S.C. § 2(a).

61. Defendant Red Roof aided and abetted non-party Meatball's violation of 18 U.S.C. § 1591.

62. The substantive offenses by Defendant CPA Hotels and non-party Meatball are stated in detail above.

63. Upon information and belief, it is possible for the jury to infer that Defendant Red Roof knew the offenses were being committed because the following combinations of suspicion and indifference to truth show that Defendant Red Roof had a strong suspicion that K.M. was being trafficked yet shut its eyes for fear of what it would learn if it opened its eyes:

a. Defendant Red Roof's booking system detailed that Meatball was consistently renting rooms at the Inn and for short period of time and over and over again.

b. Defendant Red Roof had access to Meatball's driver's license or ID card showing that Meatball was a Georgia resident with a nearby address and therefore not in need of legitimate travel lodging.

c. Defendant Red Roof frequented the Inn for inspections and Defendant Red Roof therefore saw the same signs and symptoms of trafficking that Defendant CPA Hotels saw, and which are stated above including in the Google reviews which state over an over that prostitutes and hookers were everywhere at the Inn.

64. Upon information and belief, it is also possible for the jury to find that Defendant Red Roof desired the crimes to continue because:

a. Defendant Red Roof wanted revenue and its deal with Defendant CPA Hotels was such that Defendant Red Roof made more money if Defendant CPA Hotels continued to rent rooms to Meatball.

b. Defendant Red Roof knew or closed its eyes to the problem of K.M. being trafficked.

c. Defendant Red Roof continued to provide its reservation system, its credit card processing system, its trademark and brand system, and the other assistance to Defendant CPA Hotels detailed above so that Meatball could continue to rent rooms at the Inn and so that K.M. could continue to be raped in those rooms.

**COUNT 2(D)**
**JOINT VENTURE LIABILITY**

65. Upon information and belief, Defendant Red Roof and Defendant CPA Hotels were engaged in a joint venture such that Defendant CPA Hotels' actions are imputed to Defendant Red Roof. *See Williams v. Obstfeld*, 314 F.3d 1270, 1275 (11th Cir. 2002) ("a joint venture. . .may be created by. . .implied contract. . .consist[ing] of the following elements. . .")

66. Upon information and belief, Defendant Red Roof and Defendant CPA Hotels were in a business relationship as follows:

a. the parties agreed to operate and manage the Inn in a way that

created a joint venture relationship even if Defendant Red Roof may have uttered the talismanic phrase "this is not a joint venture" during the discussions at some point.

b. Defendant Red Roof and Defendant CPA Hotels formed a business arrangement under which they pooled their resources to accomplish a specific task and fulfill an enumerated goal.

c. Defendant Red Roof brought advertising know how, management know how, a trademark with secondary meaning, operational systems, training programs, software programs for business management, a system of accounting, etc. to the joint venture.

d. Defendant CPA Hotels brought a hotel building, some local knowledge, and labor such as cleaners and desk clerks to the joint venture.

e. Defendant Red Roof and Defendant CPA Hotels pooled these resources to operate and manage the Inn hotel for the purpose and business goal of making a profit.

f. These actions and the arrangement other than any phrase by Defendant Red Roof stating "a joint venture is not intended" actually created a joint venture, and if such phrase was uttered, the parties actions showed differently such that any original agreement was modified and such that the Defendants thought of themselves as partners and acted as if they were partners.

67. Defendant Red Roof and Defendant CPA Hotels had joint control and a joint right of control over the Inn because of all the above stated facts.

68. Defendant Red Roof and Defendant CPA Hotels had a joint proprietary interest in the management and operation of the Inn as shown above.

69. Defendant Red Roof and Defendant CPA Hotels had a right to share in the profits and losses as stated above.

70. Defendant Red Roof and Defendant CPA Hotels had a common purpose in the joint venture of maximizing the profits from room rentals at Inn.

## PROXIMATE CAUSE AND DAMAGES

71. K.M.'s sex trafficking at the Red Roof was a foreseeable and preventable result of Defendants actions and inactions including failing to implement reasonable, appropriate, and adequate measures to deter sex trafficking at its hotel and failing to prevent K.M.’s continued victimization by ignoring her obvious, well-known signs and indicators of sex trafficking.

72. As a direct and proximate result of Defendants’ actions, K.M. suffered substantial physical, emotional, and psychological harm and other damages.

73. Defendants are jointly and severally liable with each other and the trafficker and any other non-party actors who participated in the trafficking for the indivisible injuries that were proximately caused to K.M.

74. Defendants are liable for K.M.’s damages in an amount to be proven at trial, including reasonable attorneys’ fees and punitive damages under the TVPRA and other federal law. *See* 18 U.S.C. § 1595(a) (a victim “may recover damages and

reasonable attorneys fees"); *see also Barry v. Edmunds*, 116 U.S. 550, 562 (1886) ("it is a well-established principle of the common law. . .that a jury may inflict what are called exemplary, punitive, or vindictive damages upon a defendant. . ."); 18 U.S.C. § 2255(a) (minor victim may recover "actual damages. . .reasonable attorney's fees. . .[and] punitive damages. . .")

75. Plaintiff K.M. brings each and every claim for damages permissible under the law against Defendants for injuries suffered in the incidents at issue, and to recover for all special damages, economic losses, medical expenses, necessary expenses, and all compensatory, special, actual, general, and punitive damages permissible under the law, including, but not limited to:

a. Personal injuries;

b. Past, present and future pain and suffering;

c. Disability;

d. Disfigurement;

e. Mental anguish;

f. Loss of the capacity for the enjoyment of life;

g. Loss of earning capacity;

h. Lost wages;

i. Diminished capacity to labor;

j. Incidental expenses;

k. Past, present and future medical expenses;

l. Permanent injuries;

m. Attorney's fees;

n. Punitive damages; and

o. Consequential damages to be proven at trial.

76. Punitive damages should be imposed upon Defendants without limitation or cap for its actions which are explained more fully above.

77. Defendants is also liable for paying Plaintiff's attorneys' fees and litigation expenses pursuant to the TVPRA.

78. Each of the forgoing acts and omissions constitute an independent act of negligence on the part of the Defendants, and one or more or all of the above stated acts were the proximate cause of the injuries and damages sustained by the Plaintiff.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for a judgment against the Defendant and for the following:

1) That process and summons issue requiring each Defendant to appear as provided by law to answer the allegations of the Complaint;

2) Plaintiff be awarded actual damages in amounts to be shown at trial;

3) Plaintiff be awarded all general, special, compensatory, economic, and other allowable damages in accordance with the enlightened conscience of an impartial jury from each Defendant;

4) Plaintiff be awarded her attorneys' fees and case expenses as allowed by law;

6) Punitive damages be imposed upon each Defendant;

7) Plaintiff be awarded a trial by jury; and

8) Plaintiff have such other relief as this Court deems just and appropriate under the circumstances.

This 1st day of March, 2023.

*/s/ Matthew B. Stoddard*
Matthew B. Stoddard
Ga. Bar No.: 558215
M. Janine Bell
Ga. Bar No.: 538932
THE STODDARD FIRM
1534 N Decatur Road
Atlanta, GA 30307
P: 470-467-2200
matt@legalhelpga.com
janine@legalhelpga.com

## CERTIFICATE OF COMPLIANCE & SERVICE

This is to certify that the foregoing document has been prepared with one of the following font and point selections approved by the Court in L.R. 5.1. Specifically, the pleading was prepared using Times New Roman font, point 14. I further certify that I have served a true and correct copy of the foregoing upon all counsel of record using the CM/ECF system, which will automatically send email notification of such filing to the following attorney of record:

**Counsel for Defendants Red Roof Inns, Inc. and Red Roof Franchising, LLC**
Charles K. Reed, Esq.
Adi Allishi, Esq.
Cameron A. Mobley, Esq.
Lewis Brisbois, Bisgaard & Smith, LLP
600 Peachtree Steet
Suite 4700
Atlanta, Georgia 30308
Chuck.reed@lewisbrisbois.com
Adi.allushi@lewisbrisbois.com
Cameron.mobley@lewbisbrisbois.com

**Counsel for Defendant CPA Hotels of Atlanta, LLC**:
Jeffrey A. Brown
Kim M. Minix
Brown & Adams, LLC
Post Office Box 139
Columbus, Georgia 31902
Email: jbrown@brownadamsllc.com
Email: kminix@brownadamsllc.com

This 1st day of March, 2023.

*/s/ Matthew B. Stoddard*
Matthew B. Stoddard