UNITED STATES DISTRICT COURT
Northern District of Georgia
Atlanta Division

| | |
|---|---|
| LIBERTY MUTUAL FIRE INSURANCE COMPANY,<br><br>              Plaintiff,<br><br>   v.<br><br>RED ROOF INNS, INC.; RED ROOF FRANCHISING, LLC; RRI WEST MANAGEMENT, LLC; FMW RRI NC, LLC,<br><br>              Defendants,<br><br>JANE DOE #1, JANE DOE #2, JANE DOE #3, JANE DOE #4, W.K., E.H., M.M., R.P., M.B., D.P., A.F., C.A., R.K., K.P., T.H., H.B., and K.M.<br><br>            Nominal Defendants. | Civil Action No.: 1:23-cv-02047-LMM<br><br>ORAL ARGUMENT REQUESTED |

**MEMORANDUM OF LAW IN SUPPORT OF
PARTIAL MOTION FOR JUDGMENT ON THE PLEADINGS OF
LIBERTY MUTUAL FIRE INSURANCE COMPANY**

NELSON MULLINS RILEY & SCARBOROUGH LLP
Erika C. Birg
Georgia Bar No. 058140
Erika.Birg@nelsonmullins.com
201 17th Street NW, Suite 1700
Atlanta, Georgia 30363
Tel: (404) 332-6110

*Of Counsel*:
MINTZ, LEVIN, COHN, FERRIS, GLOVSKY AND POPEO, P.C.
Nancy D. Adams *(pro hac vice)*
NDAdams@mintz.com
Alec J. Zadek *(pro hac vice)*
AZadek@mintz.com
One Financial Center
Boston, MA 02111
Tel: (617) 542-6000

Ellen M. Farrell *(pro hac vice)*
EMFarrell@mintz.com
555 12th Street NW, Suite 1100
Washington, D.C. 20004
Tel: (202) 434-7300

# TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................................1

FACTUAL BACKGROUND ....................................................................3

    A.    The Underlying Jane Doe #1 and Jane Doe # 2 Lawsuits ...................5

    B.    The Underlying Jane Doe #3 Lawsuit and Jane Doe #4 Lawsuit ........6

    C.    The Underlying W.K. Lawsuit ..............................................................7

    D.    The Underlying H.B. Lawsuit .............................................................10

    E.    The Underlying K.M. Lawsuit ............................................................11

    F.    The LMFIC Policies ............................................................................12

PROCEDURAL BACKGROUND ...........................................................13

STANDARD OF REVIEW .....................................................................14

ARGUMENT ...........................................................................................15

    A.    The LMFIC Policies are Governed by Ohio Law. ..............................15

    B.    LMFIC Owes No Duty to Defend or Indemnify the Red Roof Entities Because The Red Roof Entities Participated in Human Trafficking in Direct Violation of Federal Law, Georgia Law, and Public Policy. ...............................................................................16

    C.    There is No Duty to Defend or Indemnify the Red Roof Entities Under the Policy Because the Underlying Plaintiffs' Claims are Not Fortuitous. ....................................................................................23

CONCLUSION .......................................................................................25

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Benjamin v. Chemtall, Inc.*,
  2013 U.S. Dist. LEXIS 103016 (S.D. Ga. July 23, 2013) .................................. 14

*Boardman Petroleum v. Federated Mut. Ins. Co.*,
  135 F.3d 750 (11th Cir. 1998) ........................................................................ 15

*Chiquita Brands Int'l, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburg, P.A.*, 2013-Ohio-759 (Ohio App. Ct. 2013) ...................................................... 16

*Cincinnati City Sch. Dist. Bd. of Educ. v. Conners*,
  132 Ohio St. 3d 468 (Ohio 2012) .............................................................. 17, 18

*City of Atlanta v. St. Paul Fire & Marine Ins. Co.*,
  231 Ga. App. 206 (1998) ................................................................................ 15

*Cunningham v. District Attorney's Office for Exambia Cty.*,
  592 F.3d 1237 (11th Cir. 2010) ...................................................................... 14

*Enduring Wellness, L.L.C. v. Roizen*,
  2020 Ohio App. LEXIS 2129 (Ohio App. Ct. June 4, 2020) ............................ 17

*Gearing v. Nationwide Ins. Co.*,
  76 Ohio St. 3d 34 (Ohio 1996) ................................................................. 16, 17

*Grange Mut. Cas. Co. v. Gore*,
  1997 Ohio App. LEXIS 1985 (Ohio Ct. App. May 12, 1997) .......................... 16

*Motorists Mut. Ins. Co. v. Nat'l Dairy Herd Improvement Ass'n*,
  750 N.E.2d 1169 (Ohio Ct. App. 2001) .......................................................... 15

*Nautilus Ins. Co. v. Motel Mgmt. Servs.*,
  2021 U.S. Dist. LEXIS 139386 (E.D. Pa. July 27, 2021) ................................ 22

*Nautilus Ins. Co. v. Motel Mgmt. Servs.*,
  2021 U.S. Dist. LEXIS 170748 (E.D. Pa. Sept. 9, 2021) ................................ 23

*Nautilus Ins. Co. v. Motel Mgmt. Servs., Inc.*,
  320 F. Supp. 3d 636 (E.D. Pa. 2018) ............................................................. 22

*Nuvell Nat'l Auto Fin.. LLC v. Monroe Guar. Ins. Co.*,
   319 Ga. App. 400 (2012) ..................................................................15

*O'Neal v. State Farm Mut. Auto Ins. Co.*,
   243 Ga. App. 756 (2002) ............................................................15, 16

*Ohio Northern Univ. v. Charles Constr. Serv., Inc.*,
   120 N.E. 3d 762 (Ohio 2018) ..........................................................23

*Samsung Fire & Marine Ins. Co., Ltd. v. UFVS Mgmt. Co., LLC*,
   2023 U.S. Dist. LEXIS 46508 (E.D. Pa. March 20, 2023).........................21, 22

*Travelers Prop. Cas. Co. of America v. Moore*,
   763 F.3d 1265 (11th Cir. 2014) .......................................................16

**Statutes**

O.C.G.A. § 16-14-4 (Georgia Racketeer Influenced and Corrupt
   Organizations Act) ....................................................................*passim*

O.C.G.A. § 16-5-46(c) (Georgia's Trafficking Statute) ..................................*passim*

Ohio R.C. § 2905.32 (Ohio Human Trafficking Statute) .......................................24

18 U.S. Code § 1595 (Trafficking Victim Protection Reauthorization
   Act).....................................................................................*passim*

**Other Authorities**

Federal Rule of Civil Procedure 12(c) .......................................................19, 20, 30

Liberty Mutual Fire Insurance Company ("LMFIC") submits this Memorandum of Law in Support of its Partial Motion for Judgment on the Pleadings under Counts I-VII (No Occurrence only) and Count VIII (Public Policy) of the Complaint for Declaratory Relief.[1]  For the reasons set forth herein, LMFIC has no obligation under certain general liability policies to defend or indemnify Red Roof Inns, Inc., Red Roof Franchising, LLC, RRI West Management, LLC, and FMW RRI NC, LLC (collectively, the "Red Roof Entities") against allegations by Jane Doe #1, Jane Doe #2, Jane Doe #3, Jane Doe #4, W.K., E.H., M.M., R.P., M.B., D.P., A.F., C.A., R.K., K.P., T.H., H.B., and K.M. (the "Underlying Plaintiffs") that the Red Roof Entities violated criminal laws and/or are otherwise liable for sex trafficking that occurred at two Red Roof Inn hotels.

## INTRODUCTION

The Underlying Plaintiffs allege that they were brutalized, raped, and sold for sex at certain Red Roof Inn hotels.  The Underlying Plaintiffs further allege that the corporate entities—the Red Roof Entities—that collectively, own, franchise, and operate Ref Roof-affiliated hotels, not only ***knew*** about the sex trafficking that was occurring at the hotel where the Underlying Plaintiffs were sold for sex, but

---

[1]  Counts I through VII contain multiple reasons why the LMFIC Polices do not afford coverage for the Underlying Lawsuits.  For purposes of this motion, LMFIC is moving on the "no occurrence" ground with respect to those counts.

that the Red Roof Entities **participated** in the sex trafficking and profited from it. The Red Roof Entities are seeking insurance coverage for their liability to the Underlying Plaintiffs.  Their request offends public policy.  Insurance cannot insulate perpetrators—whether individuals or large corporations—from such heinous alleged conduct. Moreover, the Underlying Plaintiffs' allegations do not allege an accident; the Red Roof Entities' knowing participation in the Underlying Plaintiffs' sex trafficking was not accidental.

Public policy prohibits insurance coverage in such circumstances. Through this action, and, in particular, this motion, LMFIC seeks an order declaring—on public policy grounds—that LMFIC has no duty to defend or indemnify the Red Roof Entities for the seven separate lawsuits pending in the District Court for the Northern District of Georgia (the "Underlying Lawsuits") brought by the Underlying Plaintiffs.[2/]  Alternatively, because the Underlying Plaintiffs' claims of sex trafficking are non-fortuitous and non-accidental, their claims do not fall

---

[2] *Jane Doe #1 v. Red Roof Inns, Inc., et al.*, Case No. 1:19-cv-3840 (the "Underlying Jane Doe #1 Lawsuit"); *Jane Doe #2 v. Red Roof Inns, Inc., et al.*, Case No. 1:19-cv-3841 (the "Underlying Jane Doe #2 Lawsuit"); *Jane Doe #3 v. Red Roof Inns, Inc., et al.*, Case No., 1:19-cv-3843 (the "Underlying Jane Doe #3 Lawsuit"); *Jane Doe #4 v. Red Roof Inns, Inc. et al.*, Case No. 1:19-cv-3845 (the "Underlying Jane Doe #4 Lawsuit"); *W.K. et al. v. Red Roof Inns, Inc., et al.*, Case No. 1:20-cv-5263 (the "Underlying W.K. Lawsuit"); *H.B. v. Red Roof Inns, Inc., et al.*, Case No. 1:22-cv-01181 (the "Underlying H.B. Lawsuit"); and, *K.M. v. CPA Hotels of Atlanta, LLC et al.*, Case No. 1:23-cv-00190 (the "Underlying K.M. Lawsuit") (collectively, the "Underlying Lawsuits").

within the grant of coverage afforded to the Red Roof Entities. Thus, on this additional ground, LMFIC has no duty to defend of indemnify the Red Roof Entities against the Underlying Lawsuits.

**FACTUAL BACKGROUND**

The Underlying Plaintiffs allege that they were sex trafficked at, among other places, four hotels owned or operated by the Red Roof Entities located at:  (i) 2200 Corporate Plaza, Smyrna, GA 30080 (the "Smyrna Red Roof"); (ii) 1960 N. Druid Hills Road NE, Atlanta, GA 30329 (the "Atlanta Red Roof"); (iii) 5171 Brooks Hollow Parkway, Norcross, GA 30071 (the "Norcross Red Roof"); and (iv) 4430 Frederick Drive SW, Atlanta, GA, 30336 (the "Frederick Red Roof") (collectively, the "Underlying Hotels").  In each Underlying Lawsuit, the Underlying Plaintiff alleges that she was sold for sex at one or more of the Underlying Hotels, which was "owned, managed, supervised, overs[een], [and] controlled" by the Red Roof Entities.[3]  The Underlying Plaintiffs' allegations and requested relief, derive from their allegations that they were raped for money at the Underlying Hotels and that the Red Roof Entities knew about, participated in, and profited from their exploitation.

---

[3] ECF 1-1, at ¶¶ 1, 76, 120; 1-2, at ¶¶ 1, 77, 118; 1-3, at ¶¶ 1, 76, 111; 1-4, at ¶¶ 74; 1-6, at ¶¶ 1, 8, 17; *see also* ECF 1-5, at ¶¶ 11-19, 66; 1-7, at ¶¶ 2-3.

Specifically, the Underlying Plaintiffs allege that the Red Roof Entities "had every reason to know about the prevalence of sex trafficking at their hotels" and that "employees at all levels, from hotel cleaning staff to the CEO of Red Roof Inns, Inc., knew of the rampant sex trafficking and prostitution at the Underlying Hotels.[4]  For example, the Underlying Plaintiffs allege that the Vice President of Operations regularly visited Smyrna Red Roof, staying 2-3 nights multiple times a year.[5]  The Underlying Plaintiffs allege that, eventually, he "refused to stay overnight" because of the trafficking activity.  (ECF 1-1, at ¶ 56.)  It is also alleged that employees of the Red Roof Entities "actively assisted [the] trafficker[s] by calling their hotel room to warn them if law enforcement was on-site or en-route or if the volume of foot traffic to and from rooms was drawing unwanted attention or guest complaints."[6]  The Underlying Plaintiffs allege that "two websites were devoted to warning about the drug activity, prostitution, and sex trafficking at the [Red Roof Smyrna], which were sent to the "[t]he highest level corporate employees at [Red Roof Smyrna]," and that "[i]n 2015, a hospitality industry executive and anti-trafficking advocate sent [certain] articles directly to [Red Roof

---

[4]  ECF 1-1, at ¶ 4; 1-2, at ¶ 4; 1-3, at ¶ 4; 1-4, at ¶ 4; 1-5, at ¶ 2; *see also* ECF 1-6, at ¶ 4; 1-7, at ¶ 4.
[5]  ECF 1-1, at ¶ 56; 1-2, at ¶ 57; 1-3, at ¶ 59; 1-4, at ¶ 54; 1-5, at ¶¶ 46-47; *see also* ECF 1-6, at ¶ 40.
[6]  ECF 1-1, at ¶ 31; 1-2, at ¶ 31; *see also* ECF 1-5, at ¶ 43 (Smyrna Red Roof hotel employees "acted as lookouts for traffickers"); ECF 1-6, at ¶¶ 33-35 (Norcross Red Roof employees "served as lookouts for sex traffickers").

Inns' president and CEO and] spoke with [him] on the phone and told him of the rampant and ongoing commercial sex trafficking at the [Red Roof Smyrna.]"[7] Based on these allegations, as well as others, the Underlying Plaintiffs seek to hold the Red Roof Entities accountable for violation of the Trafficking Victim Protection Reauthorization Act, 18 U.S. Code § 1595 (the "TVPRA"), which provides a civil remedy to victims of sex trafficking against entities and individuals that knowingly benefit from their participation in a sex trafficking venture (or any venture that violates the TVPRA). The relevant allegations from each of the Underlying Lawsuits are summarized further below.

### A.    The Underlying Jane Doe #1 and Jane Doe # 2 Lawsuits

On August 26, 2019, Jane Doe #1 and Jane Doe #2 filed lawsuits in the Northern District of Georgia. (ECF 1-1; 1-2.) Both complaints contain nearly identical allegations. More specifically, Jane Doe #1 and Jane Doe #2 allege that they were trafficked at the Red Roof Smyrna and "[s]old for commercial sex out of Defendants' hotel rooms" where the Red Roof Entities "fostered an environment that made them ideal venues for the sex trafficking ventures that victimized" them. (ECF 1-1, at ¶¶ 1-2, 29; 1-2, at ¶¶ 1-2, 29.)

---

[7] ECF 1-1, at ¶¶ 42, 48-49; 1-2, at ¶¶ 42, 48-49; 1-3 ¶ 45, 51-52; 1-4 ¶¶ 40, 46-47; 1-5 ¶¶ 50-52.

In addition to the Red Roof Smyrna, Jane Doe #1 and Jane Doe #2 allege that they were trafficked at the Red Roof Atlanta from about 2011 to 2016 (Jane Doe #1) and 2014 (Jane Doe #2).  (ECF 1-1, at ¶ 103; 1-2, at ¶ 104.) Jane Doe #1 alleges there was an "open and obvious commercial sex trade" operation at the Red Roof Atlanta and that "[e]mployees of the [Red Roof Atlanta] solicited [her] for sex." (ECF 1-1 at ¶¶ 109-110; 1-2 at ¶¶ 107-108.)  She further alleges that hotel employees "would call sex traffickers at the hotel to warn them when law enforcement was present at or coming to the hotel." (*Id.*)

Jane Does #1 and #2 assert three causes of action against the Red Roof Entities: (i) violations of the Georgia Racketeer Influenced and Corrupt Organizations Act (O.C.G.A. § 16-14-4) ("Georgia RICO Statute"); (ii) TVPRA; and (iii) negligence.[8]

### B.    The Underlying Jane Doe #3 Lawsuit and Jane Doe #4 Lawsuit

On August 26, 2019, Jane Doe #3 and Jane Doe # 4 each filed lawsuits in the Northern District of Georgia. (ECF 1-3; 1-4.)  In the complaints, Jane Doe #3 and Jane Doe #4 allege that they were trafficked at the Red Roof Smyrna "[f]rom about 2010 to 2012," which included being "tortured, beaten, drugged and raped" at the hotel. (ECF 1-3, at ¶¶ 3, 33; 1-4, at ¶¶ 3, 27.) Jane Does #3 and #4 allege that

---

[8]  On September 6, 2023, Jane Doe #1 and #2 dismissed their negligence claims against Red Roof Smyrna and related entities. The negligence claims against Red Roof Atlanta remain.  (ECF 309.)

"[at] a point in time, most of the [Red Roof Smyrna's] business came from traffickers renting hotel rooms," with "10-12 different traffickers staying at the [Red Roof Smyrna] at the same time" and "[Red Roof Smyrna] did not attempt to disguise the bustling sex trade taking place on its property." (ECF 1-3, at ¶¶ 35-36; 1-4, ¶¶ 30-31.)

Jane Doe #3 also alleges that, "[f]rom about 2010 to 2012," she was trafficked at the Red Roof Atlanta under similar circumstances. (*Id.* at ¶104.) At the Red Roof Atlanta, Jane Doe #3 alleges an "open and obvious commercial sex trade was apparent to anyone who visited" and that employees of the Red Roof Atlanta "would call sex traffickers at the hotel to warn them when law enforcement was present at or coming to the hotel." (*Id.* at ¶¶ 101-102.)

Jane Does #3 and Jane Doe #4 assert three causes of action against the Red Roof Entities: (i) violations of the Georgia RICO Statute; (ii) violations of the TVPRA; and (iii) negligence.

### C.    The Underlying W.K. Lawsuit

On March 5, 2021, W.K., E.H., M.M., R.P., M.B., D.P., A.F., C.A., R.K., K.P., and T.H. (the "Underlying W.K. Plaintiffs") filed a lawsuit in the Northern District of Georgia. (ECF 1-5.)  The Underlying W.K. Plaintiffs allege that they are "trafficking victims who were sold for sex" at the Red Roof Smyrna and Red Roof

Atlanta.[9] (*Id.* at ¶ 4.)  At the time they were trafficked, the Underlying W.K. Plaintiffs allege that Red Roof Smyrna and Red Roof Atlanta "have been known centers of commercial sex" that "[e]mployees at all levels, from hotel cleaning staff to the CEO of Red Roof Inns knew of the rampant sex trafficking and prostitution at these two hotels" and that the Red Roof Entities "knowingly permitted the [Red Roof Smyrna] and [Red Roof Atlanta] to be used for prostitution in violation of Georgia law." (*Id.* at ¶¶ 1-2, 6.) Further, the Underlying W.K. Plaintiffs allege that the Red Roof Entities "exercised control over the day-to-day operations" of the Red Roof Smyrna and Red Roof Atlanta. (*Id.* at ¶ 35.)

At the Red Roof Smyrna, W.K., E.H., M.M., R.P., M.B., D.P., and A.F. each allege that they were open and obviously sex trafficked.  They allege that they were forced to have sex with upwards of ten men a day.  (*Id.* at ¶¶ 14, 158, 162, 171, 173, 183, 185, 187, 189, 193, 195.)  They allege that multiple Red Roof Symra employees knew their traffickers, including buying drugs from them, "actively assisting" as "lookouts," and turning a blind eye to physical assaults.  (*Id.* at ¶¶ 153-154, 166, 170, 175, 190-91.)

---

[9]  Specifically, W.K., E.H., M.M., R.P., M.B., D.P., and A.F. alleged that at various times between 2010 and 2018 they were trafficked at the Red Roof Smyrna and C.A., R.K., K.P., and T.H. allege that at various times between 2009 and 2017, they were trafficked at the Red Roof Atlanta. (*Id.* at ¶¶ 11-22.)

Similarly, at the Red Roof Atlanta, W.K., R.P., C.A., R.K., K.P., and T.H. each allege that they were openly and obviously sex trafficked at various times between 2009 and 2017. (*Id.* at ¶¶ 271-273, 276, 278, 280, 284, 287, 291, 293-294, 587, and 589.)  Specifically, they allege that they were forced to have sex with upwards of ten men a day and forced to meet certain monetary daily quotas.  (*Id.* at ¶¶ 273, 276, 278, 280, 287, 293, 294.)  The Red Roof Atlanta employees are also alleged to have been friendly with the traffickers, including purchasing drugs from the traffickers in the parking lot.  (*Id.* at ¶¶ 284, 291.)

The Underlying W.K. Plaintiffs allege that, "[a]t any given time, a [] hotel employee estimated that there were 10 to 12 different traffickers operating at the [Red Roof Smyrna], many of whom controlled more than one victim at a time and some of whom controlled 4 to 5 victims at a time." (*Id.* at ¶ 96.) The Underlying W.K. Plaintiffs further alleges that at the Red Roof Smyrna "it was common for there to be more than 100 buyers of commercial sex . . . during any given day;" that "commercial sex was so prevalent that it was recognized and accepted as part of their regular operations, and they created a [no refunds after 15 minutes] policy to address it;" and, that "from roughly 2010 through at least 2016, a significant portion of the location's business—at times a majority—came from renting hotel rooms to sex traffickers and prostitutes." (*Id.* at ¶¶ 95, 100, 105.)

The Underlying W.K. Plaintiffs assert three causes of action against the Red Roof Entities: (i) violations of the TVPRA; (ii) violations of the Georgia RICO Statute; and (iii) negligence.

### D.    The Underlying H.B. Lawsuit

On March 24, 2022, H.B. filed a lawsuit in the Northern District of Georgia. (ECF 1-6.)  H.B. asserts claims against Red Roof Inns and RRI West, alleging that she was sold for sex at the Red Roof Norcross in January 2012. (*Id.*) During the time she was trafficked, H.B. alleges that Red Roof Inns and RRI West "jointly owned, managed, supervised, operated, oversaw, controlled the operation of, and/or were inextricable connected to the renting of rooms at the [Red Roof Norcross]." (*Id.* at ¶ 8.)

H.B. alleges that while she was trafficked at the Red Roof Norcross, "she witnessed multiple other sex traffickers operating openly and brazenly at the hotel" and "witnessed as many as 10 other women and children being sold for sex at the [Red Roof Norcross]." (*Id.* at ¶¶ 20-21.) In January 2012, H.B. alleges that the Red Roof Inns and RRI West "participated in a [sex trafficking] venture by associating with [her] sex traffickers, facilitating [her] minor sex trafficking, and providing to [her] traffickers the necessary venue and market for [her] sex trafficking" and that "[i]n the course of this venture, numerous buyers paid to have sex with [her], a 16-year-old child, at the [Red Roof Norcross]." (*Id.* at ¶ 62.)

H.B. alleges that she was "rescued from the [Red Roof Norcross]" in January 2012 as a result of a sting operation by the Gwinnett County Police Department, and that during this sting "Red Roof Norcross] employees called [her] sex traffickers to alert them to the police presence at the [Red Roof Norcross] but were too late in relaying their message." (*Id.* at ¶ 25.)

In the Underlying H.B. Lawsuit, H.B. asserts two causes of action against the Red Roof Entities: (i) violations of the TVPRA; and (ii) violations of the Georgia RICO Statute.

### E.    The Underlying K.M. Lawsuit

On January 13, 2023, K.M. filed a lawsuit in the Northern District of Georgia.  (ECF 1-7.)  K.M. alleges that she was "trafficked for sex" at the Red Roof Frederick "[f]rom approximately June of 2015 until approximately December of 2015," and that during this time, Red Roof Franchising "jointly operated and managed" the Red Roof Frederick."  (*Id.*)

K.M. alleges that she "was required to have sex with men in exchange for money," which would be used to "pay rent so that [she] could again be forced [to] have sex with men at the [Red Roof Frederick]" and that her "trafficking . . . took place throughout the hotel, including in the rooms, in the parking lot, and in other common areas of the hotel." (*Id.* at ¶¶ 25, 34.) K.M. alleges her trafficker "threatened" her with "violence" if she "did not continue to perform sex work at

the [Red Roof Frederick]," and that her trafficker "frequently beat [her] at the [Red Roof Frederick,] including in the rooms and in the parking lot." (*Id.* at ¶¶ 26-27.) Further, "[o]n multiple occasions, [Red Roof Franchising] employees—including the [] manager—observed K.M. getting hit, kicked, and beat in the front lobby of the [Red Roof Frederick]." (*Id.* at ¶ 31.) Moreover, K.M. alleges that "for a larger portion of the trafficking, [she] was pregnant" and was told by her trafficker "that he would take her young child away if she did not continue to have sex with men for money." (*Id.* at ¶¶ 28, 30.)

K.M. asserts a single cause action for violation of the TVPRA.

## F.    The LMFIC Policies

LMFIC issued and delivered to Red Roof Inns, Inc., located in Columbus, Ohio, the following Commercial General Liability insurance policies:

- Policy number TB2-641-437760-071, with a policy period of July 1, 2011 to July 1, 2012;

- Policy number TB2-641-437760-072, with a policy period of July 1, 2012 to July 1, 2013;

- Policy number TB2-641-437760-073, with a policy period of July 1, 2013 to July 1, 2014;

- Policy number TB2-641-437760-074, with a policy period of July 1, 2014 to July 1, 2015;

- Policy number TB2-641-437760-075, with a policy period of July 1, 2015 to July 1, 2016;

- Policy number TB2-641-437760-076, with a policy period of July 1, 2016 to July 1, 2017;

- Policy number TB2-641-437760-077, with a policy period of July 1, 2017 to July 1, 2018; and

- Policy number TB2-641-437760-078, with a policy period of July 1, 2018 to July 1, 2019

(collectively, the "LMFIC Policies").  The LMFIC Policies were in effect during the period when the Underlying Plaintiffs allege that they were trafficked at the Underlying Hotels.[10]  The Insuring Agreement for Coverage A for each of the LMFIC Policies provides, in relevant part, that the policies only apply to "bodily injury" that is caused by an "occurrence," which is defined to mean "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (ECF 1, at ¶¶ 100, 103.)

## PROCEDURAL BACKGROUND

On May 5, 2023, LMFIC filed the present action seeking, among other things, a declaration that the LMFIC Policies do not afford coverage to the Red Roof Entities for the Underlying Lawsuits.  (ECF No. 1.)  In Counts I through VII of the Complaint for Declaratory Judgment (the "DJ Complaint"), LMFIC seeks a declaration that the LMFIC Policies do not afford coverage for the Underlying

---

[10]  Selected pages of the LMFIC Policies are attached to the Complaint for Declaratory Judgment at ECF 1-9.  Subject to a reservation of rights, LMFIC is providing the Red Roof Entities with a defense against the Underlying Lawsuits. (ECF 1, at ¶¶ 118-125.)

Lawsuits because, for among other reasons, the lawsuits do not allege an "occurrence." (ECF 1 at ¶¶ 4, 128-206.) In Count VIII of the DJ Complaint, LMFIC seeks a declaration that public policy bars coverage for the Underlying Lawsuits. (ECF 1 at ¶¶ 215-227.) On July 21, 2023, the Red Roof Entities filed their Answer to the DJ Complaint, shortly after the Underlying Plaintiffs, who are Nominal Defendants in this action, filed their Answer to the DJ Complaint. (ECF 16, 18-34, 36.) Accordingly, the pleadings are now closed.

### STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 12(c), "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." A motion for judgment on the pleadings is appropriate where, as here, "no issues of material fact exist, and the moving party is entitled to judgment as a matter of law based on the substance of the pleadings and any judicially noticed facts." *Cunningham v. District Attorney's Office for Exambia Cty.*, 592 F.3d 1237, 1255 (11th Cir. 2010).

When "considering a motion for judgment on the pleadings, the court should resolve all reasonable doubts about the facts in favor of the non-movant, and draw all justifiable inferences in his or her favor." *Benjamin v. Chemtall, Inc.,* 2013 U.S. Dist. LEXIS 103016, at * 1 (S.D. Ga. July 23, 2013) (citing *Cunningham,* 592 F.3d at 1255)). "Judgment on the pleadings under Rule 12(c) of the Federal Rules

of Civil Procedure is appropriate when no issues of material fact exist, and the moving party is entitled to judgment as a matter of law based on the substance of the pleadings and any judicially noticed facts." *Id.*

For purposes of insurance, a determination as to the duty to defend can be made by comparing the facts of the claim with the provisions of the policy. *City of Atlanta v. St. Paul Fire & Marine Ins. Co.,* 231 Ga. App. 206, 207 (1998). "Where the complaint filed against the insured does not assert any claims upon which there would be insurance coverage, the insurer is justified in refusing to defend the insured's lawsuit." *City of Atlanta,* 231 Ga. App. at 207.[11]

## ARGUMENT

### A.    The LMFIC Policies are Governed by Ohio Law.

"Federal courts sitting in diversity apply the forum state's choice-of-law rules." *Boardman Petroleum v. Federated Mut. Ins. Co.*, 135 F.3d 750, 753 (11th Cir. 1998). In Georgia, choice of law analysis follows the doctrine of *lex loci contratus*, which states that a contract is governed by the law of the state in which the contract was made.  *Nuvell Nat'l Auto Fin.. LLC v. Monroe Guar. Ins. Co.*, 319

---

[11]  The same general principles apply under Ohio law, which governs the interpretation of the LMFIC Policies.  *See Motorists Mut. Ins. Co. v. Nat'l Dairy Herd Improvement Ass'n*, 750 N.E.2d 1169, 1176 (Ohio Ct. App. 2001) (courts applying Ohio law will not "impose a duty to defend based on allegations outside the complaint, where the complaint does not state a claim that arguably triggers coverage").

Ga. App. 400, 405 (2012) ("[S]ince the policy was issued and delivered in

Michigan, Michigan substantive law applies to interpretation of the policy.");

*O'Neal v. State Farm Mut. Auto Ins. Co.,* 243 Ga. App. 756, 757 (2002) ("The

insurance contract at issue in this case was executed and delivered in the state of

Tennessee and, therefore, Tennessee law governs the determination of the

substantive issues.").  A contract is "made" where it is delivered.  *See Travelers*

*Prop. Cas. Co. of America v. Moore,* 763 F.3d 1265, 1271 (11th Cir. 2014)

(applying Rhode Island law where it is undisputed that the policy was delivered to

the insured in Rhode Island).  Here, the LMFIC Policies were delivered to Red

Roof Inns, Inc., at 605 South Front Street, Columbus, Ohio. (ECF No. 1-8 at pp. 2,

12, 22, 33, 44, 55, 66, and 82.)  Accordingly, the LMFIC Policies are governed by

Ohio law.

> **B.    LMFIC Owes No Duty to Defend or Indemnify the Red Roof Entities Because The Red Roof Entities Participated in Human Trafficking in Direct Violation of Federal Law, Georgia Law, and Public Policy.**

Long-standing Ohio public policy "prohibits wrongdoers from utilizing

insurance to avoid liability for intentional criminal conduct and intentional

infliction of bodily injury to another." *Grange Mut. Cas. Co. v. Gore*, 1997 Ohio

App. LEXIS 1985, at *8 (Ohio Ct. App. May 12, 1997) (citing *Gearing v.*

*Nationwide Ins. Co.*, 76 Ohio St. 3d 34, 38 (Ohio 1996)); *see also Chiquita Brands*

*Int'l, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburg, P.A.*, 2013-Ohio-759, at *P11

(Ohio Ct. App. 2013) ("Ohio public policy generally prohibits obtaining insurance to cover damages caused by intentional torts."). In addition, in Ohio, "[c]ontracts which bring about results which the law seeks to prevent are unenforceable as against public policy. The legislative branch is the arbiter of public policy, but it is the court who must determine when the public-policy exception to freedom of contract should be recognized." *Enduring Wellness, L.L.C. v. Roizen*, 2020 Ohio App. LEXIS 2129, at * P60 (Ohio App. Ct. June 4, 2020) (internal citations and quotations omitted). While the insurability of participation in a sex trafficking venture would be a case of first impression in Ohio, as the Eastern District of Pennsylvania has held, such claims are uninsurable.

In *Gearing*, the Ohio Supreme Court analyzed Ohio public policy in the context of sexual molestation claims and held that a perpetrator's intent to injure was inferred as a matter of law based on the sexual abuse of a child. *Gearing*, 76 Ohio St. 3d at 37-38. The *Gearing* court reasoned that acts of sexual molestation of a minor are "criminal offenses for which public policy precludes a claim of unintended consequences" and Ohio public policy, as expressed in the criminal code, prevents coverage where a perpetrator-insured argues they lacked intent to cause harm. *Id.* at 38-39. As such, the *Gearing* court held that the "public policy of the state of Ohio precludes issuance of insurance to provide liability coverage for injuries procedure by criminal acts of sexual misconduct against a minor." *Id.*

17

at 40.  As with sexual molestation claims, intentionally harboring, participating in, and financially benefitting from sex trafficking unquestionably "has a tendency to be injurious to the public" and is "against the public good".  *Cincinnati City Sch. Dist. Bd. of Educ. v. Conners*, 132 Ohio St. 3d 468, 473 (Ohio 2012) (internal quotations and citations omitted).

Both federal and Georgia law criminalize sex trafficking.  First, the TVPRA "prohibits the sex trafficking of children or adults by force, fraud, or coercion." *Jane Doe #1 v. Red Roof Inns, Inc.,* 21 F4th 714, 723 (11th Cir. 2021).  In addition to the criminal prohibition, the TVPRA "provides sex-trafficking victims with a civil cause of action against 'the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter).'"  *Id.* (*citing* 18 U.S.C. § 1591(a)).  Here, the Underlying Plaintiffs allege that the Red Roof Entities knowingly benefited from participation in a venture that violated the TVPRA.  The Eleventh Circuit has held that "participation in a venture" constitutes an "undertaking or enterprise involving risk and potential profit."  *Id.* at 725. The Underlying Plaintiffs thus allege that the Red Roof Entities took part in a common undertaking or enterprise – human sex trafficking – involving risk and potential profit.  *Id.*

Second, Georgia's Trafficking of Persons for Labor or Sexual Servitude law criminalizes sex trafficking. In that regard, Georgia law specifically provides:

> A person commits the offense of trafficking an individual for sexual servitude when that person knowingly:
>
> 1.  Subjects an individual to or maintains an individual in sexual servitude;
> 2.  Recruits, entices, harbors, transports, provides, solicits, patronizes, or obtains by any means an individual for the purpose of sexual servitude; or
> 3.  Benefits financially or by receiving anything of value from the sexual servitude of another.

O.C.G.A. § 16-5-46(c) ("Georgia's Trafficking Statute").[12] Unlike the TVPRA, the Georgia Trafficking Statute does not provide for a civil cause of action by alleged victims of sex trafficking.

In addition, certain of the Underlying Plaintiffs also allege that the Red Roof Entities violated the Georgia RICO Act. For this claim, certain of the Underlying Plaintiffs[13] allege that the Red Roof Entities subjected them to sexual servitude in violation of Georgia's Trafficking Statute. They also allege against the Red Roof Entities the criminal predicate acts of keeping a place of prostitution, prostitution, and pimping. *Jane Does 1-4 v. Red Roof Inns, Inc.,* Case No. 1:21-cv-04278, (Order, Aug. 10, 2023, ECF #310), p. 12 (citing O.C.G.A. § 16-6-10)).

---

[12] Sex trafficking is likewise criminal in Ohio. Ohio R.C. § 2905.32.

[13] Jane Does #1-4, the Underlying W.K. Plaintiffs, and H.B allege violations of the Georgia RICO statute.

The Underlying Plaintiffs, several of whom are minors, make numerous and detailed allegations that, if proven, plainly establish the Red Roof Entities' conduct violated the TVPRA, the Georgia Trafficking Statute, and the Georgia RICO statute. 18 U.S. Code § 1595; O.C.G.A. § 16-5-46(c); O.C.G.A. § 16-14-4(c). Specifically, the complaints in the Underlying Lawsuits allege the following open and obvious signs of sex trafficking: (i) numerous public online reviews that included comments such as: "Prostitution sting;" "Pimp next door wasn't happy;" "it was pretty obvious that the local prostitutes were visiting a room a few doors down;" "if prostitutes and drugs are what your [sic] looking for this is your spot;" "the hotel was being used by prostitutes;" "Prostitutes everywhere;" and "People that paid for rooms there looked like addicts and sex workers;" (ii) Red Roof Entities' executives were directly contacted about the "rampant and ongoing commercial sex trafficking"; (iii) the Red Roof Entities "would call sex traffickers at the hotel to warn them when law enforcement was present or coming to the hotel"; (iv) heavy male foot traffic to the hotel rooms where the victims stayed; (v) at least "100 buyers . . . in a single day" came to one of the Underlying Hotels; (vi) frequent police activity at the Underlying Hotels; (vii) traffickers beating sex trafficking victims in public parking lots in view of the hotel employees; (viii) Underlying Plaintiffs were visibly treated in an aggressive manner by the traffickers; (ix) traffickers using force to recruit additional victims at the

20

Underlying Hotels; (x) employees at the Underlying Hotels purchasing sex from trafficking victims; and, (xi) occupancy at the Underlying Hotels were estimated at 50% to 75% persons selling drugs and commercial sex. (ECF 1-1, at ¶¶ 30, 49, 57-61, 109-110, 114, 116; 1-2, at ¶¶ 30, 33, 49, 58-59, 61, 108, 112; 1-3, at ¶¶ 3, 33-34; 1-5, at ¶¶ 90, 97; and 1-7, at ¶¶ 25-27, 34.)

These facts largely mirror those of *UFVS Mgmt. Co., LLC*, where the Eastern District of Pennsylvania found that public policy prohibits insurance coverage for similar allegations of sex trafficking. *Samsung Fires & Marine Ins. Co., Ltd. v. UFVS Mgmt. Co., LLC*, 2023 U.S. Dist. LEXIS 46508, at *23 (E.D. Pa. March 20, 2023). Specifically, in *UFVS Mgmt. Co., LLC*, the underlying complaints alleged numerous "open and obvious" signs of sex trafficking. Those signs included, but were not limited to:

> (1) rooms littered with used condoms; (2) men loitering outside of the hotel rooms; (3) rooms paid for in cash; (4) frequent refusal of housekeeping; (5) aggression directed at the young victims . . . in public spaces; (6) young victims . . . wearing sexually explicit clothing; (7) different men entering and existing the hotel rooms; and (8) young victims .. . exhibiting fear and anxiety in public spaces.

*Id*. at * 26. The court, in light of these allegations, found that the "Policyholders knowingly benefitted from acts *facilitating the trafficking scheme* by renting rooms to traffickers despite *overwhelming evidence of the trafficking scheme*." *Id.* at * 27 (emphasis supplied). The court went on to say:

21

at the very least, Policyholders looked the other way and feigned ignorance when confronted with clear indicia of sex trafficking. Indeed, the underlying facts alleged leave no question that the Policyholders *harbored the underlying plaintiffs in reckless disregard of the sex trafficking that would result.* Plainly, Policyholders' continued business dealings with traffickers and harboring of underlying plaintiffs represent a gross deviation from the standard of conduct that a reasonable person would observe in a similar situation. Accordingly, the Court is convinced that the factual allegations contained in the . . . complaints implicate Policyholders' conduct that is criminalized under the Pennsylvania Human Trafficking Law and repugnant to Pennsylvania public policy.

*Id.* (emphasis supplied).

Much like *UFVS Mgmt. Co.*, the allegations in the Underlying Lawsuits establish that the Red Roof Entities intentionally harbored the Underlying Plaintiffs despite open and obvious signs that sex trafficking would result and, despite the duty owed to the Underlying Plaintiffs, the Underlying Hotel "gross[ly] deviated from the standard of conduct that a reasonable person would observe in a similar situation." *Id.* As such, "shielding [the Red Roof Entities] from the consequences of their criminal conduct would be against the safety, morals, and welfare of the Commonwealth" thus "public policy bars coverage and [LMFIC does] not have a duty to defend or indemnify [the Red Roof Entities] in the underlying state court actions." *Id.* at * 27-28; *see also Nautilus Ins. Co. v. Motel Mgmt. Servs., Inc.*, 320 F. Supp. 3d 636, 643 (E.D. Pa. 2018) (finding both that "public policy precludes coverage" because it is against public policy to insure

against criminal acts and that it is against public policy to insure against civil

actions premised on criminal acts); *Nautilus Ins. Co. v. Motel Mgmt. Servs.*, 2021

U.S. Dist. LEXIS 139386, at * 13 n. 4 (E.D. Pa. July 27, 2021) (the amended

complaint still seeks damages for facilitating illegal conduct and "[t]he finding of

no coverage due to Pennsylvania public policy also continues to apply. The

provision of insurance for damages assessed as a result of evil or illegal conduct is

against the public policy of [Pennsylvania]") (internal quotations omitted);

*Nautilus Ins. Co. v. Motel Mgmt. Servs.*, 2021 U.S. Dist. LEXIS 170748, at * 8 n.

31 (E.D. Pa. Sept. 9, 2021) (in a nearly identical underlying complaint to the first

two *Nautilus* cases, "insurance coverage would be against public policy").

It would violate public policy to require LMFIC to continue defending and

to indemnify the Red Roof Entities against the Underlying Plaintiffs' allegations

that the Red Roof Entities participated in, and benefited from, human sex

trafficking.

### C.     There is No Duty to Defend or Indemnify the Red Roof Entities Under the Policy Because the Underlying Plaintiffs' Claims are Not Fortuitous.

To be afforded coverage under the LMFIC Policies, at a minimum, the

Underlying Lawsuits must fall within the Insuring Agreement.  Here, the Insuring

Agreements for the LMFIC Policies provide, in relevant part, that this insurance only

applies to "bodily injury" caused by an "occurrence," which is defined to mean "an

accident, including continuous or repeated exposure to substantially the same general harmful conditions." (ECF 1, at ¶¶ 100, 103.) Ohio courts have long recognized that the definition of "occurrence" requires an accidental event or happening with an element of fortuity. *See Ohio Northern Univ. v. Charles Constr. Serv., Inc.*, 120 N.E. 3d 762, 767 (Ohio 2018). The Underlying Plaintiffs' claims of sex trafficking do not constitute non-fortuitous loss and, as such, their claims do not fall within the LMFIC Policies' grant of coverage.

The gravamen of the Underlying Lawsuits is that the Red Roof Entities actively and intentionally participated—culpable assistance and sharing in the risk and reward—in the Underlying Plaintiffs' sex trafficking. According to the Plaintiffs: (i) the Red Roof Entities "maintained hotel properties where criminal conduct was rampant, open, and obvious. They fostered an environment that made them ideal venues for the sex trafficking ventures that victimized" the Underlying Plaintiffs; (ii) that even after the Red Roof Entities "had every reason to know about the prevalence of sex trafficking at their hotels, the relationship between pimps, prostitution, and trafficking, and the sex trafficking ventures . . . they continued to profit from the rent traffickers paid to facilitate [the Underlying Plaintiffs'] trafficking and victimization;" (iii) that the "[Red Roof Smyrna employees actively assisted [] trafficker[s] by calling their hotel room to warn them if law enforcement was on-site or enroute or if the volume of foot traffic to

24

and from rooms was drawing unwanted attention or guest complaints;" and, (iv) "most of the [Red Roof Smyrna's] business came from traffickers renting hotel rooms. (ECF 1-1, at ¶¶ 2, 4, 31, 32.)

According to the Underlying Plaintiffs, the Red Roof Entities actively and intentionally participated in and benefited from their promotion and assistance of the sex trafficking occurring at the Underlying Hotels. (*See, e.g.*, ECF 1-1, at ¶ 4.) As such, the Underlying Plaintiffs do not allege an unforeseeable, fortuitous event. In other words, claims for sex trafficking do not present the fortuity "inherent in the plain meaning of 'accident,'" which "is central to the notion of what constitutes insurance." *Ohio N. Univ.*, 120 N.E. 3d at 767 (internal citations omitted). Simply stated: sex trafficking is not an accident. Absent an accident—or an "occurrence"—the Underlying Plaintiffs' allegations of sex trafficking do not fall within the Insuring Agreement for the LMFIC Policies and, as such, LMFIC has no duty to defend or indemnify the Red Roof Entities against the Underlying Lawsuit.

## CONCLUSION

For the foregoing reasons, LMFIC respectfully requests that this Court grant LMFIC's motion for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c) on Counts I-VII (No Occurrence) and Count VIII (Public Policy) of the Complaint for Declaratory Judgment.

Respectfully submitted,

NELSON MULLINS RILEY &
SCARBOROUGH LLP

Date:  September 26, 2023            /s/ *Erika C. Birg*
                                     Erika C. Birg
                                     Georgia Bar No.:  058140
                                     Erika.Birg@nelsonmullins.com
                                     201 17th Street NW, Suite 1700
                                     Atlanta, Georgia  30363
                                     Tel:  (404) 332-6110

                                     Attorney for Plaintiff,
                                     Liberty Mutual Fire Insurance Company

*Of Counsel:*

Nancy D. Adams *(admitted pro hac vice)*
NDAdams@mintz.com
Alec J. Zadek *(admitted pro hac vice)*
AZadek@mintz.com
MINTZ, LEVIN, COHN, FERRIS,
GLOVSKY AND POPEO, P.C.
One Financial Center
Boston, MA 02111
Tel: (617) 542-6000

Ellen M. Farrell *(admitted pro hac vice)*
EMFarrell@mintz.com
MINTZ LEVIN, COHN, FERRIS,
GLOVSKY AND POPEO, P.C.
555 12th Street NW, Suite 1100
Washington, D.C. 20004
Tel: (202) 434-7300

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 26, 2023, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all attorneys of record in the CM/ECF system.

September 26, 2023                          /s/ *Erika C. Birg*
                                           Erika C. Birg, Esq.