# Exhibit 3

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| JANE DOE 3, | CIVIL ACTION FILE |
| Plaintiff, | NO. 1:19-cv-03843 |
| v. | JURY TRIAL DEMANDED |
| RED ROOF INNS, INC., FMW RRI NC, LLC, RED ROOF FRANCHISING, LLC, RRI WEST MANAGEMENT, LLC, WESTMONT HOSPITALITY GROUP, INC., RRI III, LLC, HSI CHAMBLEE, LLC, SUB-SU HOTEL GP, LLC, WHG SU ATLANTA, LLC, WHG SU ATLANTA LP, CC&S DEVELOPMENT, LLC, ESSEX, LLC, KUZZINS BUFORD, LLC, EXTENDED STAY AMERICA, INC., ESA MANAGEMENT, LLC, ESA P PORTFOLIO, LLC, F/K/A BRE/ESA P PORTFOLIO, LLC, ESA P PORTFOLIO OPERATING LESSEE, LLC, AND HVM, LLC ("HVM"), | Pursuant to Fed. R. Civ. P. 38 |
| Defendants. | |

**SECOND AMENDED COMPLAINT**

# TABLE OF CONTENTS

THE PARTIES ........................................................................................................2

    Smyrna Red Roof .............................................................................................2

    Atlanta Red Roof .............................................................................................3

    Suburban Extended Stay .................................................................................4

    Microtel ...........................................................................................................5

    Extended Stay America ...................................................................................6

JURISDICTION & VENUE ................................................................................8

FACTUAL ALLEGATIONS ................................................................................9

    I.      THE SMYRNA RED ROOF ....................................................................9

       A. The Trafficking of Jane Doe 3 at the Smyrna Red Roof ......................9

       B. The Smyrna Red Roof Defendants ......................................................22
          1.  The Corporate Relationship between Westmont and
             Red Roof Inns, Inc. ...............................................................23
          2.  Owners and Franchisees of the Smyrna Red Roof .........................26
          3.  Managers of the Smyrna Red Roof ...............................................26

    II.     THE ATLANTA RED ROOF ................................................................29

       A. The Sex Trafficking of Jane Doe 3 at the Atlanta Red Roof .............29

       B. The Atlanta Red Roof Defendants .......................................................34
          1.  The Corporate Relationship between Westmont and
             Red Roof Inns, Inc. ...............................................................34
          2.  Owners of the Atlanta Red Roof ....................................................35
          3.  Managers of the Atlanta Red Roof .................................................36

        4.  **Franchisors at the Atlanta Red Roof**.................................37

**III.**    **THE SUBURBAN EXTENDED STAY**...................................38
    **A. The Sex Trafficking of Jane Doe 3 at the Suburban
    Extended Stay** ...........................................................47

    **B. The Suburban Extended Stay Defendants**......................48
        1.  **Owners of the Suburban Extended Stay**...................50
        2.  **Manager of the Suburban Extended Stay** .................50

**IV.**    **THE MICROTEL INN & SUITES** ......................................51

    **A. The Sex Trafficking of Jane Doe 3 at the Microtel** .........51

    **B. The Microtel Defendants** .................................................57
        1.  **Owners of the Microtel** ..............................................58
        2.  **Managers of the Microtel** .........................................59
        3.  **The Microtel Defendants are Agents of CC&S**.........59

**V.**    **Extended Stay America**..........................................................61

    **A. The Sex Trafficking of Jane Doe 3 at the Baton Rouge ESA**........61

    **B. The Sex Trafficking of Jane Doe 3 at the Atlanta ESA** .................65

    **C. The ESA Defendants at the Atlanta and Baton Rouge ESAs** .......68
        1.  **Owners of the Baton Rouge ESA and Atlanta ESA** .................69
        2.  **Managers of the Baton Rouge ESA and Atlanta ESA**.............69
        3.  **Financial Beneficiary of the Baton Rouge ESA** .......................70
        4.  **The ESA Defendants are Agents of ESA Management
        and HVM**...................................................................71

**COUNTS** .........................................................................................72

**Violations of the Georgia Racketeer Influenced and Corrupt Organizations
Act (Allegations Common to Counts I–II, V–VI, IX–X, XIII–XIV, XVII-
XVIII)**.............................................................................................72

     **A. Acts of Racketeering Activity**......................................................72
        i.     **Sex Trafficking in Violation of Federal Law**.......................72
        ii.    **Sex Trafficking in Violation of State Law** ............................72
        iii.   **False Imprisonment** ................................................................75
        iv.   **Battery**......................................................................................76
        v.     **Keeping a Place of Prostitution** ............................................77
        vi.    **Pimping** ...................................................................................79

     **B. The Acts of Racketeering Activity Formed a Pattern** ..................79

**COUNT I – Violations of the Georgia Racketeer Influenced and Corrupt Organizations Act O.C.G.A. § 16-14-4(c) (Against Smyrna Red Roof Defendants: Westmont, RRI, Varahi, FMW, Red Roof Franchising, and RRI West)**....................................................................................81

**COUNT II – Violations of the Georgia Racketeer Influenced and Corrupt Organizations Act O.C.G.A. § 16-14-4(a) (Against Smyrna Red Roof Defendants: Westmont, RRI, Varahi, FMW, Red Roof Franchising, and RRI West)** ...............................................................................84

**COUNT III – TVPRA, 18 U.S.C. § 1595 (Against Smyrna Red Roof Defendants: Westmont, RRI, Varahi, FMW, Red Roof Franchising, and RRI West)** ...............................................................................86

   **Direct Liability** ...............................................................................86

   **Agency Liability** .............................................................................89

   **Alter Ego/Mere Instrumentality**....................................................90

   **Joint Venture** .................................................................................92

   **Damages** ........................................................................................93

**COUNT IV – Negligence (Against the Smyrna Red Roof Defendants: Westmont, RRI, Varahi, FMW, Red Roof Franchising, and RRI West)**......93

**COUNT V – Violations of the Georgia Racketeer Influenced and Corrupt Organizations Act O.C.G.A. § 16-14-4(c) (Against Atlanta Red Roof Defendants: Westmont, RRI, RRI III, RRI West, and Red Roof Franchising)** ........................................................................99

**COUNT VI – Georgia Racketeer Influenced and Corrupt Organizations Act O.C.G.A. § 16-14-4(a) (Against Atlanta Red Roof Defendants: Westmont, RRI, RRI III, RRI West, and Red Roof Franchising)** ...................................101

**COUNT VII – TVPRA, 18 U.S.C. § 1595 (Against Atlanta Red Roof Defendants:  Westmont, RRI, RRI III, RRI West, and Red Roof Franchising)** .......................................................................103

**Direct Liability** ................................................................104

**Damages** .........................................................................108

**COUNT VIII – Negligence (Against the Atlanta Red Roof Defendants: Westmont, RRI, RRI III, RRI West, and Red Roof Franchising)** ..............108

**COUNT IX – Violations of the Georgia Racketeer Influenced and Corrupt Organizations Act O.C.G.A. § 16-14-4(c) (Against Suburban Extended Stay Defendants: HSI, Westmont, WHG SU LP, WHG SU LLC, and SUB-SU)** .......................................................................114

**COUNT X – Georgia Racketeer Influenced and Corrupt Organizations Act O.C.G.A. § 16-14-4(a) (Against Suburban Extended Stay Defendants: HSI, Westmont, WHG SU LP, WHG SU LLC, and SUB-SU)** ..............................117

**COUNT XI – TVPRA, 18 U.S.C. § 1595 (Against Suburban Extended Stay Defendants:  HSI, Westmont, WHG SU LP, WHG SU LLC, and SUB-SU)** ...................................................................119

**Direct Liability** ................................................................119

**Damages** .........................................................................123

**COUNT XII – Negligence (Against the Suburban Extended Stay Defendants: HSI, Westmont, WHG SU LP, WHG SU LLC, and SUB-SU)** ..................................................................................123

**COUNT XIII – Violations of the Georgia Racketeer Influenced and Corrupt Organizations Act O.C.G.A. § 16-14-4(c) (Against Microtel Defendants: Kuzzins, CC&S, and Essex)** ......................................129

**COUNT XIV – Georgia Racketeer Influenced and Corrupt Organizations Act O.C.G.A. § 16-14-4(a) (Against Microtel Defendants: Kuzzins, CC&S and Essex)** ......................................131

**COUNT XV – TVPRA, 18 U.S.C. § 1595 (Against Microtel Defendants:  Kuzzins, CC&S, and Essex)** ....................................132

**Direct Liability** ..................................................................133

**Damages** ..........................................................................136

**COUNT XVI – Negligence (Against the Microtel Defendants: Kuzzins, CC&S, and Essex)** ..............................................136

**COUNT XVII – Violations of the Georgia Racketeer Influenced and Corrupt Organizations Act O.C.G.A. § 16-14-4(c) (Against ESA Defendants: ESA, ESA Management, ESA Portfolio, ESA Operating, and HVM)** ..............................................141

**COUNT XVIII – Georgia Racketeer Influenced and Corrupt Organizations Act O.C.G.A. § 16-14-4(a) (Against ESA Defendants: ESA, ESA Management, ESA Portfolio, ESA Operating, and HVM)** ........143

**Count XIX – TVPRA, 18 U.S.C. § 1595 (Against ESA Defendants: ESA, ESA Management, ESA Portfolio, ESA Operating, and HVM)** ........145

**Direct Liability** ..................................................................146

**Damages** ..........................................................................150

**COUNT XX – Negligence (Against the ESA Defendants: ESA, ESA Management, ESA Portfolio, ESA Operating, and HVM) ...........................150**

COMES NOW Plaintiff in the above-styled action and hereby files her Second Amended Complaint as follows:

1. From 2009 through 2012, Plaintiff Jane Doe 3 was trafficked at hotels around Atlanta. Sold for commercial sex out of Defendants' hotel rooms, Jane Doe 3 files this lawsuit against six hotels that profited from her trafficking.

2. These Defendants maintained hotel properties where criminal conduct was rampant, open, and obvious. They fostered an environment that made them ideal venues for the sex trafficking ventures that victimized Jane Doe 3.

3. For years, while being trafficked out of the Smyrna Red Roof Inn, the Atlanta Red Roof Inn, the Suburban Extended Stay, Microtel Inn & Suites, and the Extended Stay Americas in Atlanta and Baton Rouge, Jane Doe 3 was tortured, beaten, drugged and raped at those locations.

4. And even after these Defendants had every reason to know about the prevalence of sex trafficking at their hotels, the relationship between pimps, prostitution, and sex trafficking, and the sex trafficking ventures involving Jane Doe 3 and others at their hotels, they continued to profit from the rent traffickers paid to facilitate Jane Doe 3's trafficking and victimization.

5. Jane Doe 3 seeks to hold these Defendant hotels liable under the Trafficking Victims Protection and Reauthorization Act, the Georgia

Racketeer and Influenced and Corrupt Organizations Act, and for negligence.

## THE PARTIES

6.    Jane Doe 3, proceeding pseudonymously,[1] is a citizen of the United States of America and a resident of the State of Georgia.

### Smyrna Red Roof

7.    FMW RRI NC, LLC ("FMW") is a Delaware limited liability company with its principal place of business in Houston, Texas. FMW may be served with process by serving its registered agent Corporation Service Company at 40 Technology Parkway South, Suite 300, Norcross, Georgia, 30092.

8.    Red Roof Franchising, LLC ("Red Roof Franchising") is a Delaware limited liability company with its principal place of business in New Albany, Ohio. Red Roof Franchising may be served with process by serving its registered agent Corporation Service Company at 40 Technology Parkway South, Suite 300, Norcross, GA 30092, USA.

9.    Red Roof Inns, Inc. ("RRI") is a Delaware corporation with its principal place of business in New Albany, Ohio.  It regularly conducts business in the State of Georgia, derives substantial revenue from services rendered in Georgia, and has committed tortious acts or omissions both within Georgia,

---

[1] Protective Order, Doc. 91.

and outside of Georgia resulting in injuries in Georgia. RRI may be served with process by serving its registered agent Corporation Service Company at 40 Technology Parkway South, Suite 300, Norcross, Georgia, 30092.

10.     RRI West Management, LLC ("RRI West") is a Delaware limited liability company with its principal place of business in Houston, TX. RRI West may be served with process by serving its registered agent Capitol Services, Inc. at 1675 S State St. Suite B, Dover, DE 19901.

11.     Westmont Hospitality Group, Inc. ("Westmont") is a Texas corporation with its principal place of business in Houston, Texas. It regularly conducts business in the State of Georgia, derives substantial revenue from services rendered in Georgia, and has committed tortious acts or omissions both within Georgia and outside of Georgia resulting in injuries in Georgia. Westmont may be served with process by serving its registered agent Capitol Corporate Services, Inc. at 206 E. 9th Street, Suite 1300, Austin, Texas, 78701.

12.     Collectively, Westmont, RRI, FMW, Red Roof Franchising, and RRI West are the "Smyrna Red Roof Defendants."

### Atlanta Red Roof

13.     RRI III, LLC ("RRI III") is a Delaware limited liability company with its principal place of business in Houston, Texas. It regularly conducts

business in the State of Georgia, derives substantial revenue from services rendered in Georgia, and has committed tortious acts or omissions both within Georgia and outside of Georgia resulting in injuries in Georgia. RRI III may be served with process by serving its registered agent CT Corporation System, 289 S. Culver Street, Lawrenceville, Georgia, 30046.

14.     Collectively, RRI III, together with Westmont, RRI, RRI West, and Red Roof Franchising, are the "Atlanta Red Roof Defendants."

<strong>Suburban Extended Stay</strong>

15.     HSI Chamblee, LLC ("HSI") is a Georgia limited liability company with its principal place of business in Amelia Island, Florida.  HSI may be served with process by serving its registered agent, Ray Orton at 1075 Hunters Brook Court, Atlanta, Georgia, 30319.

16.     SUB-SU Hotel GP, LLC ("SUB-SU") is a Delaware limited liability company with its principal place of business in Houston, Texas.  SUB-SU is a general partner of WHG SU LP and is liable for the debts of WHG SU LP.  It regularly conducts business in the State of Georgia, derives substantial revenue from services rendered in Georgia, and has committed tortious acts or omissions both within Georgia and outside of Georgia resulting in injuries in Georgia.  SUB-SU may be served with process by serving its registered agent Capitol Corporate Services, Inc. at 515 East Park Avenue, 2nd Floor,

#3036874v2

4

Tallahassee, Florida, 32301.

17.    WHG SU Atlanta, LLC ("WHG SU LLC") is a Delaware limited liability company with its principal place of business in Houston, Texas.  WHG SU LLC may be served with process by serving its registered agent Capitol Corporate Services, Inc. at 3675 Crestwood Parkway, Suite 350, Duluth, Georgia, 30096.

18.    WHG SU Atlanta LP ("WHG SU LP") is a Delaware limited partnership with its principal place of business in Houston, Texas.  WHG SU LP may be served with process by serving its registered agent Capitol Corporate Services, Inc. at 3675 Crestwood Parkway, Suite 350, Duluth, Georgia, 30096.

19.    Collectively, HSI, SUB-SU, WHG SU LLC, and WHG SU LP, together with Westmont, are the "Suburban Extended Stay Defendants."

**Microtel**

20.    CC&S Development, LLC ("CC&S") is a Massachusetts limited liability company with its principal place of business in Needham, Massachusetts. CC&S may be served with process by serving its registered agent Wayne A. Swartz, 300 First Avenue, Suite 332, Needham, MA 02494.

21.    Essex, LLC ("Essex") is a New York limited liability company with its principal place of business in Rochester, NY. Essex may be served with

process by serving its registered agent Incorporating Services, Ltd at 900 Old Roswell Lakes Parkway, Suite 310, Roswell, GA, 30076.

22.    Kuzzins Buford, LLC ("Kuzzins") is a Georgia limited liability company with its principal place of business in Needham, Massachusetts.  Kuzzins may be served with process by serving its registered agent Corporation Service Company, 40 Technology Parkway South, Suite 300, Norcross, Georgia 30092.

23.    Collectively, CC&S, Essex, and Kuzzins are the "Microtel Defendants."

24.    For all Defendants and Defendant groups, whenever reference is made in this complaint to any act, deed, or conduct of a Defendant's agents, employees, or representatives, the allegation is that the agent, employee, or representative was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of the Defendant.

### Extended Stay America

25.    Extended Stay America, Inc. ("ESA") is a Delaware corporation with its principal place of business in Charlotte, North Carolina.  It regularly conducts business in the State of Georgia, derives substantial revenue from services rendered in Georgia, and has committed tortious acts or omissions both within Georgia and outside of Georgia resulting in injuries in Georgia.  Extended Stay America may be served with service of process by serving its

registered agent for service, National Registered Agents, Inc., 160 Greentree Dr. Ste. 101, Dover, Delaware, 19904.

26.     ESA Management, LLC ("ESA Management") is a Delaware limited liability company with its principal place of business in Charlotte, North Carolina.  It regularly conducts business in the State of Georgia, derives substantial revenue from services rendered in Georgia, and has committed tortious acts or omissions both within Georgia, and outside of Georgia resulting in injuries in Georgia.  Extended Stay Management may be served with service of process by serving its registered agent for service, National Registered Agents, Inc., 289 S. Culver Street, Lawrenceville, Georgia, 30046.

27.     ESA P Portfolio, LLC, f/k/a BRE/ESA P Portfolio, LLC ("ESA Portfolio") is a Delaware limited liability company that regularly conducts business in the State of Georgia with its principal place of business in Charlotte, North Carolina.  ESA Portfolio may be served with service of process by serving its registered agent for service, National Registered Agents, Inc., 289 S. Culver Street, Lawrenceville, Georgia, 30046.

28.     ESA P Portfolio Operating Lessee, LLC ("ESA Operating"), is a Delaware limited liability company with its principal place of business in Charlotte, North Carolina.  Extended Stay Operating may be served with

service of process by serving its registered agent for service, National
Registered Agents, Inc., 289 S. Culver Street, Lawrenceville, Georgia, 30046.

29.    HVM, LLC ("HVM") is a Delaware limited liability company with its
principal place of business in Charlotte, North Carolina.  HVM may be served
with service of process by serving its registered agent for service, National
Registered Agents, Inc. at 289 S. Culver Street, Lawrenceville, Georgia
30046.

## JURISDICTION & VENUE

30.    This Court has subject matter jurisdiction over this lawsuit pursuant to
28 U.S.C. § 1331 because Plaintiff asserts claims arising under 18 U.S.C.
1595(a), and pursuant to 28 U.S.C. § 1367 because Plaintiff's state law claims
form part of the same case or controversy as her federal law claims.

31.    Defendants are subject to personal jurisdiction in this district and
division.

32.    Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a
substantial part of the events or omissions giving rise to the claims asserted
in this action occurred in the judicial district where this action is brought.

**FACTUAL ALLEGATIONS**

## I.     THE SMYRNA RED ROOF

### A.     The Trafficking of Jane Doe 3 at the Smyrna Red Roof.

33.     From about 2010 to 2012, Jane Doe 3 was trafficked out of hotel rooms at the Smyrna Red Roof, a Red Roof Inn located at 2200 Corporate Plaza, Smyrna, Georgia 30080 ("Smyrna Red Roof").

34.     When she was trafficked out of the Smyrna Red Roof, Jane Doe 3 was forced to have sex with about 10 men per day.  The foot traffic of men to the hotel room in which Jane Doe 3 stayed evidenced trafficking.  Jane Doe 3 also witnessed other trafficking victims at the Smyrna Red Roof and was trafficked there with Jane Doe 1 and Jane Doe 4, among others.

35.     At a point in time, most of the Smyrna Red Roof's business came from traffickers renting hotel rooms.  There were 10–12 different traffickers staying at the Smyrna Red Roof at the same time, with some traffickers controlling 4–5 victims at a time at the hotel.  The Smyrna Red Roof was full of girls hanging over balconies to advertise, and traffickers directing commercial sex buyers to hotel rooms.  Commercial sex buyers were present regardless of the time of day.  There were often more than 100 buyers at the hotel in a single day.  Hotel employees also saw traffickers openly beat victims in the public parking lot.

#3036874v2

9

36.     The Smyrna Red Roof did not attempt to disguise the bustling sex trade taking place on its property.  Instead, it prominently displayed a sign at the front desk and night window reading: "NO REFUNDS AFTER 15 MINUTES."

 

37.     The "NO REFUNDS AFTER 15 MINUTES" sign was posted for many years up and through the initial filing of this lawsuit.  It also featured prominently in numerous publicly available online reviews and would have been obvious to anyone on-site, including those charged with auditing and inspecting the property on behalf of Westmont and RRI.

38.     The "NO REFUNDS" sign evidenced both that the Smyrna Red Roof was aware of the reason for the traffic at the property (trafficking in commercial sex) and that the trafficking stays were likely to be brief.

39.     Smyrna Red Roof employees routinely found "blood everywhere," and numerous condoms in rooms.

40.     The rooms Jane Doe 3 was trafficked in at the Smyrna Red Roof evidenced numerous well-known and visible signs of sex trafficking.  Frequently, the trash cans in the rooms contained an extraordinary number of used condoms.  The rooms also contained more cell phones than registered occupants.

41.     Though RRI policy required hotel staff to physically enter a room at least every three days, RRI did not follow its own policy.

42.     In addition to the condition of the room in which she stayed, to anyone who saw Jane Doe 3, her outward physical appearance often suggested fatigue, sleep deprivation, and evidence of deterioration—all well-known signs of trafficking.  She often wore inappropriate clothing and failed to make eye contact with others, and exhibited a lack of control, lack of money, and monitoring by her traffickers also were well-known signs that she was a trafficking victim.

43.     Jane Doe 3's physical condition was apparent to the Smyrna Red Roof employees and to anyone with whom she interacted during her stays on the property and she regularly requested an excessive amount of towels and bed

linens—still more well-known signs that Jane Doe 3 was a victim of sex trafficking.

44.     Additionally, an RRI employee observed that the sex trafficking ventures operating at the Smyrna Red Roof tried to control the commercial sex business there.  For example, the RRI employee noticed that any prostitute that tried to work independently—without a trafficker—was either chased off the property by traffickers or was forced to work for them.

45.     The illegal commercial sex trade and open trafficking were so obvious that not one, but two websites were devoted to warning about the drug activity, prostitution, and sex trafficking at the Smyrna Red Roof.

46.     The first website, "Red Roofie Blog," warned of drug activity and prostitution at the Smyrna Red Roof and warned travelers (especially families) not to stay at the hotel.[2]

47.     The second website, www.atltrafficking.com ("ATLTrafficking"), highlighted instances of sex trafficking at hotels in Atlanta and wrote more articles about the Smyrna Red Roof than any other hotel in the city.

48.     ATLTrafficking specifically identified by name and photograph traffickers staying at the Smyrna Red Roof and quoted an employee (a)

---

[2] Red Roofie Blog: Avoid Red Roof Inn Smyrna Georgia. http://redroofie.blogspot.com/p/reviews.html (last visited May 7, 2020).

"admit[ing] that much of the information contained in" an article published on the site "regarding sex trafficking occurring in their rooms is true" and (b) "confirm[ing] that the national Red Roof Corporate office is aware of the situation, as well as the franchise owner."

49.     ATLTrafficking published an article that posed the question: "What will it take for Red Roof Corporate (614-744-2600) to pull the franchise rights from this owner?"  The article suggested that "Concerned citizens should call the Cobb County elected officials as well as the Red Roof Corporate offices right away," and provided contact information for RRI, its communications department, and its public relations agency.

50.     ATLTrafficking published another article about the Smyrna Red Roof that stated, among other things:

    a.     "Any day of the week, dozens of girls are trafficked out of this location, some of whom look underage, even as young as 12." and;

    b.     "Private investigators recently observed a young woman being trafficked repeatedly at the Red Roof in Smyrna over a 3 day period while her 7 week old baby slept at the foot of the bed in which she was entertaining 'client' after 'client.'"

51.     The highest level corporate employees at RRI were directly informed of the conditions at the Smyrna Red Roof.  This included knowledge of the sex trafficking venture that victimized Jane Doe 3.

52.     In 2015, a hospitality industry executive and anti-trafficking advocate sent these articles directly to Andrew Alexander, RRI's president and CEO. She spoke with Mr. Alexander on the phone and told him of the rampant and ongoing commercial sex trafficking occurring at the Smyrna Red Roof.

53.     Specifically, the hospitality industry executive identified a suspected trafficker who was listed on the Georgia Sex Offender Registry and who had a lengthy criminal history of sex crimes involving minors.  This man trafficked Jane Doe 1 at the Smyrna Red Roof.  The executive told Mr. Alexander this was "[o]ne example of Red Roof Inn appearing to be involved in trafficking."

54.     Mr. Alexander's only response was to have RRI's general counsel, George Limbert, call the executive to find out who ran the website where the articles were published.

55.     The executive then sent Mr. Limbert the same information previously sent to Mr. Alexander and asked when the company would take action to address the open sex trafficking at the Smyrna Red Roof.

56. Finally, weeks after her first communication with Mr. Alexander, the hospitality industry executive emailed Mr. Alexander again, copying the company's general counsel, Mr. Limbert, and alerting them that the previously identified trafficker appeared to be living above the Smyrna Red Roof's manager's office.

57. Among other things, the email reported that the trafficker "was seen outside your manager's office last night [at the] Red Roof Inn mentioned in the report [the Smyrna Red Roof]. His background is very clear[,] and he appears to be using your hotel regularly and is quite friendly with your manager. . . . I hope Red Roof takes action on this sad situation."

58. In addition to the direct knowledge of RRI's highest executives, the conditions at the Smyrna Red Roof were obvious to anyone, including the other Red Roof Inn employees and agents who visited the property during the time Jane Doe 3 was trafficked there.

59. Jay Moyer, Vice President of Operations for RRI, regularly visited the Smyrna Red Roof to inspect the hotel and discuss the hotel's revenue and performance. He frequently stayed for 2–3 nights, several times each year. The trafficking activity described above was rampant and known to Mr. Moyer—who eventually refused to stay overnight at the hotel because of it.

60.     Sometime in 2011–2012, Cobb County police notified the then-general

manager of the Smyrna Red Roof that sex traffickers had paid a former

general manager and a then-current employee to act as "look outs."

61.     Numerous arrests and investigations also provided all the Smyrna Red

Roof Defendants with notice of sex trafficking ventures operating at the

Smyrna Red Roof.

    a.     A December 2010 prostitution sting conducted by the Metro

        Atlanta Child Exploitation Task Force and the Marietta Police

        Department, during which law enforcement rescued a 16-year-old

        trafficking victim;[3]

    b.     A March 2011 Cobb County Police arrest report remarking that

        the "location is known for problems with drugs and prostitution"

        and was a "hotbed of illegal activities";

    c.     A July 2011 report of theft at the hotel, in which the victim

        reported that "a pimp and a prostitute" stole her property

        "because she refused to work for [the pimp]";

---

[3] Katy Ruth Camp, *Six Women Arrested in Prostitution Sting*, Marietta Daily Journal (Dec. 22, 2010), www.mdjonline.com/news/six-women-arrested-in-prostitution-sting/article_a1a08727-b64a-5b5f-8b67-5b38927d16b9.html (last visited May 7, 2020).

d. Police responding to a dispute between a guest and a Smyrna Red Roof Inn employee at the hotel in April 2012 that arose because the hotel refused to refund a guest after he demanded that the hotel return his money because, among other things, he was "harassed by prostitutes" while there; and

e. A December 2014 arrest of a man, charged with buying sex from a 16-year old trafficking victim and then grabbing the girl by her hair, dragging her to the room's bathroom, and attempting to drown her in the bathtub.[4]

62. Online reviews also provided the Smyrna Red Roof Defendants with notice of the foreseeable risk of sex trafficking ventures at the Smyrna Red Roof. Through the relevant time period, RRI actively monitored online reviews on a daily basis. For example, RRI currently represents that "our president receives all of our Tripadvisor Reviews to his email daily."

63. Publicly available online reviews of the Smyrna Red Roof, reported widespread prostitution and crime at the hotel, including:[5]

---

[4] *See, e.g.,* Police: Marietta Man Tried to Kill 16-year-old, Marietta Daily Journal (Dec. 16, 2014), https://www.mdjonline.com/news/police-marietta-man-tried-to-kill--year-old/article_1ef10907-7df1-53d3-bb4a-37038e97cc0f.html (last visited May 7, 2020).

[5] Emphasis, where present, is added.

a.     A July 7, 2013 review, stating:

**Prostitutes everywhere** . . . . There were prostitutes at a couple doors too. Around midnight we heard loud yelling and looked out our window. Seven (yes seven!) cop cars were directly in front of our room and were arresting someone as a prostitute stood 5 feet from our window.  It was hard to sleep to say the least.  The only security I felt was the fact our dog was with us.  Don't stay here!!!

b.     A May 17, 2016 review, stating:

Ok to start do not stay here. . . . **There were drug dealers (fake thugs), prostitution, and for two days straight there were police leaving the premises.** … The 1st day of me checking in I found blood on the bathroom door, walls and floor.

c.     An August 12, 2014 review, stating:

**PROSTITUTION – COCK ROACHES – AND DOG POOP!** Deluxe ROOM
DO NOT GO THERE!!!!! My worst experience ever! Saw prostitution, dogs pooping outside, loitering, dead cockroaches in my room.  I askd thm 2 come get it up th clerk said he could "bring me a broom!"[] NOT! . . . I wouldn't send my enemy here! Unless you want crackheads and prostitutes and don't mind . . . .

d.     An August 8, 2015 review, stating:

DO NOT stay here! . . . **There were shady people hanging out outside of our room door at all hours of the night and there was open prostitution occurring on the property.** I was traveling alone with my teenage daughter and felt extremely unsafe at this location.

e.     An August 29, 2014 review, stating:

This hotel is unsanitary and a hotbed for criminal activity. . . . Dirty pillow cases, blood on the floor, bugs, cigarette burns everywhere, **prostitutes, and drug activity right outside our door**, which had no lock because apparently it had been kicked in by the police. The desk clerk couldn't have cared less.

f.    A September 7, 2014 review, stating:

**Nothing but a dope and prostitution den!!** The room was nasty. . . . Kind of scary with men hanging out in lobby while checking in.  The parking lot was filled with young people drinking and smoking dope.  I believe it should be condemned! Avoid at all costs.  You would be better off sleeping in your car.

g.    A second September 17, 2014 review, stating:

I am in the room right now scared! . . . I watched as a young girl did the 2 fingers to her eyes and a point to guy across to other building only to push him a min later and say"10 dollars?  Im a dime baby you no im worth more than that!"  Then the traffic throughout the day . . . . **its a drug and prostitute headquarters.**  Im a young male well over 6ft tall and fear for my safety

h.    An August 8, 2015 review, stating:

DO NOT STAY HERE.  Terrible place to stay. . . . Went to get clean towels from desk and was informed I need to go back to my room and bring them my used towels before I could receive new ones. . . . **Prostitutes and drug dealers roam the parking lot.  There are at least 5 people on the parking lot all hours of the night**.[6]

---

[6] *Id.* (emphasis added).

64.     RRI monitored the reviews of the Smyrna Red Roof, including but not limited to Tripadvisor reviews, required the location manager to respond to certain reviews, and used the reviews in its performance metrics. As a result, RRI knew or should have known of these reviews, the prevalence of crime and prostitution and other indicia of sex trafficking at the Smyrna Red Roof.

65.     RRI employees monitor each hotel. For the Smyrna Red Roof, those employees included Mr. Moyer, a Vice President of Operations, and Vickie Lam.

66.     On behalf of RRI, Mr. Moyer, Ms. Lam, and others monitored the revenue, occupancy, and online reviews of the Smyrna Red Roof.

67.     RRI employees routinely contacted the employees at the Smyrna Red Roof regarding specific negative online reviews in response to customer complaints.

68.     At one point, a general manager of the Smyrna Red Roof began making more frequent calls to the police and refused to rent rooms to people who appeared to be engaged in suspicious or illegal activity.

69.     In response, RRI and Mr. Moyer told her "you need to sell rooms" and "you need to get your numbers up."

70.     The Smyrna Red Roof security guards frequently hung out with guests who were "partying" outside their rooms, engaging in some of the same activity.

71.     One security employee told one of the Smyrna Red Roof managers that other managers encouraged this type of behavior.

72.     This ineffective security was common during FMW's ownership of the Smyrna Red Roof.

73.     During the relevant time period, the Smyrna Red Roof Defendants knew or should have known of public statements by city officials in Atlanta warning of sex trafficking at hotels, that Atlanta was an "epicenter" of sex trafficking, and of the relationship between prostitution and sex trafficking.

74.     The Smyrna Red Roof Defendants knew or should have known of the of End Child Prostitution and Trafficking (ECPAT-USA) and its Tourism Child-Protection Code of Conduct (the "Code") in the United States[7] and of guidance from the Department of Homeland Security ("DHS"), issued in 2010 to hotel companies, that identified a number of warning signs indicating the presence of sex trafficking at hotels.  According to DHS, hotel staff can and should be

---

[7] *See The Tourism Child-Protection Code of Conduct*, ECPAT-USA, *available at* www.ecpatusa.org/code/ (last visited May 7, 2020).

vigilant in observing signs of human trafficking including but not limited to, signs of poor physical appearance (injury, illness, poor hygiene, sleep deprivation, malnourishment), constant monitoring by others, requests for housekeeping and towels without entry into the room, presence of multiple computers or cell phones.[8]

75.     These facts support an inference that the Smyrna Red Roof Defendants—all owners and operators of hotels in a city particularly known for a problem with sex trafficking—had actual or constructive knowledge of sex trafficking at their hotels.

### B.     The Smyrna Red Roof Defendants

76.     As further described below, Westmont, RRI, FMW, Red Roof Franchising, RRI West, and the Smyrna Red Roof John Does Nos. 1–10 owned, managed, supervised, operated, oversaw, controlled the operation of, and were inextricably connected to the renting of rooms at the Smyrna Red Roof.

77.     Westmont, RRI, FMW, Red Roof Franchising, RRI West, and the Smyrna Red Roof John Does 1–10 each knowingly benefited financially from

---

[8] U.S. Dep't of Homeland Security, *Human Trafficking and the Hospitality Industry*, https://www.dhs.gov/blue-campaign/hospitalityindustry (last visited May 7, 2020).

the operation of the Smyrna Red Roof, including from the room revenue generated from Plaintiff's sex trafficking.

### 1. The Corporate Relationship between Westmont and Red Roof Inns, Inc.

78.     Westmont and RRI jointly own, operate, and profit from hundreds of Red Roof Inns around the country.  From 2010–2012 the two companies jointly owned, operated, and profited from the Smyrna Red Roof.

79.     Westmont and RRI are related through a complicated corporate structure:



80.     Westmont controls separate corporate entities that purchase hotels and then enter franchise agreements (as franchisee) with RRI (as franchisor). Other Westmont-controlled entities jointly manage hotels with RRI, which employs the hotel's staff.

81.     Westmont also owns RRI.  From at least 2010 through 2012 at the Smyrna Red Rood, Westmont was the owner of the real property (the franchisee), entered franchise agreements with RRI, *and* was the owner of RRI.

82.     To own and operate their hotels, Westmont and RRI rely on dozens of other companies of their creation.  These companies exist mostly on paper and do not have their own employees, offices, or operations independent of Westmont and RRI.  Several of these companies—FMW, RRI III, RRI West, Red Roof Franchising—are named Defendants.  The actions and knowledge of FMW, RRI III, RRI West, and Red Roof Franchising are attributable to Westmont and RRI because of the control Westmont and RRI exerted over these companies.





88.     Westmont and RRI jointly controlled the Smyrna Red Roof from 2010 to December 2012.

### 2.     Owners and Franchisees of the Smyrna Red Roof

89.     FMW was the fee simple owner of the Smyrna Red Roof from 2010 to December 2012.  FMW has no employees or independent business operations but is instead controlled completely by Westmont and RRI.

90.     As owner and franchisee of the Smyrna Red Roof, FMW received a percentage of the revenue from the rental of hotel rooms at the Smyrna Red Roof, including the rooms in which Jane Doe 3 was trafficked.

### 3.     Managers of the Smyrna Red Roof

91.     For purposes of managing the Smyrna Red Roof from 2010–2012, Westmont and RRI functioned as a single entity.





94.     RRI West has no employees or independent business operations but is

instead controlled completely by Westmont.



█ █

## II.   THE ATLANTA RED ROOF

### A.   The Sex Trafficking of Jane Doe 3 at the Atlanta Red Roof.

98.   From about 2010 to 2012, Jane Doe 3 was trafficked out of hotel rooms at the Red Roof Plus+, located at 1960 N. Druid Hills Road NE, Atlanta, Georgia 30329 ("Atlanta Red Roof").

99.   The foot traffic of men to the hotel rooms where victims stayed evidenced trafficking.  There were often other trafficking victims present when Jane Doe 3 was trafficked out of the Atlanta Red Roof.

100.   Like the Smyrna Red Roof, an open and obvious commercial sex trade operated at the Atlanta Red Roof.  The employees at the Atlanta Red Roof were aware of, participated in, and facilitated the trafficking at the Atlanta Red Roof.

101.   Employees of the Atlanta Red Roof would call sex traffickers at the hotel to warn them when law enforcement was present at or coming to the hotel.  Atlanta Red Roof employees would also warn traffickers to slow down or stop the traffic to a particular room if it had been too busy, and to caution them if other guests complained.

102.   The open and obvious sex trafficking was apparent to anyone who visited the property, such as Jay Moyer and/or Vickie Lam, RRI employees.

103. Furthermore, the information provided to RRI executives, Mr. Alexander and Mr. Limbert, relating to the sex trafficking ventures operating out of the Smyrna Red Roof put them on notice of the likelihood of similar activities at the Atlanta Red Roof. These two hotels are less than 15 miles apart in the greater Atlanta area and are under the same corporate supervision.

104. Some of the same RRI employees sometimes worked at both Red Roof Smyrna and Red Roof Atlanta. For example, a general manager of the Smyrna Red Roof also worked one day a week at the Atlanta Red Roof. Accordingly, the same RRI employee knew of the conditions at both the Smyrna Red Roof and the Atlanta Red Roof.

105. Online reviews reported widespread prostitution and crime occurring at the hotel which the Atlanta Red Roof knew or should have known are indications of sex trafficking. Such reviews included:

    a.    A July 2012 review, stating:

> I was surprised, however, at all of the open drug dealing going on in the rooms and parking lot. . . . I complained upon checkout. They had a practiced look of surprise on their faces but I do not believe for a minute that the staff does not know what is going on in this hotel.

    b.    A July 2012 review, stating:

> Prostitution sting. During the stay, there was a prostitution

sting.  The next night at 2:00 AM, a prostitute knocked on my
door wanting to know if I wanted "company."

106.   The complaints made in the online reviews of the Atlanta Red Roof
make it implausible that these reviews were unknown to the local owners of
the Atlanta Red Roof and the corporate executives of the Red Roof Inn.

107.   And even after Jane Doe 3 was able to escape from her trafficker, the
pattern of illegal conduct continued at the Atlanta Red Roof.

   a.   A 2014 review, stating:

        Dirty orgy smell in both rooms I had.  Smoke like smell only
        drowned out by the semen and bleach.  Weird activity late at
        night.  **Pimp next door wasn't happy** with his ladies take for
        the night apparently.

   b.   A May 2016 review, stating:

        . . . it was pretty obvious that the local prostitutes were visiting a
        room a few doors down.  Something I know RRI is pretty familiar
        with.

   c.   An August 2016 review, stating:

        Within the first hour, my brother and his friend were approached
        by prostitutes who wanted them to come with them.

   d.   A 2016 review, stating:

        If prostitutes and drugs are what your looking for this is your
        spot. . . . Passed out vomitus covered people in parking lot 2 days
        out of three.  Seman splattered on mirror. . . . Felt so bad for the
        "working women" with their personal items in garbage bags that
        I gave away 3 tote bags.

e.     A November 2016 review, stating:

The hotel was being used by prostitutes and Shady characters were always coming and going.

f.     A December 2016 review, stating:

Drug dealers and pimps hanging around outside . . . .

g.     A January 2017 review, stating:

If you enjoy the smell of marijuana coming from 10% of the rooms and prostitutes setting up shop next to you then this is the place for you!

h.     A 2017 review, stating:

. . . A hooker/drug dealer was set up 2 doors down and had many visitors during the day/night. . . .

i.     A 2017 review, stating:

. . . This place is Disgusting there are hookers that are staying here and that is not the least of my worries. . . . There is also lots of drug use here someone just overdosed. I found crack on the floor . . . .

j.     An October 2018 review, stating:

People that paid for rooms there looked like addicts and sex workers.

k.     A 2019 review, stating:

. . . I saw a drug deal, it looks like another room had suspicious women coming in and out and multiple men going in . . . .

108.  During the relevant time period, the Atlanta Red Roof Defendants knew or should have known of public statements by city officials in Atlanta

warning of sex trafficking at hotels, that Atlanta was an "epicenter" of sex trafficking, and of the relationship between prostitution and sex trafficking.

109.   The Atlanta Red Roof Defendants knew or should have known of the ECPAT-USA, its Code,[9] and of DHS guidance issued in 2010 to hotel companies, that identified a number of warning signs indicating the presence of sex trafficking at hotels. According to DHS, hotel staff can and should be vigilant in observing signs of human trafficking including but not limited to, signs of poor physical appearance (injury, illness, poor hygiene, sleep deprivation, malnourishment), constant monitoring by others, requests for housekeeping and towels without entry into the room, presence of multiple computers or cell phones.[10]

110.   These facts support an inference that the Atlanta Red Roof Defendants—all owners and operators of hotels in a city particularly known for a problem with sex trafficking—had actual or constructive knowledge of sex trafficking at their hotels.

---

[9] *See The Tourism Child-Protection Code of Conduct*, ECPAT-USA, *available at* www.ecpatusa.org/code/ (last visited May 7, 2020).

[10] U.S. Dep't of Homeland Security, *Human Trafficking and the Hospitality Industry*, https://www.dhs.gov/blue-campaign/hospitalityindustry (last visited May 7, 2020).

## B. The Atlanta Red Roof Defendants

111. Westmont, RRI, RRI III, RRI West, RRI Franchising, and John Does Nos. 1–10 (collectively, the "Atlanta Red Roof Defendants") owned, managed, supervised, operated, oversaw, controlled the day-to-day operation of, and were inextricably connected to the renting of rooms at the Red Roof Plus+ located at 1960 N. Druid Hills Road NE, Atlanta, Georgia, 30329 (the "Atlanta Red Roof").

112. Westmont, RRI, RRI III, RRI West, and John Does 1–10 each knowingly benefited financially from the operation of the Atlanta Red Roof, including from the room revenue generated from Plaintiff's sex trafficking.

### 1. The Corporate Relationship between Westmont and Red Roof Inns, Inc.

113. Westmont and RRI jointly own, operate, and profit from hundreds of Red Roof Inns around the country. From 2010–2019, Westmont and RRI jointly owned, operated and profited from the Atlanta Red Roof.

114. At the Atlanta Red Roof, Westmont was both the owner of the property (the franchisee) who entered franchise agreements with RRI *and* the owner of RRI.



115.  Jane Doe 3 incorporates the Paragraphs in Part I.B.1., above, explaining the relationship between Westmont and Red Roof Inns, Inc., as set forth fully here.

### 2.  Owners of the Atlanta Red Roof

116.  RRI III was the fee simple owner of the Atlanta Red Roof from 2011–2019.  RRI III has no employees or independent business operations but is instead controlled completely by Westmont.

117.  RRI III received a percentage of the revenue from the rental of hotel rooms at the Atlanta Red Roof, including the rooms in which Jane Doe 3 was trafficked.

### 3.    Managers of the Atlanta Red Roof

118.   For purposes of managing the Atlanta Red Roof from 2010–2012,

Westmont and RRI functioned as a single entity.



120.   RRI West has no employees or business operations independent from

Westmont. Instead, employees at the Atlanta Red Roof were employees of

RRI and Westmont, owing to the relationship between those entities

described in Part II.B.1., above.





4. **Franchisors at the Atlanta Red Roof**

███████████████████████████

████████████████

## III. THE SUBURBAN EXTENDED STAY

### A. The Sex Trafficking of Jane Doe 3 at the Suburban Extended Stay

123. From about 2010 to 2012, Jane Doe 3 was trafficked on multiple occasions out of hotel rooms at the Suburban Extended Stay, located at 2050 Peachtree Industrial Court, Chamblee, Georgia 30341 ("Suburban Extended Stay").

124. When she was trafficked out of the Suburban Extended Stay, the foot traffic of men to the hotel room in which Jane Doe 3 stayed evidenced trafficking with numerous men coming to her room for short periods each day.

125. And because Jane Doe 3 was not the only trafficking victim in rooms at the Suburban Extended Stay at that time, there were often even more men: entering the parking lot, going into a room for a short period of time, leaving the room, and then exiting the parking lot.

126. The volume of buyers coming in and out of rooms on a daily basis supported an inference that any commercial sex happening in rooms at the

Suburban Extended Stay was not prostitution alone, but instead was sex trafficking as a result of force, fraud, or coercion.

127.   The illegal commercial sex and trafficking at the Suburban Extended Stay was open and obvious, reinforcing the location's reputation as a hotel that permitted illegal commercial sex and sex trafficking.  Several nonprofit and religious groups routinely visited the Suburban Extended Stay in order to provide food and rescue information to the sex trafficking victims whom these groups knew would be there.

128.   The sex trafficking ventures at the Suburban Extended Stay operated with the knowledge and assistance of Suburban Extended Stay employees, agents, and managers.  Multiple Suburban Extended Stay employees actively assisted sex traffickers.  For example, upon arrival at the Suburban Extended Stay, another trafficking victim, Jane Doe 2 observed she and Jane Doe 1's trafficker greet two front desk attendants as if they were friends.  The Suburban Extended Stay employees asked if the trafficker wanted to rent a room in the "usual spot."

129.   The trafficker responded to the Suburban Extended Stay employees by requesting that "Y'all call that phone if anything crazy is going on.  Look out for my girl here and let me know if she does something crazy."  The trafficker stated, "Y'all always got my back."

130.  Similarly, a maintenance worker at the Suburban Extended Stay was both aware of and facilitated trafficking at the location.  After another trafficking victim, Jane Doe 2 was left at the location alone for a short time, she approached the maintenance worker for help.  Without a phone, money, or any other means of escape, Jane Doe 2 asked the Suburban Extended Stay maintenance employee to use his cell phone or to give her a ride.  He refused.

131.  Later that day, after Jane Doe 2's trafficker—who was then also trafficking Jane Doe 3—returned, he beat Jane Doe 2, yelling loudly enough for others to hear, "You think somebody is going to help you? None of these people are going to help you."

132.  Following the beating, Jane Doe 2 showed unmistakable signs of her injuries, including redness, bruises, and a swollen and busted lip.  Suburban Extended Stay employees who saw Jane Doe 2 had to have observed these well-known physical indications of her trafficking.

133.  Like Jane Doe 2, Jane Doe 3's physical appearance while being trafficked at the Suburban Extended Stay often showed evidence of physical beatings by her trafficker.  Her physical appearance also suggested malnourishment, poor hygiene, fatigue, sleep deprivation, injuries, evidence of deterioration, all well-known signs of trafficking.  Her failure to make eye contact with others, lack of control and possession of money, and monitoring

by her traffickers also were well-known signs that she was a trafficking victim.

134.   The Suburban Extended Stay hotel rooms in which she stayed also showed well-known and visible signs of sex trafficking.  The smell of the room reflected the frequent sexual acts, and the trash cans contained an extraordinary number of used condoms—again suggestive of a higher volume of buyers than would be reasonably expected through prostitution alone.

135.   The number of cell phones exceeded the number of registered guests in the room.

136.   And while staying at the Suburban Extended Stay, Jane Doe 3 frequently requested extra towels, other linens, and a significant volume of other housekeeping items.

137.   Jane Doe 3's physical condition and the condition of the room in which she was trafficked was apparent to the employees on-site, at least some of whom worked for Westmont, and to anyone with whom she interacted during her stays on the property.

138.   A Westmont employee reported being aware of sex trafficking occurring at the hotel, witnessed physical assaults of women there, and saw evidence of sexual assaults.

139.   The same Westmont employee was aware of several traffickers operating out of the Suburban Extended Stay who told some hotel staff that the 4–5 victims with each trafficker were their "girlfriends."

140.   The same Westmont employee reported receiving no training regarding safety, security, or the risk of sex trafficking and had no knowledge of other on-site employees receiving such training.

141.   Employees at the Suburban Extended stay were required to send all reports of crime directly to Westmont on a regular basis.

142.   In addition to the obvious signs of sex trafficking ventures operating with impunity at the Suburban Extended Stay, numerous arrests and investigations gave the Suburban Extended Stay knowledge and notice of the foreseeable risk of sex trafficking ventures at the hotel. Such incidents include:

> a.   On July 22, 2010, a 20-year-old was arrested for prostitution and drugs at the Suburban Extended Stay as part of a sting operation conducted by the Dekalb County Vice Unit. The woman stated she was prostituting to make money for her boyfriend.
>
> b.   On April 21, 2011, a 31-year-old was arrested for prostitution at the Suburban Extended Stay as part of a sting operation conducted by the Dekalb County Vice Unit.

c. On June 20, 2012, the Dekalb County Vice Unit conducted an operation at the Suburban Extended Stay solely "to deter prostitution on going [sic] at this hotel." As part of the operation, two individuals, one sex offender, were arrested on drug charges and for failing to register as a sex offender.

d. On January 2, 2013, a 19-year-old and a 24-year-old were arrested for prostitution and drugs at the Suburban Extended Stay as part of a sting operation conducted by the Dekalb County Vice Unit.

e. On January 21, 2014, an 18-year old was arrested for prostitution and a 26-year-old male was arrested for pimping and drugs at the Suburban Extended Stay as part of a sting operation conducted by the Dekalb County Vice Unit. The 18-year-old stated that she had traveled to Atlanta from Wisconsin to live at the Suburban Extended Stay with the man. At the Suburban Extended Stay, she worked as a prostitute; the man kept half of the proceeds from her prostitution.

143. These arrests and the volume and type of criminal activity they reflect—relating to prostitution, women being forcibly recruited for prostitution, and men profiting from others' prostitution—at least support an

inference that the Suburban Extended Stay Defendants had actual or constructive knowledge of sex trafficking at the location.

144. As part of the operation and management of the Suburban Extended Stay, the Suburban Extended Stay Defendants actively monitor online customer reviews of the Suburban Extended Stay. Among the reviews reporting prostitution (which is sex trafficking or is suggestive of sex trafficking) and other crime were:

    a.    A review from January 2012 stated,

> A place of horror, if you want to know what hell is like stay here. I can understand why there no improvements most of people that **I see are crackheads rough looking thugs or prostitutes and** they don't use computers. front desk is rude, does nothing about putting the customer first. there are always people hanging out in the parking lot full of alcohol no telling what else. you don't go outside at night here for fear of your own safety from the thugs thet make up most of the clients.

    b.    A review from August 2012 stated,

> lots of people hanging out.. I was in the room for 5 minutes and requested a refund. I'm still waiting on the refund and it has been 2 months. Manger said that she would mail the refund, still waiting. Have spoken with the mangsr several times, still waiting. I think this hotel is a hangout spot for Drug dealers and Crackheads.

    c.    A review from May 2014 stated,

> Marijuana Smoke, [. . .] Drug dealers next door, Cops circling the

premises, The staff is rude, Cum stained sheets and Telephones with no cords, If you want to live a Herpe, drug free wait, if you just want to LIVE, do not stay here.

d.   A review from June 2014 stated,

Disgusting. Hotel. [. . .] **2 working prostitutes** and many drug dealers. I am stuck here.

e.   A review from June 2014 stated,

Great if your looking for new drug dealers. . . . Getting to sleep at night can be a challenge, especially if you are not comfortable being **surrounded by felons, thieves, drug dealers (the bad drugs to boot) and also prostitutes and some pimps**. If you are a female traveling without a male companion, or if you are not carrying a firearm, it would be foolish to stay here. . . .

f.   A review from June 2015 stated,

The building and surrounding areas aren't much better. The hall ways are dirty, including the elevator which has a broken hand rail. In addition, during our 2 week stay I noticed 4 different police offficers responding to calls in the building. I was also informed by a business owner very similar to the Suburban Extended Stay that the hotel is "ghetto" and is **frequently used for selling drugs and prostitution...** DISGUSTING again!

145.   These reviews and the volume and type of criminal activity they reflect at a minimum support an inference that the Suburban Extended Stay defendants had actual or constructive knowledge of various sex and drug crimes happening at the location, including sex trafficking.

146.   During the relevant time period, the Suburban Extended Stay Defendants knew or should have known of public statements by city officials

in Atlanta warning of sex trafficking at hotels, that Atlanta was an "epicenter" of sex trafficking, and of the relationship between prostitution and sex trafficking.

147.    The Suburban Extended Stay Defendants knew or should have known of the knew or should have known of the ECPAT-USA, its Code,[11] and of DHS guidance issued in 2010 to hotel companies, that identified a number of warning signs indicating the presence of sex trafficking at hotels. According to DHS, hotel staff can and should be vigilant in observing signs of human trafficking including but not limited to, signs of poor physical appearance (injury, illness, poor hygiene, sleep deprivation, malnourishment), constant monitoring by others, requests for housekeeping and towels without entry into the room, presence of multiple computers or cell phones.[12]

148.    These facts support an inference that the Suburban Extended Stay Defendants—all owners and operators of hotels in a city particularly known for a problem with sex trafficking—had actual or constructive knowledge of

---

[11] *See The Tourism Child-Protection Code of Conduct*, ECPAT-USA, *available at* www.ecpatusa.org/code/ (last visited May 7, 2020).

[12] U.S. Dep't of Homeland Security, *Human Trafficking and the Hospitality Industry*, https://www.dhs.gov/blue-campaign/hospitalityindustry (last visited May 7, 2020).

sex trafficking at their hotels.

## B.    The Suburban Extended Stay Defendants

149.   Westmont—the same Westmont that owns RRI—bought the Suburban Extended Stay in July 2011.  Westmont owned, operated, and managed the hotel along with a franchisor, Choice Hotels.[13]

150.   In connection with the Suburban Extended Stay, Westmont created three other entities, none of whom have employees, offices, or operations independent of Westmont: WHG SU LP, WHG SU LLC, and SUB-SU.

151.   Before Westmont bought the Suburban Extended Stay, HSI, a company unrelated to Westmont, owned the hotel.

152.   At all relevant times, HSI, Westmont, WHG SU LP, WHG SU LLC, SUB-SU, and Suburban Extended Stay John Does Nos. 1–10 owned, managed, supervised, operated, oversaw, controlled the operation of, and were inextricably connected to the renting of rooms at the Suburban Extended Stay located at the Suburban Extended Stay.

153.   At all relevant times, HSI, Westmont, WHG SU LP, WHG SU LLC, SUB-SU, and the Suburban Extended Stay John Does Nos. 1–10 benefitted

---

[13] The Suburban Extended Stay where Jane Doe 3 was trafficked is currently a HomeTown Studios hotel, a brand of Red Roof Inns, Inc.  However, during the time of her trafficking, the hotel was a Suburban Extended Stay, a brand of Choice Hotels.

financially from the operation of the Suburban Extended Stay, including from the room revenue generated from Plaintiff's sex trafficking.

### 1. Owners of the Suburban Extended Stay

154. HSI was the fee simple owner of the Suburban Extended Stay from 1997 to July 2011.



155. WHG SU LLC was the fee simple owner of the Suburban Extended Stay from July 2011 to 2018. WHG SU LLC has no employees or independent business operations but is instead controlled completely by Westmont.



156.   WHG SU Atlanta, LP is the current fee simple owner of the Suburban Extended Stay since 2018.  Though Westmont has represented in this lawsuit that these are two different companies, they are, in fact, the same company. WHG SU LLC converted to WHG SU LP in a July 31, 2018 filing with the Delaware Division of Corporations.  The two companies filed a name change with the Georgia Secretary of State on August 2, 2018.  The name change was signed by Richard Agee, Westmont's Director of Acquisitions and Asset Management.

157. On August 10, 2018, WHG SU LP filed an Affidavit Relating to Title that confirmed the name change and affirmed that WHG SU LP was bound by a previous loan which used the Suburban Extended Stay as collateral. This document was signed by Richard Agee and Westmont's Vice President of Finance, Bob Choo.

158. To the extent they are different companies, WHG SU LP is the successor of WHG SU LLC. WHG SU LP has no employees or independent business operations but is instead controlled completely by Westmont.

## 2. Manager of the Suburban Extended Stay

159. HSI was the manager and operator of the Suburban Extended Stay from 1997–July 2011. Employees of the Suburban Extended Stay at that time were employed directly by HSI.

160. Westmont was the manager and operator of the Suburban Extended Stay after July 2011. Employees of the Suburban Extended Stay were employed directly by Westmont.

161. As the owner, manager, and employer of staff at the Suburban Extended Stay, Westmont controlled the hotel's day-to-day operation, including, but not limited to,

    a. Employee training, supervision, responsibilities, and termination decisions for every type of employee;

b. Every aspect of employee pay, including setting the amount and scale, reduction in pay policies, and dictating employee hours worked and timekeeping systems employees used;

c. Regulating vacation, paid holidays, employee discounts, employee leave, employee benefits, and employee discipline;

d. Housekeeping procedures controlling how to clean a room and how and whether to report safety and security issues;

e. Safety and security policies and practices for employees to follow;

f. Hours of operation; and

g. Fixing prices and discount policies.

## IV. THE MICROTEL INN & SUITES

### A. The Sex Trafficking of Jane Doe 3 at the Microtel

162. From 2010 to 2012, on multiple separate stays, Jane Doe 3 was trafficked out of hotel rooms at the Microtel Inn & Suites by Wyndham, located at 1840 Corporate Boulevard NE, Atlanta, Georgia 30329 ("Microtel").

163. When she was trafficked out of the Microtel, Jane Doe 3 was at times trafficked along with other victims who shared rooms with her or got additional rooms. Jane Doe 3 was also aware of other trafficking victims who were being trafficked at the Microtel.

164.   The volume of foot traffic of buyers to the hotel room in which Jane Doe 3 stayed evidenced trafficking, rather than prostitution alone, with as many as 10 men a day coming to and from the hotel room, each staying for a short period of time.  And because she was not the only trafficking victim in hotel rooms at the Microtel, there were often even more men coming and going from the Microtel for the purpose of purchasing sex.

165.   The illegal commercial sex and trafficking at the Microtel was open and obvious.  The sex trafficking ventures at the Microtel operated with the knowledge and assistance of Microtel employees, agents and managers. Microtel front desk employees knew of the sex trafficking venture and agreed to act as "look outs" for traffickers.

166.   For several years, including while Plaintiff was trafficked at the Microtel, a single sex trafficker, Quintavious Obie (a/k/a Swazie), completely controlled the third floor of the hotel.  Obie was convicted of sex trafficking in violation of the TVPRA and sentenced to 21 years in prison in *United States v. Obie*, 1:18-cr-0007-ODE.

167.   During this time, Obie lived on the third floor along with multiple relatives and other associates.  Microtel employees only rented rooms on the third floor with Obie's prior permission.

168.   At times, Obie had seven or more victims—several of whom were

minors—living on the third floor of the Microtel. Women being trafficked by Obie each had their own room on the third floor. If they required another room, for example, to meet a buyer, they only had to go to the front desk and say "[Obie] told me to get another room." These victims were never required to show identification to get another room and only paid in cash.

169. Obie also used the banquet room of the Microtel for photo shoots for advertisements to post online for commercial sex at the Microtel. At least one of these photo shoots was videotaped and the video was posted online.

170. Obie often walked through the hotel with several women surrounding him. He was frequently violent with the women trafficked at the hotel. He was also violent with buyers at the hotel, including beating one man, stripping his clothes off, and making him leave the hotel naked. These violent incidents were audible and visible to employees at the Microtel.

171. Microtel housekeeping staff frequently came to the third floor to bring numerous extra towels at the request of trafficking victims.

172. Like the numerous other trafficking victims who essentially lived at the Microtel, while Jane Doe 3 was trafficked at the Microtel, her outward physical appearance reflected her status as a trafficking victim. Her physical appearance suggested malnourishment, poor hygiene, fatigue, sleep deprivation, and evidence of deterioration, all well-known signs of trafficking.

Her failure to make eye contact with others, lack of control and lack of money, and monitoring by her traffickers also were well-known signs in the hotel industry that she was a trafficking victim.

173. The hotel room in which Jane Doe 3 stayed while being trafficked at the Microtel also showed well-known and visible signs of sex trafficking. The smell of the room reflected the frequent sexual acts, and the trash cans contained an extraordinary number of used condoms—suggesting a volume of buyers not associated with prostitution alone.

174. The number of cell phones in the room also exceeded the number of guests registered to the room.

175. And while staying at the Microtel, Jane Doe 3 frequently requested extra towels, other linens, and a significant volume of other housekeeping items.

176. In addition, numerous reviews of the Microtel—available to the Microtel Defendants and the general public—reported the presence of pimps and prostitution (which is sex trafficking or is suggestive of sex trafficking) at the hotel, including:

   a.   A September 5, 2011 review:
        One morning at 5:00AM two men had a foul-mouthed shouting
        match over a woman and had to be thrown out of the hotel. We
        suspect this type of behavior is common as the hotel is in close

proximity to a strip joint and a night club. **There are many different people coming and going at all hours, which we makes us suspect prostitution.** This is the worst experience my wife and I have had at a hotel.

b. An April 21, 2013 review:
In operation to service the Pink Pony
Unfortunately for the normal traveler, this hotel is next to the Pink Pony. During day time hours this isn't such a big deal, but if you are trying to leave for a 5 am flight with your three small children **and have to wait for the prostitutes to clear the hallway . . .** well, it is not exactly a family friendly establishment.

c. A July 2014 review:
I want to believe that **some of the stragglers hanging around the hotel were pimps & prostitutes.** Definitely need new management there. I had the room booked for two nights but only stayed one due to all this that was going on, Never, ever, ever again would I stay at this hotel. I'm still itching thinking about it!!!

177. In addition to the obvious signs of sex traffickers operating with impunity at the Microtel, arrests and investigations gave the Microtel knowledge and notice of the foreseeable risk of sex trafficking ventures at the hotel.

178. Similarly, the volume and type of criminal activity at the Microtel— relating to prostitution, women being forcibly recruited for prostitution, and men profiting from others' prostitution—at a minimum support an inference

that the Microtel Defendants had actual or constructive knowledge of sex trafficking at the location.

179. During the relevant time period, the Microtel Defendants knew or should have known of public statements by city officials in Atlanta warning of sex trafficking at hotels, that Atlanta was an "epicenter" of sex trafficking, and of the relationship between prostitution and sex trafficking.

180. The Microtel Defendants knew or should have known of the ECPAT-USA, its Code,[14] and of DHS guidance issued in 2010 to hotel companies, that identified a number of warning signs indicating the presence of sex trafficking at hotels. According to DHS, hotel staff can and should be vigilant in observing signs of human trafficking including but not limited to, signs of poor physical appearance (injury, illness, poor hygiene, sleep deprivation, malnourishment), constant monitoring by others, requests for housekeeping and towels without entry into the room, presence of multiple computers or cell phones.[15]

---

[14] *See The Tourism Child-Protection Code of Conduct*, ECPAT-USA, *available at* www.ecpatusa.org/code/ (last visited May 7, 2020).

[15] U.S. Dep't of Homeland Security, *Human Trafficking and the Hospitality Industry*, https://www.dhs.gov/blue-campaign/hospitalityindustry (last visited May 7, 2020).

181.   These facts support an inference that the Microtel Defendants—all owners and operators of hotels in a city particularly known for a problem with sex trafficking—had actual or constructive knowledge of sex trafficking at their hotels.

## B.   The Microtel Defendants

182.   CC&S owns and operates the Microtel.  CC&S created Kuzzins, which has no offices, employees, or operations independent of CC&S, to own the Microtel, but in practice CC&S owned, operated, and managed the hotel with only itself and the franchisor, a Wyndham Hotels entity.

183.   CC&S hired Essex to manage the Microtel. Essex employed the staff at the hotel, marketed, advertised, and recruited corporate accounts for the hotel, and operated the hotel pursuant to a management agreement with Kuzzins that CC&S signed.  However, CC&S in turn managed even the smallest details of Essex's operations at the Microtel.

184.   Kuzzins, CC&S, Essex, and Microtel John Does Nos. 1–10 (collectively, the "Microtel Defendants") owned, managed, supervised, operated, oversaw, controlled the operation of, and were inextricably connected to the renting of rooms at the Microtel.

185.   Kuzzins, CC&S, Essex, and Microtel John Does Nos. 1–10 benefitted financially from the operation of the Microtel, including from the room revenue generated from Plaintiff's sex trafficking.



### 1.   Owners of the Microtel

186.   Kuzzins is the fee simple owner of the Microtel.  Kuzzins has no employees or independent business operations but is instead controlled completely by CC&S.

### 2. Managers of the Microtel

187. Essex employs the staff at the Microtel and manages the Microtel at the direction of CC&S.

### 3. The Microtel Defendants are Agents of CC&S

188. Kuzzins and Essex expressly created an agency relationship via contract in the parties' management agreement for the Microtel. In that management agreement, Kuzzins agreed that "[a]ll debts, obligations and other liabilities incurred by [Essex ] in performance of its duties hereunder shall be incurred on behalf of [Kuzzins]."

189. Just as Kuzzins is an alter ego of CC&S, Essex is an agent of CC&S in their acts and omissions related to the Microtel. CC&S recognized its role as principal in this agency relationship through hundreds of emails directing and ratifying Essex's day-to-day activities.

190. CC&S exercised an ongoing and systemic right of control over Essex and Kuzzins at the Microtel, including exercising control over how Essex and Kuzzins conducted their daily business. For example, CC&S:

    a. Explicitly entered an agency relationship with Essex through Kuzzins for Essex's work at the Microtel;

b. Directed Essex to provide instruction and receive clearance regarding the details of specific daily tasks such as pressure washing the property, parking lot maintenance, and landscaping;

c. Required that individual incidents of crime be reported to CC&S;

d. Directed Essex's use of Essex's own funds;

e. Required approval from CC&S regarding remodeling and maintenance decisions and details, including details such as the height in inches (4 versus 3) of bathroom backsplashes, the thickness of the vanity top, sink dimensions and details, the color of the finish on furniture, among other details;

f. Instructed Essex on how and how often to supervise specific employees;

g. Required pre-approval from CC&S for all purchase orders and change orders,

h. Personally inspected the property and directed Essex to replace specific items such as trash can lids, fix a bolt on an ice machine, and dust behind vending machines;

i. Controlled the amount of Essex employee pay and bonuses;

j. Required that personnel files be organized in a specific way;

      k.      Closely monitored security protocols and made decisions regarding the use of specific security devices, armed security, and policies and procedures to be enacted by Essex employees at the Microtel.

## V.    Extended Stay America

### A.    The Sex Trafficking of Jane Doe 3 at the Baton Rouge ESA

191.  From 2010 to 2012, Jane Doe 3 was trafficked out of hotel rooms at the Baton Rouge ESA.  During this time period, the Baton Rouge ESA was a hotel that Jane Doe 3's trafficker frequented, including stays in February, April and May of 2011.

192.  While Jane Do 3 was trafficked from hotel rooms at the Baton Rouge ESA, she was often trafficked with three other young victims, two of whom were minors aged 15 and 16 years old.

193.  Upon arrival at the Baton Rouge ESA, the four young victims, ages 19 to 15, arrived in the company of an older man. The young victims were scantily dressed, and of lesser quality clothing than the man and men who accompanied them on different visits.  These are well-known signs of sex trafficking that were visible to Baton Rouge ESA employees.

194.  Jane Doe 3, or another member of the group, was required to rent multiple rooms under her name or another name and paid using cash or prepaid credit cards or gift cards.

195.  The sex trafficking ventures operating at the Baton Rouge ESA were open and obvious and operated with the knowledge and assistance of Baton Rouge ESA employees, agents and managers.  Multiple Baton Rouge ESA employees actively assisted Jane Doe 3's trafficker.

196.  When she was trafficked out of the Baton Rouge ESA, Jane Doe 3's trafficker required each victim to produce $1,000 per day.  As a result, Jane Doe 3 was forced to have sex with at least 10 and sometimes up to 20 men per day.  The daily quota imposed by Jane Doe 3's trafficker on her and his other victims meant that each of the victims was required to do the same.  That meant that every day at least 40 buyers were coming to the hotel, visiting a room for a brief period, returning to their car and leaving the property just to purchase sex from the group of victims Jane Doe 3 was trafficked with. This constant flow of traffic and buyers with no other reason to be on the property was open and obvious.

197.  In fact, Jane Doe 3's trafficker operated a sex trafficking venture with impunity at the Baton Rough ESA, having photos taken at the Baton Rouge

ESA to "advertise" the trafficking victims at the Baton Rouge ESA and posting them publicly.

198.   Similarly, Jane Doe 3 and the other victims met buyers throughout the property and could be seen at various times all through the day meeting with different men.

199.   Once, Jane Doe 3's trafficker and several of his associates, who were also traffickers, all gathered at the Baton Rouge ESA.  There were 3 or 4 traffickers, the four victims with Jane Doe 3, plus several other victims who came with the other traffickers. The increased number of trafficker and victims also meant a resulting increase in the number of buyers on the property of the Baton Rouge ESA.

200.   The hotel room where Jane Doe 3 was trafficked, evidenced numerous well-known and visible signs of sex trafficking. Frequently the trash cans in the rooms in which Jane Doe 3 was trafficked would contain an extraordinary number of used condoms, multiple cell phones were in the room, she stayed for extended periods with very few personal items or possessions in the room.

201.   Jane Doe 3 frequently requested excessive items from housekeeping while preventing housekeeping from entering the room.

202.   Criminal activity, including other traffickers and victims and drug dealers operating openly on the property, was prevalent at the Baton Rouge

ESA while Jane Doe 3 was trafficked there. The conduct was so pervasive it would have been nearly impossible for Baton Rouge ESA employees not to observe it.

203. Once, while at the Baton Rouge ESA, Jane Doe 3 heard a violent fight between a man she knew to be a trafficker and a woman, who was a trafficking victim. The fight took place in a hotel room four or five doors down from Jane Doe 3. The fight was so loud and violent that Jane Doe 3 could hear it, as could any other guest or employees in the vicinity. Instead of calling the police, or asking the trafficker to leave the property, the Baton Rouge ESA simply relocated the man and woman to a different room so that the trafficking could continue.

204. Furthermore, numerous arrests and investigations gave the Baton Rouge ESA notice of the foreseeable risk of sex trafficking ventures at the hotel. Such incidents include:

a. On December 8, 2010, two women from Texas were arrested for prostitution at the Baton Rouge ESA as part of a sting operation conducted by the Baton Rouge Police Narcotics Detectives.

b. On October 28, 2011, and July 22, 2010, a 20-year-old called the police and admitted she was "running a prostitut[ion] business" at the Baton Rouge ESA. She called the police after her partner

in the venture beat her at the Baton Rouge ESA along with three other women and two men.

c.  On November 17, 2011, another woman from Georgia was arrested for prostitution at the Baton Rouge ESA as part of a sting operation conducted by the Baton Rouge Police Narcotics Detectives.

d.  On November 21, 2011, an anonymous caller reported suspected prostitution after witnessing numerous men going in and out of a room at the ESA Baton Rouge.

e.  On January 19, 2015, a 26-year-old from Georgia was arrested for prostitution a buyer and the woman's "fiancée"—also from Atlanta, Georgia—got in a shootout in the hallways of the Baton Rouge ESA.  The woman was later murdered in Atlanta.  Her "fiancée" was later arrested for promoting prostitution in Tennessee.

## B.  The Sex Trafficking of Jane Doe 3 at the Atlanta ESA

205.  From 2009 to 2010, Jane Doe 3 was trafficked out of hotel rooms at the Atlanta ESA.

206.  The sex trafficking ventures operating at the Atlanta ESA were open and obvious and operated with the knowledge and assistance of Atlanta ESA

employees, agents and managers.  Atlanta ESA employees actively assisted Jane Doe 3's trafficker who obtained the room for Jane Doe 3 at the ESA Atlanta.

207.   The sex trafficking ventures operating at the Atlanta ESA were open and obvious.  For example, on one stay when she was being trafficked out of hotel rooms at the Atlanta ESA, Jane Doe 3 approached the Atlanta ESA front desk employee to request additional towels.  During that conversation, Jane Doe 3 disclosed the trafficking to the employee.  The employee's only response was to reach under the desk and pull out a box full of lingerie.  The employee offered to sell Jane Doe 3 lingerie from the front desk of the Atlanta ESA.

208.   While she was being trafficked out of hotel rooms at the Atlanta ESA the foot traffic of buyers to the room in which she was traffic was indicative of trafficking.

209.   The hotel room where Jane Doe 3 was trafficked, evidenced numerous well-known and visible signs of sex trafficking. Frequently the trash cans in the rooms in which Jane Doe 3 was trafficked would contain an extraordinary number of used condoms, multiple cell phones were in the room, she stayed for extended periods with very few personal items or possessions in the room.

210.   Jane Doe 3 frequently requested excessive items from housekeeping while preventing housekeeping from entering the room.

211.   Not surprisingly, criminal activity appeared to be rampant at the Baton Rouge ESA while Jane Doe 3 was trafficked there, including other traffickers and victims and drug dealers operating openly on the property. The conduct was so pervasive it would have been nearly impossible for Baton Rouge ESA employees not to observe it.

212.   During the relevant time period, the ESA Defendants knew or should have known of public statements by city officials in Atlanta warning of sex trafficking at hotels, that Atlanta was an "epicenter" of sex trafficking, and of the relationship between prostitution and sex trafficking.

213.   The ESA Defendants knew or should have known of the ECPAT-USA, its Code,[16] and of DHS guidance issued in 2010 to hotel companies, that identified a number of warning signs indicating the presence of sex trafficking at hotels. According to DHS, hotel staff can and should be vigilant in observing signs of human trafficking including but not limited to, signs of poor physical appearance (injury, illness, poor hygiene, sleep deprivation,

---

[16] *See The Tourism Child-Protection Code of Conduct*, ECPAT-USA, *available at* www.ecpatusa.org/code/ (last visited May 7, 2020).

malnourishment), constant monitoring by others, requests for housekeeping and towels without entry into the room, presence of multiple computers or cell phones.[17]

214. These facts support an inference that the ESA Defendants—all owners and operators of hotels in a city particularly known for a problem with sex trafficking—had actual or constructive knowledge of sex trafficking at their hotels.

### C. The ESA Defendants at the Atlanta and Baton Rouge ESAs

215. ESA, ESA Management, ESA Portfolio, ESA Operating, HVM, and John Does Nos. 1–10 (collectively, the "ESA Defendants") owned, managed, supervised, operated, oversaw, controlled the operation of, and were inextricably connected to the renting of rooms at the Baton Rouge ESA and Atlanta ESA.

216. At all times relevant to this Complaint, Defendants ESA, ESA Management, ESA Portfolio, ESA Operating, HVM, and John Does Nos. 1–10 benefitted financially from the operation of the Baton Rouge ESA and the

---

[17] U.S. Dep't of Homeland Security, *Human Trafficking and the Hospitality Industry*, https://www.dhs.gov/blue-campaign/hospitalityindustry (last visited May 7, 2020).

Atlanta ESA, including from the room revenue generated from Plaintiff's sex trafficking.

217.   ESA, ESA Management, ESA Portfolio, ESA Operating, and HVM are agents and alter-egos of each other.  All share an office with each other.  ESA, ESA Portfolio, and ESA Operating do not have employees.  Employees of ESA Management and HVM conduct the business of ESA, ESA Portfolio, and ESA Operating.  However, all actions taken by ESA Management, ESA Portfolio, ESA Operating, and HVM are taken on behalf of, and in order to benefit, ESA, the parent company.

### 1.      Owners of the Baton Rouge ESA and Atlanta ESA

218.   ESA Portfolio is the fee simple owner of both the Baton Rouge ESA and the Atlanta ESA.  ESA Portfolio shares an office with all other ESA Defendants.  Employees of ESA Management and HVM conduct the business of ESA Portfolio.  ESA Portfolio has no employees or operations of its own and is an agent and alter ego of ESA, ESA Management, and HVM.

### 2.      Managers of the Baton Rouge ESA and Atlanta ESA

219.   HVM was the manager of the Baton Rouge ESA and the Atlanta ESA prior to HVM's sale to ESA Management in 2013 as part of an internal reorganization by ESA.  ESA Management was then the manager of the

Baton Rouge ESA. ESA Management is the successor entity of HVM and ESA Management is liable for the intentional and negligent acts of HVM.

220. HVM and ESA Management share an office with all other ESA Defendants. HVM and ESA Management employed the staff at the Baton Rouge ESA and the Atlanta ESA and are the only ESA entities that have employees. HVM and ESA Management are agents and alter egos of each other and ESA.

221. ESA Operating was the "tenant" of the Baton Rouge ESA and the Atlanta ESA, leasing the property from ESA Portfolio. ESA Operating shares an office with all other ESA Defendants. Employees of ESA Management and HVM conduct the business of ESA Operating. ESA Operating has no employees or operations of its own and is an agent and alter ego of ESA, ESA Management, and HVM.

### 3. Financial Beneficiary of the Baton Rouge ESA

222. ESA is the ultimate parent company of all ESA Defendants. ESA shares an office with all other ESA Defendants. Employees of ESA Management and HVM conduct the business of ESA. All actions taken by all ESA Defendants are taken in order to benefit and enrich ESA. ESA has no employees or operations of its own and is an agent and alter ego of ESA Management, and HVM.

### 4. The ESA Defendants are Agents of ESA Management and HVM

223. ESA Management and HVM are and were in an agency relationship with ESA, ESA Portfolio, and ESA Operating. This agency relationship was created through ESA Management's and HVM's exercise of an ongoing and systemic right of control over the operations of ESA, ESA Portfolio, and ESA Operating, including the means and methods of how those companies conducted daily business, including:

     a. Employee training, supervision, responsibilities, and termination decisions for every type of employee;

     b. Every aspect of employee pay, including setting the amount and scale, reduction in pay policies, and dictating employee hours worked and timekeeping systems employees used;

     c. Regulating vacation, paid holidays, employee discounts, employee leave, employee benefits, and employee discipline;

     d. Housekeeping procedures controlling how to clean a room and how and whether to report safety and security issues;

     e. Safety and security policies and practices for employees to follow;

     f. Hours of operation;

g. Fixing prices and discount policies;

h. setting employee wages;

i. building and maintaining the hotels;

j. regular inspection of the hotels; and

k. fixing prices.

## COUNTS

### Violations of the Georgia Racketeer Influenced and Corrupt Organizations Act
### (Allegations Common to Counts I–II, V–VI, IX–X, XIII–XIV, XVII-XVIII)

224. Each Defendant acquired or maintained, directly or indirectly, an interest in money through a pattern of racketeering activity.

### A. Acts of Racketeering Activity

#### i. Sex Trafficking in Violation of Federal Law

225. As set forth in the Counts above, Defendants have each violated 18 U.S.C. § 1591 by participating in the sex trafficking of Jane Doe 3 and others. This constitutes racketeering activity.

#### ii. Sex Trafficking in Violation of State Law

226. Committing, attempting to commit, and soliciting, coercing, or intimidating another person to commit the crime of trafficking a person for

sexual servitude in violation of Georgia law is racketeering activity.  O.C.G.A.

§ 16-14-3(5)(A)(vi); O.C.G.A. § 16-5-46.

227.   A person commits the offense of trafficking an individual for sexual

servitude when that person knowingly:

>    a.    subjects an individual to or maintains an individual in sexual
>          servitude;
>
>    b.    recruits, entices, harbors, transports, provides, solicits,
>          patronizes, or obtains by any means an individual for the purpose
>          of sexual servitude; or
>
>    c.    benefits financially or by receiving anything of value from the
>          sexual servitude of another.

O.C.G.A. § 16-14-3(5)(C); 18 U.S.C. § 1961(B).

228.   "Sexual Servitude" means any sexually explicit conduct or performance

involving sexually explicit conduct that is induced or obtained by coercion or

deception and for which anything of value is directly or indirectly given,

promised to, or received by any individual.  O.C.G.A. § 16-5-46(a)(8)(A).

229.   As alleged above, Jane Doe 3 and other victims were subjected to and

maintained in sexual servitude by Defendants, individually, as parties to the

crime, and as co-conspirators, in violation of O.C.G.A. § 16-5-46(c)(1), when

they were coerced into performing or conducting sexually explicit conduct for

which something of value, directly or indirectly, was given, promised to, or received by someone.

230.   Defendants also violated O.C.G.A. § 16-5-46(c)(2) by, individually, as parties to the crime, and as co-conspirators, harboring, recruiting, enticing, transporting, providing, or soliciting Jane Doe 3 and other victims for the purpose of sexual servitude.

231.   Defendants also violated O.C.G.A. § 16-5-46(c)(3) by benefitting financially and by receiving things of value from the sexual servitude of Jane Doe 3 and other victims.

232.   Specifically, as alleged above, Jane Doe 3 was trafficked for sexual servitude:

    a.   at the Smyrna Red Roof by the Smyrna Red Roof Defendants—Westmont, RRI, FMW, Red Roof Franchising, and RRI West—and various traffickers;

    b.   at the Atlanta Red Roof by the Atlanta Red Roof Defendants—Westmont, RRI, RRI III, RRI West, and Red Roof Franchising—and various traffickers;

    c.   at the Suburban Extended Stay by the Suburban Extended Stay Defendants—HSI, Westmont, WHG SU LP, WHG SU LLC, and SUB-SU—and various traffickers;

d.    at the Microtel by the Microtel Defendants—Kuzzins, CC&S, and
      Essex—and various traffickers; and

e.    at the Baton Rouge and Atlanta ESAs by the ESA Defendants—
      ESA, ESA Management, ESA Portfolio, ESA Operating, and
      HVM—and various traffickers.

233.  Defendants' agents participated in violations of O.C.G.A. § 16-5-46,
alleged above, while acting within the scope of their office or employment and
on behalf of Defendants.  The conduct of Defendants' agents constituted a
pattern of illegal activity that each Defendant or its agents knew or should
have known was occurring.

                iii.    False Imprisonment

234.  Defendants, individually, as parties to the crime and as co-conspirators,
also falsely imprisoned Jane Doe 3 and other victims by, as alleged above,
confining and detaining them without legal authority, contrary to their will
and in violation of their personal liberty, in violation of O.C.G.A. §16-5-41.
This constitutes racketeering activity.  O.C.G.A. §§ 16-14-3(5)(A)(vi).

235.  Specifically, as alleged above, Jane Doe 3 was falsely imprisoned:

a.    at the Smyrna Red Roof by traffickers and the Smyrna Red Roof
      Defendants—Westmont, RRI, FMW, Red Roof Franchising, and

RRI West—acting individually, as parties to the crime, and as co-conspirators;

b.     at the Atlanta Red Roof by traffickers and the Atlanta Red Roof Defendants—Westmont, RRI, RRI III, RRI West, and Red Roof Franchising—acting individually, as parties to the crime, and as co-conspirators;

c.     at Suburban Extended Stay by traffickers and the Suburban Extended Stay Defendants—HSI, Westmont, WHG SU LP, WHG SU LLC, and SUB-SU—acting individually, as parties to the crime, and as co-conspirators;

d.     at the Microtel by traffickers and the Microtel Defendants—Kuzzins, CC&S, and Essex—acting individually, as parties to the crime, and as co-conspirators;

e.     at the Baton Rouge and Atlanta ESAs by the ESA Defendants—ESA, ESA Management, ESA Portfolio, ESA Operating, and HVM— acting individually, as parties to the crime, and as co-conspirators.

iv.     <u>Battery</u>

236.   Traffickers at Defendants' hotels regularly committed the offense of battery, intentionally causing visible bodily harm to their victims, including

Jane Doe 3, in violation of O.C.G.A. § 16-5-23.1.  This constitutes

racketeering activity.  O.C.G.A. § 16-14-3(5)(A)(v).  Defendants engaged in

this racketeering activity as parties to the crime and co-conspirators by

alerting traffickers to victims' efforts to escape, refusing to report batteries

committed by traffickers to law enforcement, and permitting traffickers to

remain in their hotels, continue trafficking their victims, and committing

further acts of battery.

### v.    Keeping a Place of Prostitution

237.   While Jane Doe 3 and other victims were confined and detained against

their will as alleged above, they were prostituted by being forced to perform

sexual acts in exchange for money or other items of value.

238.   Defendants kept a place of prostitution by, acting individually, as

parties to the crime, and as co-conspirators, while having and exercising

control over the use of a place which offered seclusion and shelter for the

practice of prostitution, knowingly granting and permitting the use of that

location for the purpose of prostitution, in violation of O.C.G.A. § 16-6-10.

This constitutes racketeering activity.  O.C.G.A. § 16-14-3(5)(A)(vii).

239.   Specifically,

   a.    While the Smyrna Red Roof Defendants—Westmont, RRI, FMW,

         Red Roof Franchising, and RRI West—had control over the use of

the Smyrna Red Roof, a place which offered seclusion or shelter for the practice of prostitution, they knowingly granted and permitted its use for the purpose of prostitution;

b.  While the Atlanta Red Roof Defendants—Westmont, RRI, RRI III, RRI West, and Red Roof Franchising—had control over the use of the Atlanta Red Roof, a place which offered seclusion or shelter for the practice of prostitution, they knowingly granted and permitted its use for the purpose of prostitution;

c.  While the Suburban Extended Stay Defendants—HSI, Westmont, WHG SU LP, WHG SU LLC, and SUB-SU—had control over the use of the Suburban Extended Stay, a place which offered seclusion or shelter for the practice of prostitution, they knowingly granted and permitted its use for the purpose of prostitution;

d.  While the Microtel Defendants—Kuzzins, CC&S, and Essex—had control over the use of the Microtel, a place which offered seclusion or shelter for the practice of prostitution, they knowingly granted and permitted its use for the purpose of prostitution;

e. While the ESA Defendants—ESA, ESA Management, ESA Portfolio, ESA Operating, and HVM—had control over the use of the Baton Rouge and Atlanta ESAs, places which offered seclusion or shelter for the practice of prostitution, they knowingly granted and permitted its use for the purpose of prostitution.

vi. <u>Pimping</u>

240. Defendants engaged in pimping when, individually, as parties to the crime, and as co-conspirators, they knowingly aided and abetted others in the commission of prostitution in violation of O.C.G.A. § 16-6-11(5). This constitutes racketeering activity. O.C.G.A. § 16-14-3(5)(A)(vii).

**B. The Acts of Racketeering Activity Formed a Pattern**

241. Each of the Smyrna Red Roof, Atlanta Red Roof, Suburban Extended Stay, Microtel, and ESA Defendants engaged in more than two acts of racketeering activity in furtherance of one or more incidents, schemes, or transactions.

242. The acts of racketeering activity were interrelated by distinguishing characteristics and were not isolated incidents.

243. As to each of the Smyrna Red Roof, Atlanta Red Roof, Suburban Extended Stay, Microtel, and ESA Defendants, the acts of racketeering had

the same or similar intents, including but not limited to obtaining money, directly or indirectly, through a pattern of racketeering activity.

244. As to each of the Smyrna Red Roof, Atlanta Red Roof, Suburban Extended Stay, Microtel, and ESA Defendants, the acts of racketeering had the same or similar results, in that they obtained money or facilitated the obtaining of money, directly or indirectly, through a pattern of racketeering activity.

245. As to each of the Smyrna Red Roof, Atlanta Red Roof, Suburban Extended Stay, Microtel, and ESA Defendants, the acts of racketeering had the same or similar accomplices, including but not limited to sex traffickers, hotels, hotel management, and hotel chain management.

246. As to each of the Smyrna Red Roof, Atlanta Red Roof, Suburban Extended Stay, Microtel, and ESA Defendants, the acts of racketeering had the same or similar victims, including but not limited to Jane Doe 3 and other victims who were forced to engage in sexual acts in exchange for money at Defendants' hotels, were falsely imprisoned at those hotels and were the victim of other acts of racketeering activity committed at those hotels.

247. As to each of the Smyrna Red Roof, Atlanta Red Roof, Suburban Extended Stay, Microtel, and ESA Defendants, the acts of racketeering had the same or similar methods of commission, including but not limited to

harboring, holding, confining, and detaining persons who were forced to engage in sexual acts in exchange for money at Defendants' hotels.

248.   As to each of the Smyrna Red Roof, Atlanta Red Roof, Suburban Extended Stay, Microtel, and ESA Defendants, the acts of racketeering were further interrelated by distinguishing characteristics, including but not limited to:

    a.    warning sex traffickers when law enforcement was present or making inquiries;

    b.    as to each Suburban Extended Stay Defendant warning sex traffickers when victims sought to escape; and

    c.    allowing and assisting traffickers to force persons to perform sex acts in exchange for money on a repeated and ongoing basis.

## COUNT I
## Violations of the Georgia Racketeer Influenced and Corrupt Organizations Act O.C.G.A. § 16-14-4(c)
## (Against Smyrna Red Roof Defendants: Westmont, RRI, FMW, Red Roof Franchising, and RRI West)

249.   Jane Doe 3 repeats and incorporates the allegations set forth in Parts I.A–B. and paragraphs 224–248, above, as if fully set forth herein.

250.   The Smyrna Red Roof Defendants—Westmont, RRI, FMW, Red Roof Franchising, and RRI West—violated O.C.G.A. § 16-14-4(c) by conspiring to

acquire money through a pattern of racketeering activity in violation of O.C.G.A. § 16-14-4(a).

251. The Smyrna Red Roof Defendants—Westmont, RRI, FMW, Red Roof Franchising, and RRI West—knowingly and willfully joined a conspiracy which contained a common plan or purpose to commit two or more acts of racketeering activity, through which an interest in and control of money would be acquired and maintained, either directly or indirectly (the "Smyrna Red Roof Sex Trafficking Conspiracy").

252. Each of the Smyrna Red Roof Defendants—Westmont, RRI, FMW, Red Roof Franchising, and RRI West—also individually violated O.C.G.A. § 16-14-4(c) by endeavoring to violate O.C.G.A. § 16-14-4(a) by acquiring or maintaining, directly or indirectly, an interest in and control of money through a pattern of racketeering activity.

253. Each of the Smyrna Red Roof Defendants—Westmont, RRI, FMW, Red Roof Franchising, and RRI West—committed acts of racketeering activity and overt acts in furtherance of its individual endeavors and the Smyrna Red Roof Sex Trafficking Conspiracy, including those alleged above.

254. The acts committed by the participants in the Smyrna Red Roof Sex Trafficking Conspiracy number in the thousands.

255.  The conduct in violation of the Georgia RICO Act in which each Defendant participated by committing an act of racketeering activity or an overt act continued to within five years of the filing of this action.

256.  Upon information and belief, the conduct of the Smyrna Red Roof Defendants—Westmont, RRI, FMW, Red Roof Franchising, and RRI West— in violation of O.C.G.A. § 16-14-4 has not terminated.

257.  Jane Doe 3 has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the violations of Georgia RICO committed by the Smyrna Red Roof Defendants— Westmont, RRI, FMW, Red Roof Franchising, and RRI West.

258.  The Smyrna Red Roof Defendants—Westmont, RRI, FMW, Red Roof Franchising, and RRI West—are liable to Jane Doe 3 for three times her damages in an amount to be proven at trial, her attorneys' fees, and the costs of investigation and litigation.

259.  The wrongful actions of the Smyrna Red Roof Defendants—Westmont, RRI, FMW, Red Roof Franchising, and RRI West—constitute willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, rendering them liable to Jane Doe 3 for punitive damages pursuant to O.C.G.A. § 51-12-5.1.

260.  Because the Smyrna Red Roof Defendants—Westmont, RRI, FMW, Red Roof Franchising, and RRI West—acted with the specific intent to cause harm, there is no limitation regarding the amount that may be awarded as punitive damages.

**COUNT II**
**Violations of the Georgia Racketeer Influenced and Corrupt Organizations Act O.C.G.A. § 16-14-4(a)**
**(Against Smyrna Red Roof Defendants: Westmont, RRI, FMW, Red Roof Franchising, and RRI West)**

261.  Jane Doe 3 repeats and incorporates the allegations set forth in Parts I.A–B. and 224–48, above, as if fully set forth herein.

262.  As set forth above in paragraphs 224–248, the Smyrna Red Roof Defendants—Westmont, RRI, FMW, Red Roof Franchising, and RRI West— violated O.C.G.A. § 16-14-4(a) by acquiring or maintaining, directly or indirectly, an interest in money through a pattern of racketeering activity.

263.  The conduct in violation of the Georgia RICO Act in which the Smyrna Red Roof Defendants—Westmont, RRI, FMW, Red Roof Franchising, and RRI West—participated continued to within five years of the filing of this action.

264.  Upon information and belief, the conduct of the Smyrna Red Roof Defendants—Westmont, RRI, FMW, Red Roof Franchising, and RRI West— in violation of O.C.G.A. § 16-14-4 has not terminated.

265.   Jane Doe 3 has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the Smyrna Red Roof Defendants—Westmont, RRI, FMW, Red Roof Franchising, and RRI West—violations of Georgia RICO.

266.   The Smyrna Red Roof Defendants—Westmont, RRI, FMW, Red Roof Franchising, and RRI West—are liable to Jane Doe 3 for three times her damages in an amount to be proven at trial, her attorneys' fees, and her costs of investigation and litigation.

267.   The wrongful actions of the Smyrna Red Roof Defendants—Westmont, RRI, FMW, Red Roof Franchising, and RRI West—constitute willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, rendering them liable to Jane Doe 3 for punitive damages pursuant to O.C.G.A. § 51-12-5.1.

268.   Because the Smyrna Red Roof Defendants—Westmont, RRI, FMW, Red Roof Franchising, and RRI West—acted with the specific intent to cause harm, there is no limitation regarding the amount that may be awarded as punitive damages.

## COUNT III
## TVPRA, 18 U.S.C. § 1595
### (Against Smyrna Red Roof Defendants: Westmont, RRI, FMW, Red Roof Franchising, and RRI West)

269.    Plaintiff repeats and incorporates the allegations set forth in paragraphs Parts I.A–B., above, as if fully set forth herein.

270.    In violation of 18 U.S.C. § 1595(a), each Smyrna Red Roof Defendant—Westmont, RRI, FMW, Red Roof Franchising, and RRI West—knowingly benefitted from participation in a venture that it knew or should have known engaged in sex trafficking.

### Direct Liability

271.    Each Smyrna Red Roof Defendant—Westmont, RRI, FMW, Red Roof Franchising, and RRI West—is directly liable for its benefit, actual or constructive knowledge, and participation in the sex trafficking ventures at the Smyrna Red Roof.

272.    The Smyrna Red Roof Defendants—Westmont, RRI, FMW, Red Roof Franchising, and RRI West—knowingly benefitted from Plaintiff's sex trafficking by receiving a percentage of the revenue generated by the operation of the Smyrna Red Roof, including a percentage of the revenue generated for the rate charged on the rooms in which Plaintiff was trafficked.

273.    The Smyrna Red Roof Defendants—Westmont, RRI, FMW, Red Roof

Franchising, and RRI West—participated in a sex trafficking venture by providing to Plaintiff's trafficker the necessary venue for her sex trafficking. In the course of this venture, numerous buyers paid to have sex with Plaintiff at the Smyrna Red Roof.

274.   The venture in which the Smyrna Red Roof Defendants—Westmont, RRI, FMW, Red Roof Franchising, and RRI West—participated was in or affecting interstate commerce.

275.   The Smyrna Red Roof Defendants—Westmont, RRI, FMW, Red Roof Franchising, and RRI West—knew or should have known the venture violated the TVPRA because the Smyrna Red Roof Defendants, their agents and representatives, saw the signs of sex trafficking exhibited by Plaintiff, her trafficker, the rooms in which she was trafficked, the frequent traffic of male buyers to Plaintiff's rooms, and the numerous other victims being trafficked at the hotel.

276.   FMW, based on the facts alleged in Parts I.A–B., above, and incorporated here by reference, knew or should have known about sex trafficking ventures at the hotel it owned from 2010 to December 2012.  FMW participated in the sex trafficking ventures at the Smyrna Red Roof by providing the venue, the physical location where Plaintiff's sex trafficking was permitted.

277.   RRI West contracted with FMW to manage the Smyrna Red Roof in exchange for a percentage of the hotel's revenue from at least August 2011 to December 2012.  Based on the facts alleged in Parts I.A–B., above, and incorporated here by reference, RRI West knew or should have known about the sex trafficking ventures at the Smyrna Red Roof.  RRI West participated in the sex trafficking ventures at the Smyrna Red Roof by managing the property where the trafficking was permitted and by renting rooms to sex traffickers for sex trafficking at the Smyrna Red Roof with actual or constructive knowledge.

278.   From 2010–December 2012, RRI managed the Smyrna Red Roof and employed the staff there.  Based on the facts alleged in Parts I.A–B., above, and incorporated here by reference, RRI knew or should have known about the sex trafficking ventures at the Smyrna Red Roof involving its employees. RRI participated in the sex trafficking ventures at the Smyrna Red Roof by renting rooms to sex traffickers for sex trafficking at the Smyrna Red Roof with actual or constructive knowledge.

279.   From 2010–December 2012, Westmont managed and operated the business of the Smyrna Red Roof.  Based on the facts alleged in Parts I.A–B., above, and incorporated here by reference, Westmont knew or should have known about the sex trafficking ventures at the Smyrna Red Roof it managed

and operated. Westmont participated in the sex trafficking ventures at the Smyrna Red Roof by operating the hotel in such a manner as to permit sex trafficking to occur and by renting rooms to sex traffickers for sex trafficking at the Smyrna Red Roof with actual or constructive knowledge.

280. Red Roof Franchising contracted with FMW via RRI's franchise agreements. Red Roof Franchising knew or should have known what it contractually obligated itself to know through its franchise agreements. That is, Red Roof Franchising knew or should have known about every safety and security incident occurring on the property because its franchise agreements required franchisees to report every safety and security incident occurring on the property. Further, based on the facts alleged in Parts I.A.–B., above and incorporated here by reference, Red Roof Franchising knew or should have known about the sex trafficking ventures at the Smyrna Red Roof. Red Roof Franchising participated in sex trafficking ventures at the Smyrna Red Roof by permitting and profiting from sex trafficking at the Smyrna Red Roof after it had actual and constructive knowledge of the integral role that sex trafficking played at the hotel.

## Agency Liability

281. Alternatively, Westmont and RRI are also liable under the TVPRA through their agency relationships with certain other Smyrna Red Roof

Defendant.

282.  At all times relevant to this lawsuit, FMW and RRI West were in an agency relationship with Westmont.  Westmont exerted complete control over FMW and RRI West.  Westmont directed and at times conducted all the business of FMW and RRI West.  Westmont controlled the means and methods of how FMW and RRI West conducted their daily business.  FMW and RRI West were agents of Westmont.

283.  At all times relevant to this lawsuit, Red Roof Franchising was in an agency relationship with RRI.  RRI exerted complete control over Red Roof Franchising.  RRI directed and at times conducted all the business of Red Roof Franchising.  RRI controlled the means and methods of how Red Roof Franchising conducted its daily business.  Red Roof Franchising was an agent of RRI.

## Alter Ego/Mere Instrumentality

284.  Alternatively, Westmont and RRI are also liable to Plaintiff under the TVPRA because certain other Smyrna Red Roof Defendants—Westmont, RRI, FMW, Red Roof Franchising, and RRI West—are alter egos of Westmont and RRI.

285.  At all times relevant to this lawsuit, FMW and RRI West were alter egos of Westmont.  FMW and RRI West were created by Westmont and share

the same office as Westmont.  Westmont exerted complete control over FMW

and RRI West's finances, policies, and business practices.  Westmont

employees conducted all the business of FMW and RRI West.  FMW and RRI

West did not have their own employees or operations independent of

Westmont.  Westmont controlled the means and methods of how FMW and

RRI West conducted their daily business.  Westmont's control over FMW and

RRI West was used to allow Westmont to profit from sex trafficking,

including Plaintiff's sex trafficking, at the Smyrna Red Roof while attempting

to avoid liability for doing so.  Westmont's control of FMW and RRI West,

therefore, caused Plaintiff's injuries in this lawsuit.

286.   At all times relevant to this lawsuit, Red Roof Franchising was an alter

ego of RRI.  Red Roof Franchising was created by RRI and shares the same

office as RRI.  RRI exerted complete control over Red Roof Franchising's

finances, policies, and business practices.  RRI employees conducted all the

business of Red Roof Franchising.  Red Roof Franchising did not have its own

employees or operations independent of RRI.  RRI controlled the means and

methods of how Red Roof Franchising conducted its daily business.  RRI's

control over Red Roof Franchising was used to allow RRI to profit from sex

trafficking, including Plaintiff's sex trafficking, at the Smyrna Red Roof while

attempting to avoid liability for doing so.  RRI's control of Red Roof

Franchising, therefore, caused Plaintiff's injuries in this lawsuit.

## Joint Venture

287.   Alternatively, Westmont and RRI are also liable to Plaintiff under the TVPRA because they were in a joint venture at the Smyrna Red Roof and each is liable for the acts and omissions of the other.

288.   Westmont is the owner of RRI.  The two companies are interrelated and share employees and operations.  The two companies are even further integrated in situations where Westmont is the owner of a hotel property that is then franchised through RRI.  That was the case at the Smyrna Red Roof from 2010 through December 2012.

289.   From at least 2010 through December 2012, the Smyrna Red Roof was a joint undertaking for profit by Westmont and RRI.

290.   From at least 2010 through December 2012, Westmont and RRI each exerted control over, and each had a right of control over, the Smyrna Red Roof.

291.   Westmont and RRI have joint proprietary interests in the Smyrna Red Roof and each share in the profits and losses of the hotel.

292.   On information and belief, Westmont and RRI have common stock ownership, common directors and officers, common business departments, share each other's property as their own; and their daily operations are not

kept separate.

## Damages

293.   Plaintiff has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the Smyrna Red Roof Defendants' conduct—that of Westmont, RRI, FMW, Red Roof Franchising, and RRI West—and their participation in the sex trafficking ventures at the Smyrna Red Roof.

294.   The Smyrna Red Roof Defendants—Westmont, RRI, FMW, Red Roof Franchising, and RRI West—are liable to Plaintiff for her damages in an amount to be proven at trial, including reasonable attorneys' fees under the TVPRA and punitive damages.

295.   All Defendants are jointly and severally liable for damages arising from the indivisible injuries they caused Plaintiff.

## COUNT IV
### Negligence
### (Against the Smyrna Red Roof Defendants: Westmont, RRI, FMW, Red Roof Franchising, and RRI West)

296.   Jane Doe 3 repeats and incorporates the allegations set forth in Parts I.A–B., above as if fully set forth herein.

297.   At all relevant times, the Smyrna Red Roof Defendants—Westmont, RRI, FMW, Red Roof Franchising, and RRI West—controlled the operation

and management of Smyrna Red Roof, and had the legal duty to keep the premises safe and secure with the due regard for the safety of their invitees, including Plaintiff. The Smyrna Red Roof Defendants—Westmont, RRI, FMW, Red Roof Franchising, and RRI West—breached their duty and failed to act as similarly situated businesses would in similar circumstances.

298.  At all relevant times, the Smyrna Red Roof Defendants—Westmont, RRI, FMW, Red Roof Franchising, and RRI West—had authority and discretion regarding whether and how to take certain measures to provide for the safety and security of invitees at the Smyrna Red Roof.

299.  At all relevant times, Jane Doe 3 was an invitee of the Smyrna Red Roof and the Smyrna Red Roof Defendants—Westmont, RRI, FMW, Red Roof Franchising, and RRI West—owed a duty of care to their invitees, including Jane Doe 3, to keep the Smyrna Red Roof safe from unlawful acts on the premises.

300.  The Smyrna Red Roof Defendants—Westmont, RRI, FMW, Red Roof Franchising, and RRI West—negligently failed to keep the Smyrna Red Roof safe and negligently failed to adequately and properly protect their invitees, including Jane Doe 3, in breach of their duty of care. The Smyrna Red Roof Defendants—Westmont, RRI, FMW, Red Roof Franchising, and RRI West— were negligent, and their negligence proximately caused Plaintiff injuries by:

a.  Negligently violating O.C.G.A. § 51-3-1 by failing to use ordinary care to keep the premises safe;

b.  Negligently violating O.C.G.A. § 41-1-1 by creating and maintaining a nuisance;

c.  Negligently failing to provide appropriate and effective security personnel during Plaintiff's trafficking at the hotel;

d.  Negligently failing to properly inspect and maintain the premises;

e.  Negligently failing to properly train and supervise their employees regarding sex trafficking at the hotel;

f.  Negligently failing to properly retain, hire, train, and supervise said employees;

g.  Negligently failing to ensure business policies, systems, and security were adequately followed and implemented;

h.  Negligently failing to inspect, patrol, or appropriately monitor the property;

i.  Negligently failing to remediate a long history of crime at the Smyrna Red Roof and the area nearby;

j.  Negligently failing to warn invitees of known hazards at the property; and

k.    Negligently representing to invitees that the property was safe.

301.  FMW had a duty to keep the premises safe for guests and invitees, including Jane Doe 3.  Based on the facts alleged in Parts I.A–B., above, and incorporated here by reference, FMW had knowledge of, or in the exercise of reasonable care should have had knowledge of the threat of sex trafficking at the Smyrna Red Roof.  Despite its actual and constructive knowledge, FMW negligently failed to protect invitees, including Plaintiff, from the risks of sex trafficking.

302.  RRI West had a duty to keep the premises safe for guests and invitees, including Jane Doe 3, during the time it was the property manager at the Smyrna Red Roof.  Based on the facts alleged in Parts I.A–B., above, and incorporated here by reference, RRI West had knowledge of, or in the exercise of reasonable care should have had knowledge of the threat of sex trafficking at the Smyrna Red Roof.  Despite its actual and constructive knowledge, RRI West negligently failed to protect invitees, including Plaintiff, from the risks of sex trafficking.

303.  Westmont had a duty to keep the premises safe for guests and invitees, including Jane Doe 3 while it was the manager and operator of the Smyrna Red Roof from 2010–2012.  Based on the facts alleged in Parts I.A–B., above, and incorporated here by reference, Westmont had knowledge of, or in the

exercise of reasonable care should have had knowledge of the threat of sex trafficking at the Smyrna Red Roof. Despite its actual and constructive knowledge, Westmont negligently failed to protect invitees, including Plaintiff, from the risks of sex trafficking.

304. Red Roof Franchising had a duty to keep the premises safe for guests and invitees, including Jane Doe 3. Based on the facts alleged in Parts I.A– B., above, and incorporated here by reference, Red Roof Franchising had knowledge of, or in the exercise of reasonable care should have had knowledge of the threat of sex trafficking at the Smyrna Red Roof because reporting of sex trafficking was required under the franchise agreement. Despite its actual and constructive knowledge, Red Roof Franchising negligently failed to protect invitees, including Plaintiff, from the risks of sex trafficking.

305. RRI had a duty to keep the premises safe for guests and invitees, including Jane Doe 3. Based on the facts alleged in Parts I.A–B., above, and incorporated here by reference, RRI had knowledge of, or in the exercise of reasonable care should have had knowledge of the threat of sex trafficking at the Smyrna Red Roof. Despite its actual and constructive knowledge, RRI negligently failed to protect invitees, including Plaintiff, from the risks of sex trafficking.

306.  Alternatively, Westmont and RRI are also liable in negligence to Plaintiff under three distinct theories: (1) Agency; (2) Alter Ego; (3) Joint Venture.  Plaintiff Jane Doe 3 repeats and incorporates the allegations set forth in paragraphs 282–92 above as if fully set forth herein.

307.  As a direct and proximate result of the actions and/or inactions of Smyrna Red Roof Defendants—Westmont, RRI, FMW, Red Roof Franchising, and RRI West—Jane Doe 3 suffered substantial physical, emotional, and psychological harm and other damages in an amount to be proven at trial.

308.  The wrongful actions of the Smyrna Red Roof Defendants—Westmont, RRI, FMW, Red Roof Franchising, and RRI West—constitute willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, rendering them liable to Jane Doe 3 for punitive damages pursuant to O.C.G.A. § 51-12-5.1.

309.  Plaintiff is entitled to an award of punitive damages without limitation or cap because the actions of the Smyrna Red Roof Defendants—Westmont, RRI, FMW, Red Roof Franchising, and RRI West—and their employees were willful and wanton and showed an entire want of care, which raises the presumption of a conscious indifference to consequences.

310.  The actions of the Smyrna Red Roof Defendants—Westmont, RRI,

FMW, Red Roof Franchising, and RRI West—evidence a species of bad faith, were and are stubbornly litigious, and have caused Plaintiff undue expense. Thus, Plaintiff is entitled to recover the necessary expenses of litigation, including an award of reasonable attorney's fees and expenses required by this action, pursuant to O.C.G.A. § 13-6-11 and/or O.C.G.A. § 9-11-68(e), as well as any other statutory or common law basis.

## COUNT V
### Violations of the Georgia Racketeer Influenced and Corrupt Organizations Act O.C.G.A. § 16-14-4(c)
### (Against Atlanta Red Roof Defendants: Westmont, RRI, RRI III, RRI West, and Red Roof Franchising)

311. Jane Doe 3 repeats and incorporates the allegations set forth in Parts II.A–B. and paragraphs 224–48, above, as if fully set forth herein.

312. The Atlanta Red Roof Defendants—Westmont, RRI, RRI III, RRI West, and Red Roof Franchising—violated O.C.G.A. § 16-14-4(c) by conspiring to acquire money through a pattern of racketeering activity in violation of O.C.G.A. § 16-14-4(a).

313. The Atlanta Red Roof Defendants—Westmont, RRI, RRI III, RRI West, and Red Roof Franchising—knowingly and willfully joined a conspiracy which contained a common plan or purpose to commit two or more acts of racketeering activity, through which an interest in and control of money

would be acquired and maintained, either directly or indirectly (the "Atlanta Red Roof Sex Trafficking Conspiracy").

314.   Each of the Atlanta Red Roof Defendants—Westmont, RRI, RRI III, RRI West, and Red Roof Franchising—also individually violated O.C.G.A. § 16-14-4(c) by endeavoring to violate O.C.G.A. § 16-14-4(a) by acquiring or maintaining, directly or indirectly, an interest in and control of money through a pattern of racketeering activity.

315.   Each of the Atlanta Red Roof Defendants—Westmont, RRI, RRI III, RRI West, and Red Roof Franchising—committed acts of racketeering activity and overt acts in furtherance of its individual endeavors and the Atlanta Red Roof Sex Trafficking Conspiracy, including those alleged above.

316.   The acts committed by the participants in the Atlanta Red Roof Sex Trafficking Conspiracy number in the thousands.

317.   The conduct in violation of the Georgia RICO Act in which the Atlanta Red Roof Defendants—Westmont, RRI, RRI III, RRI West, and Red Roof Franchising—participated continued to within five years of the filing of this action.

318.   Upon information and belief, the conduct of the Atlanta Red Roof Defendants—Westmont, RRI, RRI III, RRI West, and Red Roof Franchising— in violation of O.C.G.A. § 16-14-4 has not terminated.

319.  Jane Doe 3 has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the Atlanta Red Roof Defendants violations of Georgia RICO.

320.  The Atlanta Red Roof Defendants are liable to Jane Doe 3 for three times her damages in an amount to be proven at trial, her attorneys' fees, and the costs of investigation and litigation.

321.  The wrongful actions of the Atlanta Red Roof Defendants constitute willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, rendering them liable to Jane Doe 3 for punitive damages pursuant to O.C.G.A. § 51-12-5.1.

322.  Because the Atlanta Red Roof Defendants acted with the specific intent to cause harm, there is no limitation regarding the amount that may be awarded as punitive damages.

## COUNT VI
### Georgia Racketeer Influenced and Corrupt Organizations Act
### O.C.G.A. § 16-14-4(a)
### (Against Atlanta Red Roof Defendants: Westmont, RRI, RRI III, RRI West, and Red Roof Franchising)

323.  Jane Doe 3 repeats and incorporates the allegations set forth in Parts II.A–B. and paragraphs 224–48, above, as if fully set forth herein.

324. As set forth above in paragraphs 224–48, above, the Atlanta Red Roof Defendants—Westmont, RRI, RRI III, RRI West, and Red Roof Franchising—violated O.C.G.A. § 16-14-4(a) by acquiring or maintaining, directly or indirectly, an interest in money through a pattern of racketeering activity.

325. The conduct in violation of the Georgia RICO Act in which the Atlanta Red Roof Defendants—Westmont, RRI, RRI III, RRI West, and Red Roof Franchising—participated continued to within five years of the filing of this action.

326. Upon information and belief, the conduct of the Atlanta Red Roof Defendants—Westmont, RRI, RRI III, RRI West, and Red Roof Franchising—in violation of O.C.G.A. § 16-14-4 has not terminated.

327. Jane Doe 3 has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the violations of Georgia RICO committed by the Atlanta Red Roof Defendants—Westmont, RRI, RRI III, RRI West, and Red Roof Franchising.

328. The Atlanta Red Roof Defendants—Westmont, RRI, RRI III, RRI West, and Red Roof Franchising—are liable to Jane Doe 3 for three times her damages in an amount to be proven at trial, her attorneys' fees, and her costs of investigation and litigation.

329. The wrongful actions of the Atlanta Red Roof Defendants—Westmont, RRI, RRI III, RRI West, and Red Roof Franchising—constitute willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, rendering them liable to Jane Doe 3 for punitive damages pursuant to O.C.G.A. § 51-12-5.1.

330. Because the Atlanta Red Roof Defendants—Westmont, RRI, RRI III, RRI West, and Red Roof Franchising—acted with the specific intent to cause harm, there is no limitation regarding the amount that may be awarded as punitive damages.

**COUNT VII**
**TVPRA, 18 U.S.C. § 1595**
**(Against Atlanta Red Roof Defendants: Westmont, RRI, RRI III, RRI West, and Red Roof Franchising)**

331. Plaintiff repeats and incorporates the allegations set forth in Parts II.A–B., above, as if fully set forth herein.

332. In violation of 18 U.S.C. § 1595(a), each Atlanta Red Roof Defendant—Westmont, RRI, RRI III, RRI West, and Red Roof Franchising—knowingly benefitted from participation in a venture that it knew or should have known engaged in sex trafficking.

## Direct Liability

333.   Each Atlanta Red Roof Defendant—Westmont, RRI, RRI III, RRI West, and Red Roof Franchising—is directly liable for its knowing benefit, actual or constructive knowledge, and participation in the sex trafficking ventures at the Atlanta Red Roof.

334.   The Atlanta Red Roof Defendants—Westmont, RRI, RRI III, RRI West, and Red Roof Franchising—knowingly benefitted from Plaintiff's sex trafficking by receiving a percentage of the revenue generated by the operation of the Atlanta Red Roof, including a percentage of the revenue generated for the rate charged on the rooms in which Plaintiff was trafficked.

335.   The Atlanta Red Roof Defendants—Westmont, RRI, RRI III, RRI West, and Red Roof Franchising—participated in a sex trafficking venture by providing to Plaintiff's trafficker the necessary venue for her sex trafficking. In the course of this venture, numerous buyers paid to have sex with Plaintiff at the Atlanta Red Roof.

336.   The venture in which the Atlanta Red Roof Defendants—Westmont, RRI, RRI III, RRI West, and Red Roof Franchising—participated was in or affecting interstate commerce.

337.   The Atlanta Red Roof Defendants—Westmont, RRI, RRI III, RRI West, and Red Roof Franchising—knew or should have known the venture violated

the TVPRA because the Atlanta Red Roof Defendants, their agents and representatives, saw the signs of sex trafficking exhibited by Plaintiff, her trafficker, the rooms in which she was trafficked, the frequent traffic of numerous male buyers to Plaintiff's rooms, and the numerous other victims being trafficked at the hotel.

338.   Based on the facts alleged in Parts II.A–B., above, and incorporated here by reference, RRI III knew or should have known about sex trafficking ventures at the hotel it owned.  RRI III participated in the sex trafficking ventures at the Atlanta Red Roof by providing the venue, the physical location where Plaintiff's sex trafficking was allowed to occur.

339.   Based on the facts alleged in Parts II.A–B., above, and incorporated here by reference, RRI West knew or should have known about the sex trafficking ventures at the Atlanta Red Roof.  RRI West participated in the sex trafficking ventures at the Atlanta Red Roof by managing the property where the trafficking was permitted and by renting rooms to sex traffickers for sex trafficking at the Atlanta Red Roof with actual or constructive knowledge.

340.   RRI managed the Atlanta Red Roof and employed the staff there. Based on the facts alleged in Parts II.A–B., above, and incorporated here by reference, RRI knew or should have known about the sex trafficking ventures

at the Atlanta Red Roof.  RRI participated in the sex trafficking ventures at

the Atlanta Red Roof by managing the property in such a manner as to

permit sex trafficking to occur and by renting rooms to sex traffickers for sex

trafficking at the Atlanta Red Roof with actual or constructive knowledge.

341.   Westmont managed and operated the business of the Atlanta Red Roof.

Based on the facts alleged in Parts II.A–B., above, and incorporated here by

reference, Westmont knew or should have known about the sex trafficking

ventures at the Atlanta Red Roof it managed and operated.  Westmont

participated in the sex trafficking ventures at the Atlanta Red Roof by

operating the hotel in such a manner as to permit sex trafficking to occur and

by renting rooms to sex traffickers for sex trafficking at the Atlanta Red Roof

with actual or constructive knowledge.

342.   Red Roof Franchising contracted with RRI III via RRI's franchise

agreements.  Based on the facts alleged in Parts II.A–B., above, and

incorporated here by reference, Red Roof Franchising knew or should have

known about every safety and security incident occurring on the property

because its franchise agreements required franchisees to report every safety

and security incident occurring on the property.  Red Roof Franchising

participated in sex trafficking ventures at the Atlanta Red Roof by permitting

and profiting from sex trafficking at the Atlanta Red Roof after it had actual

and constructive knowledge of the integral role that sex trafficking played at the hotel.

343. Alternatively, Westmont and RRI are also liable to Plaintiff under the TVPRA under three distinct theories: (1) Agency; (2) Alter Ego; (3) Joint Venture.

344. At all times relevant to this lawsuit, RRI III was in an agency relationship with Westmont. Westmont exerted complete control over RRI III. Westmont directed and at times conducted all the business of RRI III. Westmont controlled the means and methods of how RRI III conducted its daily business. RRI III was an agent of Westmont.

345. At all times relevant to this lawsuit, RRI III was an alter ego of Westmont. RRI III was created by Westmont and shares the same office as Westmont. Westmont exerts complete control over RRI III's finances, policies, and business practices. Westmont employees conduct all the business of RRI III. RRI III did not have its own employees or operations independent of Westmont. Westmont controlled the means and methods of how RRI III conducted its daily business. Westmont's control over RRI III was used to allow Westmont to profit from sex trafficking, including Plaintiff's sex trafficking, at the Atlanta Red Roof while attempting to avoid liability for doing so. Westmont's control of RRI III, therefore, caused

Plaintiff's injuries in this lawsuit.

346.   Regarding the other Atlanta Red Roof Defendants and allegations supporting agency, alter ego, and joint venture, Plaintiff repeats and incorporates the allegations set forth in paragraphs 113–22 and 282–92, above, as if fully set forth herein.

## Damages

347.   Plaintiff has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the participation of the Atlanta Red Roof Defendants—Westmont, RRI, RRI III, RRI West, and Red Roof Franchising—in the sex trafficking ventures at the Atlanta Red Roof.

348.   The Atlanta Red Roof Defendants—Westmont, RRI, RRI III, RRI West, and Red Roof Franchising—are liable to Plaintiff for her damages in an amount to be proven at trial, including reasonable attorneys' fees under the TVPRA and punitive damages.

349.   All Defendants are jointly and severally liable for damages arising from the indivisible injuries they caused Plaintiff.

## COUNT VIII
### Negligence
### (Against the Atlanta Red Roof Defendants: Westmont, RRI, RRI III, RRI West, and Red Roof Franchising)

350. Jane Doe 3 repeats and incorporates the allegations set forth in Parts II.A–B., above, as if fully set forth herein.

351. At all relevant times, the Atlanta Red Roof Defendants—Westmont, RRI, RRI III, RRI West, and Red Roof Franchising—controlled the operation and management of Atlanta Red Roof and had the legal duty to keep the premises safe and secure with the due regard for the safety of their invitees, including Plaintiff. The Atlanta Red Roof Defendants—Westmont, RRI, RRI III, RRI West, and Red Roof Franchising—breached their duty and failed to act as similarly situated businesses would in similar circumstances.

352. At all relevant times, the Atlanta Red Roof Defendants—Westmont, RRI, RRI III, RRI West, and Red Roof Franchising—had authority and discretion regarding whether and how to take certain measures to provide for the safety and security of invitees at the Atlanta Red Roof.

353. At all relevant times, Jane Doe 3 was an invitee of the Atlanta Red Roof and the Atlanta Red Roof Defendants—Westmont, RRI, RRI III, RRI West, and Red Roof Franchising—owed a duty of care to their invitees, including Jane Doe 3, to keep the Atlanta Red Roof safe from unlawful acts on the premises.

354. The Atlanta Red Roof Defendants—Westmont, RRI, RRI III, RRI West, and Red Roof Franchising—negligently failed to keep the Atlanta Red Roof

safe and negligently failed to adequately and properly protect their invitees, including Jane Doe 3, in breach of their duty of care.  The Atlanta Red Roof Defendants—Westmont, RRI, RRI III, RRI West, and Red Roof Franchising—were negligent, and their negligence proximately caused Plaintiff injuries by:

a. Negligently violating O.C.G.A. § 51-3-1 by failing to use ordinary care to keep the premises safe;

b. Negligently violating O.C.G.A. § 41-1-1 by creating and maintaining a nuisance;

c. Negligently failing to provide appropriate and effective security personnel during Plaintiff's trafficking at the hotel;

d. Negligently failing to properly inspect and maintain the premises;

e. Negligently failing to properly train and supervise their employees regarding sex trafficking at the hotel;

f. Negligently failing to properly retain, hire, train, and supervise said employees;

g. Negligently failing to ensure business policies, systems, and security were adequately followed and implemented;

h. Negligently failing to inspect, patrol, or appropriately monitor the property;

i.       Negligently failing to remediate a long history of crime at the Atlanta Red Roof and the area nearby;

j.       Negligently failing to warn invitees of known hazards at the property; and

k.       Negligently representing to invitees that the property was safe.

355. Based on the facts alleged in Parts II.A–B., above, and incorporated here by reference, RRI III had a duty to keep the premises safe for guests and invitees, including Jane Doe 3. RRI III had knowledge of, or in the exercise of reasonable care should have had knowledge of the threat of sex trafficking at the Atlanta Red Roof Inn. Despite its actual and constructive knowledge, RRI III negligently failed to protect invitees, including Plaintiff, from the risks of sex trafficking.

356. Based on the facts alleged in Parts II.A–B., above, and incorporated here by reference, RRI West had a duty to keep the premises safe for guests and invitees, including Jane Doe 3. RRI West had knowledge of, or in the exercise of reasonable care should have had knowledge of the threat of sex trafficking at the Atlanta Red Roof Inn. Despite its actual and constructive knowledge, RRI West negligently failed to protect invitees, including Plaintiff, from the risks of sex trafficking.

357.  Based on the facts alleged in Parts II.A–B., above, and incorporated here by reference, Westmont had a duty to keep the premises safe for guests and invitees, including Jane Doe 3.  Westmont had knowledge of, or in the exercise of reasonable care should have had knowledge of the threat of sex trafficking at the Atlanta Red Roof Inn.  Despite its actual and constructive knowledge, Westmont negligently failed to protect invitees, including Plaintiff, from the risks of sex trafficking.

358.  Based on the facts alleged in Parts II.A–B., above, and incorporated here by reference, Red Roof Franchising had a duty to keep the premises safe for guests and invitees, including Jane Doe 3.  RRI III had knowledge of, or in the exercise of reasonable care should have had knowledge of the threat of sex trafficking at the Atlanta Red Roof Inn because reporting of sex trafficking was required under the franchise agreement.  Despite its actual and constructive knowledge, Red Roof Franchising negligently failed to protect invitees, including Plaintiff, from the risks of sex trafficking.

359.  Based on the facts alleged in Parts II.A–B., above, and incorporated here by reference, RRI had a duty to keep the premises safe for guests and invitees, including Jane Doe 3.  RRI had knowledge of, or in the exercise of reasonable care should have had knowledge of the threat of sex trafficking at the Atlanta Red Roof.  Despite its actual and constructive knowledge, RRI

negligently failed to protect invitees, including Plaintiff, from the risks of sex trafficking.

360. Alternatively, Westmont and RRI are also liable in negligence to Plaintiff under three distinct theories of liability: (1) Agency; (2) Alter Ego; (3) Joint Venture. In support of those theories of liability, Plaintiff Jane Doe 3 repeats and incorporates the allegations set forth in paragraphs 113–22, 282–92, and 344–346 above as if fully set forth herein.

361. As a direct and proximate result of the actions and/or inactions of Atlanta Red Roof Defendants—Westmont, RRI, RRI III, RRI West, and Red Roof Franchising—Jane Doe 3 suffered substantial physical, emotional, and psychological harm and other damages in an amount to be proven at trial.

362. The wrongful actions of the Atlanta Red Roof Defendants—Westmont, RRI, RRI III, RRI West, and Red Roof Franchising—constitute willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, rendering them liable to Jane Doe 3 for punitive damages pursuant to O.C.G.A. § 51-12-5.1.

363. Plaintiff is entitled to an award of punitive damages without limitation or cap because the actions of the Atlanta Red Roof Defendants—Westmont, RRI, RRI III, RRI West, and Red Roof Franchising—and their employees

were willful and wanton and showed an entire want of care, which raises the presumption of a conscious indifference to consequences.

364.   The actions of the Atlanta Red Roof Defendants—Westmont, RRI, RRI III, RRI West, and Red Roof Franchising—evidence a species of bad faith, were and are stubbornly litigious, and have caused Plaintiff undue expense. Thus, Plaintiff is entitled to recover the necessary expenses of litigation, including an award of reasonable attorney's fees and expenses required by this action, pursuant to O.C.G.A. § 13-6-11 and/or O.C.G.A. § 9-11-68(e), as well as any other statutory or common law basis.

**COUNT IX**

**Violations of the Georgia Racketeer Influenced and Corrupt Organizations Act O.C.G.A. § 16-14-4(c)**
**(Against Suburban Extended Stay Defendants: HSI, Westmont, WHG SU LP, WHG SU LLC, and SUB-SU)**

365.   Jane Doe 3 repeats and incorporates the allegations set forth in Parts III.A–B. and paragraphs 224–48, above, as if fully set forth herein.

366.   The Suburban Extended Stay Defendants—HSI, Westmont, WHG SU LP, WHG SU LLC, and SUB-SU—violated O.C.G.A. § 16-14-4(c) by conspiring to acquire money through a pattern of racketeering activity in violation of O.C.G.A. § 16-14-4(a).

367. The Suburban Extended Stay Defendants—HSI, Westmont, WHG SU LP, WHG SU LLC, and SUB-SU—knowingly and willfully joined a conspiracy which contained a common plan or purpose to commit two or more acts of racketeering activity, through which an interest in and control of money would be acquired and maintained, either directly or indirectly (the "Suburban Extended Stay Sex Trafficking Conspiracy").

368. Each of the Suburban Extended Stay Defendants—HSI, Westmont, WHG SU LP, WHG SU LLC, and SUB-SU—also individually violated O.C.G.A. § 16-14-4(c) by endeavoring to violate O.C.G.A. § 16-14-4(a) by acquiring or maintaining, directly or indirectly, an interest in and control of money through a pattern of racketeering activity.

369. Each of the Suburban Extended Stay Defendants—HSI, Westmont, WHG SU LP, WHG SU LLC, and SUB-SU—committed acts of racketeering activity and overt acts in furtherance of its individual endeavors and the Suburban Extended Stay Sex Trafficking Conspiracy, including those alleged above.

370. The acts committed by the participants in the Suburban Extended Stay Sex Trafficking Conspiracy number in the thousands.

371. The conduct in violation of the Georgia RICO Act in which the Suburban Extended Stay Defendants—HSI, Westmont, WHG SU LP, WHG

SU LLC, and SUB-SU—participated continued to within five years of the filing of this action.

372.   Upon information and belief, the conduct of the Suburban Extended Stay Defendants—HSI, Westmont, WHG SU LP, WHG SU LLC, and SUB-SU—in violation of O.C.G.A. § 16-14-4 has not terminated.

373.   Jane Doe 3 has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the violations of Georgia RICO by the Suburban Extended Stay Defendants—HSI, Westmont, WHG SU LP, WHG SU LLC, and SUB-SU.

374.   The Suburban Extended Stay Defendants—HSI, Westmont, WHG SU LP, WHG SU LLC, and SUB-SU—are liable to Jane Doe 3 for three times her damages in an amount to be proven at trial, her attorneys' fees, and the costs of investigation and litigation.

375.   The wrongful actions of the Suburban Extended Stay Defendants—HSI, Westmont, WHG SU LP, WHG SU LLC, and SUB-SU—constitute willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, rendering them liable to Jane Doe 3 for punitive damages pursuant to O.C.G.A. § 51-12-5.1.

376.   Because the Suburban Extended Stay Defendants acted with the specific intent to cause harm, there is no limitation regarding the amount that may be awarded as punitive damages.

## COUNT X
### Georgia Racketeer Influenced and Corrupt Organizations Act
### O.C.G.A. § 16-14-4(a)
### (Against Suburban Extended Stay Defendants: HSI, Westmont, WHG SU LP, WHG SU LLC, and SUB-SU)

377.   Jane Doe 3 repeats and incorporates the allegations set forth in Parts III.A–B. and paragraphs 224–48, above, as if fully set forth herein.

378.   As set forth above in paragraphs 224–48, above, the Suburban Extended Stay Defendants—HSI, Westmont, WHG SU LP, WHG SU LLC, and SUB-SU—violated O.C.G.A. § 16-14-4(a) by acquiring or maintaining, directly or indirectly, an interest in money through a pattern of racketeering activity.

379.   The conduct in violation of the Georgia RICO Act in which the Suburban Extended Stay Defendants—HSI, Westmont, WHG SU LP, WHG SU LLC, and SUB-SU—participated continued to within five years of the filing of this action.

380. Upon information and belief, the conduct of the Suburban Extended Stay Defendants—HSI, Westmont, WHG SU LP, WHG SU LLC, and SUB-SU—in violation of O.C.G.A. § 16-14-4 has not terminated.

381. Jane Doe 3 has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the Suburban Extended Stay Defendants—HSI, Westmont, WHG SU LP, WHG SU LLC, and SUB-SU—violations of Georgia RICO.

382. The Suburban Extended Stay Defendants—HSI, Westmont, WHG SU LP, WHG SU LLC, and SUB-SU—are liable to Jane Doe 3 for three times her damages in an amount to be proven at trial, her attorneys' fees, and her costs of investigation and litigation.

383. The wrongful actions of the Suburban Extended Stay Defendants—HSI, Westmont, WHG SU LP, WHG SU LLC, and SUB-SU—constitute willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, rendering them liable to Jane Doe 3 for punitive damages pursuant to O.C.G.A. § 51-12-5.1.

384. Because the Suburban Extended Stay Defendants—HSI, Westmont, WHG SU LP, WHG SU LLC, and SUB-SU—acted with the specific intent to

cause harm, there is no limitation regarding the amount that may be

awarded as punitive damages.

## COUNT XI
## TVPRA, 18 U.S.C. § 1595
## (Against Suburban Extended Stay Defendants: HSI, Westmont, WHG SU LP, WHG SU LLC, and SUB-SU)

385.   Plaintiff repeats and incorporates the allegations set forth in Parts

III.A–B., above, as if fully set forth herein.

386.   In violation of 18 U.S.C. § 1595(a), each Suburban Extended Stay

Defendant—HSI, Westmont, WHG SU LP, WHG SU LLC, and SUB-SU—

knowingly benefitted from participation in a venture that it knew or should

have known engaged in sex trafficking.

### Direct Liability

387.   Each Suburban Extended Stay Defendant, HSI, Westmont, WHG SU

LP, WHG SU LLC, SUB-SU, is directly liable for its knowing benefit, actual

or constructive knowledge, and participation in the sex trafficking ventures

at the Suburban Extended Stay.

388.   The Suburban Extended Stay Defendants—HSI, Westmont, WHG SU

LP, WHG SU LLC, and SUB-SU—knowingly benefitted from Plaintiff's sex

trafficking by receiving a percentage of the revenue generated by the

operation of the Suburban Extended Stay, including a percentage of the

revenue generated for the rate charged on the rooms in which Plaintiff was trafficked.

389.   The Suburban Extended Stay Defendants—HSI, Westmont, WHG SU LP, WHG SU LLC, SUB-SU—participated in a sex trafficking venture by providing to Plaintiff's trafficker the necessary venue for her sex trafficking. In the course of this venture, numerous buyers paid to have sex with Plaintiff at the Suburban Extended Stay.

390.   The venture in which the Suburban Extended Stay Defendants—HSI, Westmont, WHG SU LP, WHG SU LLC, SUB-SU—participated was in or affecting interstate commerce.

391.   The Suburban Extended Stay Defendants—HSI, Westmont, WHG SU LP, WHG SU LLC, and SUB-SU—knew or should have known the venture violated the TVPRA because the Suburban Extended Stay Defendants, their agents and representatives, saw the signs of sex trafficking exhibited by Plaintiff, her trafficker, the rooms in which she was trafficked, the frequent traffic of male buyers to Plaintiff's rooms, and the numerous other victims being trafficked at the hotel.

392.   Based on the facts alleged in Parts III.A–B., above, and incorporated here by reference, HSI knew or should have known about sex trafficking ventures at the hotel it owned.  HSI participated in the sex trafficking

ventures at the Suburban Extended Stay by providing the venue, the physical location where Plaintiff's sex trafficking was allowed to occur.

393. Based on the facts alleged in Parts III.A–B., above, and incorporated here by reference, WHG SU LLC and its successor WHG SU LP, knew or should have known about sex trafficking ventures at the hotel they owned. WHG SU LLC and its successor WHG SU LP participated in the sex trafficking ventures at the Suburban Extended Stay by providing the venue, the physical location where Plaintiff's sex trafficking was allowed to occur.

394. As the general partner of WHG SU LP, SUB-SU is liable for the debts and liabilities of WHG SU LP, which itself is liable as a successor of WHG SU LLC.

395. Westmont managed the Suburban Extended Stay and employed the staff there. Based on the facts alleged in Parts III.A–B., above, and incorporated here by reference, Westmont knew or should have known about the sex trafficking ventures at the Suburban Extended Stay. Westmont participated in the sex trafficking ventures at the Suburban Extended Stay by managing the property in such a manner as to permit sex trafficking to occur and by renting rooms to sex traffickers for sex trafficking at the Suburban Extended Stay with actual or constructive knowledge.

396.   Alternatively, Westmont is also liable to Plaintiff under the TVPRA under two other distinct theories: (1) Agency; and (2) Alter Ego.

397.   At all times relevant to this lawsuit, WHG SU LP, WHG SU LLC, and SUB-SU were in agency relationships with Westmont.  Westmont exerted complete control over WHG SU LP, WHG SU LLC, and SUB-SU.  Westmont directed and conducted all the business of WHG SU LP, WHG SU LLC, and SUB-SU.  Westmont controlled the means and methods of how WHG SU LP, WHG SU LLC, and SUB-SU conducted their daily business.  WHG SU LP, WHG SU LLC, and SUB-SU were agents of Westmont.

398.   At all times relevant to this lawsuit, WHG SU LP, WHG SU LLC, and SUB-SU were alter egos of Westmont.  WHG SU LP, WHG SU LLC, and SUB-SU were created by Westmont and shars the same office as Westmont.  Westmont exerts complete control over WHG SU LP's, WHG SU LLC's, and SUB-SU's finances, policies, and business practices.  Westmont employees conduct all the business of WHG SU LP, WHG SU LLC, and SUB-SU.  WHG SU LP, WHG SU LLC, and SUB-SU did not have their own employees or operations independent of Westmont.  Westmont controlled the means and methods of how WHG SU LP, WHG SU LLC, and SUB-SU conducted their daily business.  Westmont's control over WHG SU LP, WHG SU LLC, and SUB-SU was used to allow Westmont to profit from sex trafficking, including

Plaintiff's sex trafficking, at the Suburban Extended Stay while attempting to avoid liability for doing so. Westmont's control of WHG SU LP, WHG SU LLC, and SUB-SU, therefore, caused Plaintiff's injuries in this lawsuit.

## Damages

399. Plaintiff has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the Suburban Extended Stay Defendants', HSI, Westmont, WHG SU LP, WHG SU LLC, SUB-SU, participation in the sex trafficking ventures at the Suburban Extended Stay.

400. The Suburban Extended Stay Defendants—HSI, Westmont, WHG SU LP, WHG SU LLC, and SUB-SU—are liable to Plaintiff for her damages in an amount to be proven at trial, including reasonable attorneys' fees under the TVPRA and punitive damages.

401. All Defendants are jointly and severally liable for damages arising from the indivisible injuries they caused Plaintiff.

## COUNT XII
### Negligence
### (Against the Suburban Extended Stay Defendants: HSI, Westmont, WHG SU LP, WHG SU LLC, and SUB-SU)

402. Jane Doe 3 repeats and incorporates the allegations set forth in Parts III.A–B., above as if fully set forth herein.

403.   At all relevant times, the Suburban Extended Stay Defendants—HSI, Westmont, WHG SU LP, WHG SU LLC, and SUB-SU—controlled the operation and management of the Suburban Extended Stay and had the legal duty to keep the premises safe and secure with the due regard for the safety of their invitees, including Plaintiff.  The Suburban Extended Stay Defendants breached their duty and failed to act as similarly situated businesses would in similar circumstances.

404.   At all relevant times, the Suburban Extended Stay Defendants—HSI, Westmont, WHG SU LP, WHG SU LLC, and SUB-SU—had authority and discretion regarding whether and how to take certain measures to provide for the safety and security of invitees at the Suburban Extended Stay.

405.   At all relevant times, Jane Doe 3 was an invitee of the Suburban Extended Stay and the Suburban Extended Stay Defendants—HSI, Westmont, WHG SU LP, WHG SU LLC, and SUB-SU—owed a duty of care to their invitees, including Jane Doe 3, to keep the Suburban Extended Stay safe from unlawful acts on the premises.

406.   The Suburban Extended Stay Defendants—HSI, Westmont, WHG SU LP, WHG SU LLC, and SUB-SU—negligently failed to keep the Suburban Extended Stay safe and negligently failed to adequately and properly protect their invitees, including Jane Doe 3, in breach of their duty of care.  The

Suburban Extended Stay Defendants were negligent, and their negligence proximately caused Plaintiff injuries by:

   a.   Negligently violating O.C.G.A. § 51-3-1 by failing to use ordinary care to keep the premises safe;

   b.   Negligently violating O.C.G.A. § 41-1-1 by creating and maintaining a nuisance;

   c.   Negligently failing to provide appropriate and effective security personnel during Plaintiff's trafficking at the hotel;

   d.   Negligently failing to properly inspect and maintain the premises;

   e.   Negligently failing to properly train and supervise their employees regarding sex trafficking at the hotel;

   f.   Negligently failing to properly retain, hire, train, and supervise said employees;

   g.   Negligently failing to ensure business policies, systems, and security were adequately followed and implemented;

   h.   Negligently failing to inspect, patrol, or appropriately monitor the property;

   i.   Negligently failing to remediate a long history of crime at the Suburban Extended Stay and the area nearby;

j.     Negligently failing to warn invitees of known hazards at the property; and

k.     Negligently representing to invitees that the property was safe.

407.   Based on the facts alleged in Parts III.A–B., above, and incorporated here by reference, HSI had a duty to keep the premises safe for guests and invitees, including Jane Doe 3.  HSI had knowledge of, or in the exercise of reasonable care should have had knowledge of the threat of sex trafficking at the Suburban Extended Stay Inn.  Despite its actual and constructive knowledge, HSI negligently failed to protect invitees, including Plaintiff, from the risks of sex trafficking.

408.   Based on the facts alleged in Parts III.A–B., above, and incorporated here by reference, WHG SU LLC had a duty to keep the premises safe for guests and invitees, including Jane Doe 3.  WHG SU LLC had knowledge of, or in the exercise of reasonable care should have had knowledge of the threat of sex trafficking at the Suburban Extended Stay Inn.  Despite its actual and constructive knowledge, WHG SU LLC negligently failed to protect invitees, including Plaintiff, from the risks of sex trafficking.

409.   Based on the facts alleged in Parts III.A–B., above, and incorporated here by reference, WHG SU LLC and its successor WHG SU LP, knew or should have known about sex trafficking ventures at the hotel they owned.

WHG SU LLC and its successor WHG SU LP participated in the sex trafficking ventures at the Suburban Extended Stay by providing the venue, the physical location where Plaintiff's sex trafficking was allowed to occur.

410. As the general partner of WHG SU LP, SUB-SU is liable for the debts and liabilities of WHG SU LP, which itself is liable as a successor of WHG SU LLC.

411. Based on the facts alleged in Parts III.A–B., above, and incorporated here by reference, Westmont had a duty to keep the premises safe for guests and invitees, including Jane Doe 3. Westmont had knowledge of, or in the exercise of reasonable care should have had knowledge of the threat of sex trafficking at the Suburban Extended Stay Inn. Despite its actual and constructive knowledge, Westmont negligently failed to protect invitees, including Plaintiff, from the risks of sex trafficking.

412. Alternatively, Westmont is also liable in negligence to Plaintiff under two other distinct theories of liability: (1) Agency; and (2) Alter Ego. In support of those theories of liability, Plaintiff Jane Doe 3 repeats and incorporates the allegations set forth in paragraphs 397–98, above, as if fully set forth herein.

413. As a direct and proximate result of the actions and/or inactions of Suburban Extended Stay Defendants—HSI, Westmont, WHG SU LP, WHG

SU LLC, and SUB-SU—Jane Doe 3 suffered substantial physical, emotional, and psychological harm and other damages in an amount to be proven at trial.

414. The wrongful actions of the Suburban Extended Stay Defendants—HSI, Westmont, WHG SU LP, WHG SU LLC, and SUB-SU—constitute willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, rendering them liable to Jane Doe 3 for punitive damages pursuant to O.C.G.A. § 51-12-5.1.

415. Plaintiff is entitled to an award of punitive damages without limitation or cap because the actions of the Suburban Extended Stay Defendants—HSI, Westmont, WHG SU LP, WHG SU LLC, and SUB-SU—and their employees were willful and wanton and showed an entire want of care, which raises the presumption of a conscious indifference to consequences.

416. The Suburban Extended Stay Defendants', HSI, Westmont, WHG SU LP, WHG SU LLC, SUB-SU, actions evidence a species of bad faith, were and are stubbornly litigious, and have caused Plaintiff undue expense. Thus, Plaintiff is entitled to recover the necessary expenses of litigation, including an award of reasonable attorney's fees and expenses required by this action, pursuant to O.C.G.A. § 13-6-11 and/or O.C.G.A. § 9-11-68(e), as well as any

other statutory or common law basis.

## COUNT XIII
## Violations of the Georgia Racketeer Influenced and Corrupt Organizations Act O.C.G.A. § 16-14-4(c)
## (Against Microtel Defendants: Kuzzins, CC&S, and Essex)

417.  Jane Doe 3 repeats and incorporates the allegations set forth in Parts IV.A–B. and paragraphs 224–48, above, as if fully set forth herein.

418.  The Microtel Defendants—Kuzzins, CC&S, and Essex—violated O.C.G.A. § 16-14-4(c) by conspiring to acquire money through a pattern of racketeering activity in violation of O.C.G.A. § 16-14-4(a).

419.  The Microtel Defendants—Kuzzins, CC&S, and Essex—knowingly and willfully joined a conspiracy which contained a common plan or purpose to commit two or more acts of racketeering activity, through which an interest in and control of money would be acquired and maintained, either directly or indirectly (the "Microtel Sex Trafficking Conspiracy").

420.  Each of the Microtel Defendants—Kuzzins, CC&S, and Essex—also individually violated O.C.G.A. § 16-14-4(c) by endeavoring to violate O.C.G.A. § 16-14-4(a) by acquiring or maintaining, directly or indirectly, an interest in and control of money through a pattern of racketeering activity.

421.  Each of the Microtel Defendants—Kuzzins, CC&S, and Essex— committed acts of racketeering activity and overt acts in furtherance of its

individual endeavors and the Microtel Sex Trafficking Conspiracy, including those alleged above.

422. The acts committed by the participants in the Microtel Sex Trafficking Conspiracy number in the thousands.

423. The conduct in violation of the Georgia RICO Act in which the Microtel Defendants—Kuzzins, CC&S, and Essex—participated continued to within five years of the filing of this action.

424. Upon information and belief, the conduct of the Microtel Defendants—Kuzzins, CC&S, and Essex—in violation of O.C.G.A. § 16-14-4 has not terminated.

425. Jane Doe 3 has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the violations of Georgia RICO committed by the Microtel Defendants—Kuzzins, CC&S, and Essex.

426. The Microtel Defendants—Kuzzins, CC&S, and Essex—are liable to Jane Doe 3 for three times her damages in an amount to be proven at trial, her attorneys' fees, and the costs of investigation and litigation.

427. The wrongful actions of the Microtel Defendants—Kuzzins, CC&S, and Essex—constitute willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious

indifference to consequences, rendering them liable to Jane Doe 3 for punitive damages pursuant to O.C.G.A. § 51-12-5.1.

428.   Because the Microtel Defendants—Kuzzins, CC&S, and Essex—acted with the specific intent to cause harm, there is no limitation regarding the amount that may be awarded as punitive damages.

**COUNT XIV**
**Georgia Racketeer Influenced and Corrupt Organizations Act**
**O.C.G.A. § 16-14-4(a)**
**(Against Microtel Defendants: Kuzzins, CC&S and Essex)**

429.   Jane Doe 3 repeats and incorporates the allegations set forth in Parts IV.A–B. and paragraphs 224–48, above, as if fully set forth herein.

430.   As set forth above in paragraphs 22–48, above, the Microtel Defendants—Kuzzins, CC&S, and Essex—violated O.C.G.A. § 16-14-4(a) by acquiring or maintaining, directly or indirectly, an interest in money through a pattern of racketeering activity.

431.   The conduct in violation of the Georgia RICO Act in which the Microtel Defendants—Kuzzins, CC&S, and Essex—participated continued to within five years of the filing of this action.

432.   Upon information and belief, the conduct of the Microtel Defendants—Kuzzins, CC&S, and Essex—in violation of O.C.G.A. § 16-14-4 has not terminated.

433.   Jane Doe 3 has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the violations of Georgia RICO committed by the Microtel Defendants—Kuzzins, CC&S, and Essex.

434.   The Microtel Defendants—Kuzzins, CC&S, and Essex—are liable to Jane Doe 3 for three times her damages in an amount to be proven at trial, her attorneys' fees, and her costs of investigation and litigation.

435.   The wrongful actions of the Microtel Defendants—Kuzzins, CC&S, and Essex—constitute willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, rendering them liable to Jane Doe 3 for punitive damages pursuant to O.C.G.A. § 51-12-5.1.

436.   Because the Microtel Defendants—Kuzzins, CC&S, and Essex—acted with the specific intent to cause harm, there is no limitation regarding the amount that may be awarded as punitive damages.

**COUNT XV**
**TVPRA, 18 U.S.C. § 1595**
**(Against Microtel Defendants:  Kuzzins, CC&S, and Essex)**

437.   Plaintiff repeats and incorporates the allegations set forth in Parts IV.A–B., above, as if fully set forth herein.

438.   In violation of 18 U.S.C. § 1595(a), each Microtel Defendant, Kuzzins,

CC&S, ESSEX, knowingly benefitted from participation in a venture that it knew or should have known engaged in sex trafficking.

## Direct Liability

439.  Each Microtel Defendant—Kuzzins, CC&S, and Essex—is directly liable for its knowing benefit, actual or constructive knowledge, and participation in the sex trafficking ventures at the Microtel.

440.  The Microtel Defendants—Kuzzins, CC&S, and Essex—knowingly benefitted from Plaintiff's sex trafficking by receiving a percentage of the revenue generated by the operation of the Microtel, including a percentage of the revenue generated for the rate charged on the rooms in which Plaintiff was trafficked.

441.  The Microtel Defendants—Kuzzins, CC&S, and Essex—participated in a sex trafficking venture by providing to Plaintiff's trafficker the necessary venue for her sex trafficking. In the course of this venture, numerous buyers paid to have sex with Plaintiff at the Microtel.

442.  The venture in which the Microtel Defendants—Kuzzins, CC&S, and Essex—participated was in or affecting interstate commerce.

443.  The Microtel Defendants—Kuzzins, CC&S, and Essex—knew or should have known the venture violated the TVPRA because the Microtel Defendants, their agents and representatives, saw the signs of sex trafficking

exhibited by Plaintiff, her trafficker, the rooms in which she was trafficked, the frequent traffic of male buyers to Plaintiff's rooms, and the numerous other victims being trafficked at the hotel.

444. Based on the facts alleged in Parts IV.A–B., above, and incorporated here by reference, Kuzzins knew or should have known about sex trafficking ventures at the hotel it owned. Kuzzins participated in the sex trafficking ventures at the Microtel by providing the venue, the physical location where Plaintiff's sex trafficking was allowed to occur.

445. Based on the facts alleged in Parts IV.A–B., above, and incorporated here by reference, CC&S knew or should have known about sex trafficking ventures at the hotel. CC&S participated in the sex trafficking ventures at the Microtel by providing the venue, the physical location where Plaintiff's sex trafficking was allowed to occur.

446. Essex managed the Microtel and employed the staff there. Based on the facts alleged in Parts IV.A–B., above, and incorporated here by reference, Essex knew or should have known about the sex trafficking ventures at the Microtel. Essex participated in the sex trafficking ventures at the Microtel by managing the property in such a manner as to permit sex trafficking to occur and by renting rooms to sex traffickers for sex trafficking at the Microtel with actual or constructive knowledge.

447. Alternatively, CC&S and Kuzzins are also liable to Plaintiff under the TVPRA under two other distinct theories: (1) Agency; and (2) Alter Ego.

448. At all times relevant to this lawsuit, Kuzzins was in agency relationships with CC&S. CC&S exerted complete control over Kuzzins. CC&S directed and conducted all the business of Kuzzins. CC&S controlled the means and methods of how Kuzzins conducted its daily business. Kuzzins was an agent of CC&S.

449. At all times relevant to this lawsuit, Kuzzins was an alter ego of CC&S. Kuzzins was created by CC&S and shares the same office as CC&S. CC&S exerts complete control over Kuzzins's finances, policies, and business practices. CC&S employees conduct all the business of Kuzzins. Kuzzins does not have its own employees or operations independent of CC&S. CC&S controlled the means and methods of how Kuzzins conducted its daily business. CC&S's control over Kuzzins was used to allow CC&S to profit from sex trafficking, including Plaintiff's sex trafficking, at the Microtel while attempting to avoid liability for doing so. CC&S's control of Kuzzins, therefore, caused Plaintiff's injuries in this lawsuit.

450. Essex is also an agent of Kuzzins. Kuzzins and Essex expressly created an agency relationship via contract in the parties' management agreement for the Microtel.

## Damages

451.  Plaintiff has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the participation of the Microtel Defendants—Kuzzins, CC&S, and Essex—in the sex trafficking ventures at the Microtel.

452.  The Microtel Defendants—Kuzzins, CC&S, and Essex—are liable to Plaintiff for her damages in an amount to be proven at trial, including reasonable attorneys' fees under the TVPRA and punitive damages.

453.  All Defendants are jointly and severally liable for damages arising from the indivisible injuries they caused Plaintiff.

## COUNT XVI

### Negligence
### (Against the Microtel Defendants: Kuzzins, CC&S, and Essex)

454.  Jane Doe 3 repeats and incorporates the allegations set forth in Parts IV.A–B., above, as if fully set forth herein.

455.  At all relevant times, the Microtel Defendants—Kuzzins, CC&S, and Essex—controlled the operation and management of the Microtel and had the legal duty to keep the premises safe and secure with the due regard for the safety of their invitees, including Plaintiff.  The Microtel Defendants breached their duty and failed to act as similarly situated businesses would

in similar circumstances.

456.   At all relevant times, the Microtel Defendants—Kuzzins, CC&S, and Essex—had authority and discretion regarding whether and how to take certain measures to provide for the safety and security of invitees at the Microtel.

457.   At all relevant times, Jane Doe 3 was an invitee of the Microtel and the Microtel Defendants—Kuzzins, CC&S, and Essex—owed a duty of care to their invitees, including Jane Doe 3, to keep the Microtel safe from unlawful acts on the premises.

458.   The Microtel Defendants—Kuzzins, CC&S, and Essex—negligently failed to keep the Microtel safe and negligently failed to adequately and properly protect their invitees, including Jane Doe 3, in breach of their duty of care.   The Microtel Defendants—Kuzzins, CC&S, and Essex—were negligent, and their negligence proximately caused Plaintiff injuries by:

   a.   Negligently violating O.C.G.A. § 51-3-1 by failing to use ordinary care to keep the premises safe;

   b.   Negligently violating O.C.G.A. § 41-1-1 by creating and maintaining a nuisance;

   c.   Negligently failing to provide appropriate and effective security personnel during Plaintiff's trafficking at the hotel;

d.    Negligently failing to properly inspect and maintain the premises;

e.    Negligently failing to properly train and supervise their employees regarding sex trafficking at the hotel;

f.    Negligently failing to properly retain, hire, train, and supervise said employees;

g.    Negligently failing to ensure business policies, systems, and security were adequately followed and implemented;

h.    Negligently failing to inspect, patrol, or appropriately monitor the property;

i.    Negligently failing to remediate a long history of crime at the Microtel and the area nearby;

j.    Negligently failing to warn invitees of known hazards at the property; and

k.    Negligently representing to invitees that the property was safe.

459.    Based on the facts alleged in Parts IV.A–B., above, and incorporated here by reference, Kuzzins had a duty to keep the premises safe for guests and invitees, including Jane Doe 3.  Kuzzins had knowledge of, or in the exercise of reasonable care should have had knowledge of the threat of sex trafficking at the Microtel.  Despite its actual and constructive knowledge,

Kuzzins negligently failed to protect invitees, including Plaintiff, from the risks of sex trafficking.

460. Based on the facts alleged in Parts IV.A–B., above, and incorporated here by reference, CC&S had a duty to keep the premises safe for guests and invitees, including Jane Doe 3. CC&S had knowledge of, or in the exercise of reasonable care should have had knowledge of the threat of sex trafficking at the Microtel. Despite its actual and constructive knowledge, CC&S negligently failed to protect invitees, including Plaintiff, from the risks of sex trafficking.

461. Based on the facts alleged in Parts IV.A–B., above, and incorporated here by reference, Essex had a duty to keep the premises safe for guests and invitees, including Jane Doe 3. Essex had knowledge of, or in the exercise of reasonable care should have had knowledge of the threat of sex trafficking at the Microtel. Despite its actual and constructive knowledge, Essex negligently failed to protect invitees, including Plaintiff, from the risks of sex trafficking.

462. Alternatively, CC&S and Kuzzins are also liable in negligence to Plaintiff under two other distinct theories of liability: (1) Agency; and (2) Alter Ego. In support of those theories of liability, Plaintiff Jane Doe 3

repeats and incorporates the allegations set forth in paragraphs 448–50, above, as if fully set forth herein.

463.   As a direct and proximate result of the actions and/or inactions of Microtel Defendants—Kuzzins, CC&S, and Essex—Jane Doe 3 suffered substantial physical, emotional, and psychological harm and other damages in an amount to be proven at trial.

464.   The wrongful actions of the Microtel Defendants—Kuzzins, CC&S, and Essex—constitute willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, rendering them liable to Jane Doe 3 for punitive damages pursuant to O.C.G.A. § 51-12-5.1.

465.   Plaintiff is entitled to an award of punitive damages without limitation or cap because the actions of the Microtel Defendants—Kuzzins, CC&S, and Essex—and their employees were willful and wanton and showed an entire want of care, which raises the presumption of a conscious indifference to consequences.

466.   The actions of the Microtel Defendants—Kuzzins, CC&S, and Essex—evidence a species of bad faith, were and are stubbornly litigious, and have caused Plaintiff undue expense. Thus, Plaintiff is entitled to recover the necessary expenses of litigation, including an award of reasonable attorney's

fees and expenses required by this action, pursuant to O.C.G.A. § 13-6-11

and/or O.C.G.A. § 9-11-68(e), as well as any other statutory or common law

basis.

## COUNT XVII

**Violations of the Georgia Racketeer Influenced and Corrupt
Organizations Act O.C.G.A. § 16-14-4(c)
(Against ESA Defendants: ESA, ESA Management, ESA Portfolio, ESA
Operating, and HVM)**

467.  Jane Doe 3 repeats and incorporates the allegations set forth in Parts

V.A–C. and paragraphs 224–48, above, as if fully set forth herein.

468.  The ESA Defendants—ESA, ESA Management, ESA Portfolio, ESA

Operating, and HVM—violated O.C.G.A. § 16-14-4(c) by conspiring to acquire

money through a pattern of racketeering activity in violation of O.C.G.A. §

16-14-4(a).

469.  The ESA Defendants—ESA, ESA Management, ESA Portfolio, ESA

Operating, and HVM—knowingly and willfully joined a conspiracy which

contained a common plan or purpose to commit two or more acts of

racketeering activity, through which an interest in and control of money

would be acquired and maintained, either directly or indirectly (the "ESA Sex

Trafficking Conspiracy").

470.  Each of the ESA Defendants—ESA, ESA Management, ESA Portfolio, ESA Operating, and HVM—also individually violated O.C.G.A. § 16-14-4(c) by endeavoring to violate O.C.G.A. § 16-14-4(a) by acquiring or maintaining, directly or indirectly, an interest in and control of money through a pattern of racketeering activity.

471.  Each of the ESA Defendants—ESA, ESA Management, ESA Portfolio, ESA Operating, and HVM—committed acts of racketeering activity and overt acts in furtherance of its individual endeavors and the ESA Sex Trafficking Conspiracy, including those alleged above.

472.  The acts committed by the participants in the ESA Sex Trafficking Conspiracy number in the thousands.

473.  The conduct in violation of the Georgia RICO Act in which the ESA Defendants—ESA, ESA Management, ESA Portfolio, ESA Operating, and HVM—participated continued to within five years of the filing of this action.

474.  Upon information and belief, the conduct of the ESA Defendants—ESA, ESA Management, ESA Portfolio, ESA Operating, and HVM—in violation of O.C.G.A. § 16-14-4 has not terminated.

475.  Jane Doe 3 has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the

violations of Georgia RICO by the ESA Defendants—ESA, ESA Management, ESA Portfolio, ESA Operating, and HVM.

476. The ESA Defendants—ESA, ESA Management, ESA Portfolio, ESA Operating, and HVM—are liable to Jane Doe 3 for three times her damages in an amount to be proven at trial, her attorneys' fees, and the costs of investigation and litigation.

477. The wrongful actions of the ESA Defendants—ESA, ESA Management, ESA Portfolio, ESA Operating, and HVM—constitute willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, rendering them liable to Jane Doe 3 for punitive damages pursuant to O.C.G.A. § 51-12-5.1.

478. Because the ESA Defendants acted with the specific intent to cause harm, there is no limitation regarding the amount that may be awarded as punitive damages.

## COUNT XVIII
### Georgia Racketeer Influenced and Corrupt Organizations Act
### O.C.G.A. § 16-14-4(a)
### (Against ESA Defendants: ESA, ESA Management, ESA Portfolio, ESA Operating, and HVM)

479. Jane Doe 3 repeats and incorporates the allegations set forth in Parts V.A–C. and paragraphs 224–48, above, as if fully set forth herein.

480. As set forth above in paragraphs 224–48, the ESA Defendants—ESA, ESA Management, ESA Portfolio, ESA Operating, and HVM—violated O.C.G.A. § 16-14-4(a) by acquiring or maintaining, directly or indirectly, an interest in money through a pattern of racketeering activity.

481. The conduct in violation of the Georgia RICO Act in which the ESA Defendants—ESA, ESA Management, ESA Portfolio, ESA Operating, and HVM—participated continued to within five years of the filing of this action.

482. Upon information and belief, the conduct of the ESA Defendants—ESA, ESA Management, ESA Portfolio, ESA Operating, and HVM—in violation of O.C.G.A. § 16-14-4 has not terminated.

483. Jane Doe 3 has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the ESA Defendants—ESA, ESA Management, ESA Portfolio, ESA Operating, and HVM—violations of Georgia RICO.

484. The ESA Defendants—ESA, ESA Management, ESA Portfolio, ESA Operating, and HVM—are liable to Jane Doe 3 for three times her damages in an amount to be proven at trial, her attorneys' fees, and her costs of investigation and litigation.

485.   The wrongful actions of the ESA Defendants—ESA, ESA Management, ESA Portfolio, ESA Operating, and HVM—constitute willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, rendering them liable to Jane Doe 3 for punitive damages pursuant to O.C.G.A. § 51-12-5.1.

486.   Because the ESA Defendants—ESA, ESA Management, ESA Portfolio, ESA Operating, and HVM—acted with the specific intent to cause harm, there is no limitation regarding the amount that may be awarded as punitive damages.

**COUNT XIX**
**TVPRA, 18 U.S.C. § 1595**
**(Against ESA Defendants:  ESA, ESA Management, ESA Portfolio, ESA Operating, and HVM)**

487.   Plaintiff repeats and incorporates the allegations set forth in Parts V.A–C. as if fully set forth herein.

488.   In violation of 18 U.S.C. § 1595(a), each ESA Defendant—ESA, ESA Management, ESA Portfolio, ESA Operating, and HVM—knowingly benefitted from participation in a venture that it knew or should have known engaged in sex trafficking.

## Direct Liability

489.   Each ESA Defendant, ESA, ESA Management, ESA Portfolio, ESA Operating, and HVM, is directly liable for its knowing benefit, actual or constructive knowledge, and participation in the sex trafficking ventures at the Baton Rouge and Atlanta ESAs.

490.   The ESA Defendants—ESA, ESA Management, ESA Portfolio, ESA Operating, and HVM—knowingly benefitted from Plaintiff's sex trafficking by receiving a percentage of the revenue generated by the operation of the Baton Rouge and Atlanta ESAs, including a percentage of the revenue generated for the rate charged on the rooms in which Plaintiff was trafficked.

491.   The ESA Defendants—ESA, ESA Management, ESA Portfolio, ESA Operating, and HVM—participated in a sex trafficking venture by providing to Plaintiff's trafficker the necessary venue for her sex trafficking. In the course of this venture, numerous buyers paid to have sex with Plaintiff at the Baton Rouge and Atlanta ESAs.

492.   The venture in which the ESA Defendants—ESA, ESA Management, ESA Portfolio, ESA Operating, and HVM—participated was in or affecting interstate commerce.

493.   The ESA Defendants—ESA, ESA Management, ESA Portfolio, ESA Operating, and HVM—knew or should have known the venture violated the

TVPRA because the ESA Defendants, their agents and representatives, saw the signs of sex trafficking exhibited by Plaintiff, her trafficker, the rooms in which she was trafficked, the frequent traffic of male buyers to Plaintiff's rooms, and the numerous other victims being trafficked at the Baton Rouge and Atlanta ESAs.

494.   Based on the facts alleged in Parts V.A–C., above, and incorporated here by reference, ESA Portfolio knew or should have known about sex trafficking ventures at the hotels it owned.  ESA Portfolio participated in the sex trafficking ventures at the Baton Rouge and Atlanta ESAs by providing the venue, the physical location where Plaintiff's sex trafficking was allowed to occur.

495.   Based on the facts alleged in Parts V.A–C., above, and incorporated here by reference, ESA Operating, knew or should have known about sex trafficking ventures at the hotels it leased.  ESA Operating, as the lessor of the Baton Rouge and Atlanta ESAs, participated in the sex trafficking ventures at the hotels by providing the venues, the physical location where Plaintiff's sex trafficking was allowed to occur.

496.   The actions of all other ESA Defendants were taken for the sole benefit of ESA, the parent company of all ESA Defendants.  ESA participated in the sex trafficking ventures at its hotels by providing a venue to sex traffickers

for sex trafficking in exchange for the revenue generated from the room rentals, including the rooms in which Plaintiff was trafficked.

497.   ESA Management and HVM managed the ESA and employed the staff there.  Based on the facts alleged in Parts V.A–C. ESA Management and HVM knew or should have known about the sex trafficking ventures at the Baton Rouge and Atlanta ESAs.  ESA Management and HVM participated in the sex trafficking ventures at the Baton Rouge and Atlanta ESAs by managing the property in such a manner as to permit sex trafficking to occur and by renting rooms to sex traffickers for sex trafficking at the Baton Rouge and Atlanta ESAs with actual or constructive knowledge.

498.   Alternatively, ESA Management and HVM are also liable to Plaintiff under the TVPRA under two other distinct theories: (1) Agency; and (2) Alter Ego.

499.   At all times relevant to this lawsuit, ESA, ESA Portfolio, and ESA Operating were in an agency relationship with ESA Management and HVM. ESA Management and HVM exerted complete control over ESA, ESA Portfolio, and ESA Operating.  ESA Management and HVM directed and conducted all the business of ESA, ESA Portfolio, and ESA Operating.  ESA Management and HVM controlled the means and methods of how ESA, ESA Portfolio, and ESA Operating conducted their daily business.  ESA, ESA

Portfolio, and ESA Operating were agents of ESA Management and HVM.

500.   At all times relevant to this lawsuit, ESA, ESA Portfolio, and ESA Operating were alter egos of ESA Management and HVM.

501.   ESA, ESA Portfolio, and ESA Operating share the same office as ESA Management and HVM.  ESA Management and HVM exerts complete control over ESA's, ESA Portfolio's, and ESA Operating's, finances, policies, and business practices.  ESA Management and HVM employees conduct all the business of ESA, ESA Portfolio, and ESA Operating.  ESA, ESA Portfolio, and ESA Operating did not have their own employees or operations independent of ESA Management and HVM.  ESA Management and HVM controlled the means and methods of how ESA, ESA Portfolio, and ESA Operating conducted their daily business.

502.   ESA Management and HVM's control over ESA, ESA Portfolio, and ESA Operating was used to allow ESA Management and HVM to profit from sex trafficking, including Plaintiff's sex trafficking, at the Atlanta and Baton Rouge ESAs while attempting to avoid liability for doing so.  ESA Management and HVM's control of ESA, ESA Portfolio, and ESA Operating, therefore, caused Plaintiff's injuries in this lawsuit.

## Damages

503.  Plaintiff has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the ESA Defendants', ESA, ESA Management, ESA Portfolio, ESA Operating, and HVM's, participation in the sex trafficking ventures at the Baton Rouge and Atlanta ESAs.

504.  The ESA Defendants—ESA, ESA Management, ESA Portfolio, ESA Operating, and HVM—are liable to Plaintiff for her damages in an amount to be proven at trial, including reasonable attorneys' fees under the TVPRA and punitive damages.

505.  All Defendants are jointly and severally liable for damages arising from the indivisible injuries they caused Plaintiff.

## COUNT XX
## Negligence
### (Against the ESA Defendants: ESA, ESA Management, ESA Portfolio, ESA Operating, and HVM)

506.  Jane Doe 3 repeats and incorporates the allegations set forth in Parts V.A–C. above as if fully set forth herein.

507.  At all relevant times, the ESA Defendants—ESA, ESA Management, ESA Portfolio, ESA Operating, and HVM—controlled the operation and management of the ESA and had the legal duty to keep the premises safe and

secure with the due regard for the safety of their invitees, including Plaintiff. The ESA Defendants breached their duty and failed to act as similarly situated businesses would in similar circumstances.

508.   At all relevant times, the ESA Defendants—ESA, ESA Management, ESA Portfolio, ESA Operating, and HVM—had authority and discretion regarding whether and how to take certain measures to provide for the safety and security of invitees at the Baton Rouge and Atlanta ESAs.

509.   At all relevant times, Jane Doe 3 was an invitee of the ESA and the ESA Defendants—ESA, ESA Management, ESA Portfolio, ESA Operating, and HVM—owed a duty of care to their invitees, including Jane Doe 3, to keep the ESA safe from unlawful acts on the premises.

510.   The ESA Defendants—ESA, ESA Management, ESA Portfolio, ESA Operating, and HVM—negligently failed to keep the ESA safe and negligently failed to adequately and properly protect their invitees, including Jane Doe 3, in breach of their duty of care.  The ESA Defendants were negligent, and their negligence proximately caused Plaintiff injuries by:

   a.   Negligently violating O.C.G.A. § 51-3-1 by failing to use ordinary care to keep the premises safe;

   b.   Negligently violating O.C.G.A. § 41-1-1 by creating and maintaining a nuisance;

c.    Negligently failing to provide appropriate and effective security personnel during Plaintiff's trafficking at the hotels;

d.    Negligently failing to properly inspect and maintain the premises;

e.    Negligently failing to properly train and supervise their employees regarding sex trafficking at the hotels;

f.    Negligently failing to properly retain, hire, train, and supervise said employees;

g.    Negligently failing to ensure business policies, systems, and security were adequately followed and implemented;

h.    Negligently failing to inspect, patrol, or appropriately monitor the property;

i.    Negligently failing to remediate a long history of crime at the Baton Rouge and Atlanta ESAs and the areas nearby;

j.    Negligently failing to warn invitees of known hazards at the properties; and

k.    Negligently representing to invitees that the property was safe.

511.   Based on the facts alleged in Parts V.A–C., above, and incorporated here by reference, ESA Portfolio had a duty to keep the premises safe for guests and invitees, including Jane Doe 3.  ESA Portfolio had knowledge of,

or in the exercise of reasonable care should have had knowledge of the threat of sex trafficking at the Baton Rouge and Atlanta ESAs. Despite its actual and constructive knowledge, ESA Portfolio negligently failed to protect invitees, including Plaintiff, from the risks of sex trafficking.

512. Based on the facts alleged in Parts V.A–C., above, and incorporated here by reference, ESA Operating had a duty to keep the premises safe for guests and invitees, including Jane Doe 3. ESA Operating had knowledge of, or in the exercise of reasonable care should have had knowledge of the threat of sex trafficking at the Baton Rouge and Atlanta ESAs. Despite its actual and constructive knowledge, ESA Operating negligently failed to protect invitees, including Plaintiff, from the risks of sex trafficking.

513. Based on the facts alleged in Parts V.A–C., above, and incorporated here by reference, ESA had a duty to keep the premises safe for guests and invitees, including Jane Doe 3. ESA had knowledge of, or in the exercise of reasonable care should have had knowledge of the threat of sex trafficking at the Baton Rouge and Atlanta ESAs. Despite its actual and constructive knowledge, ESA negligently failed to protect invitees, including Plaintiff, from the risks of sex trafficking.

514. Based on the facts alleged in Parts V.A–C., above, and incorporated here by reference, ESA Management had a duty to keep the premises safe for

guests and invitees, including Jane Doe 3. ESA Management had knowledge of, or in the exercise of reasonable care should have had knowledge of the threat of sex trafficking at the Baton Rouge and Atlanta ESAs. Despite its actual and constructive knowledge, ESA Management negligently failed to protect invitees, including Plaintiff, from the risks of sex trafficking.

515. Based on the facts alleged in Parts V.A–C., above, and incorporated here by reference, HVM had a duty to keep the premises safe for guests and invitees, including Jane Doe 3. HVM had knowledge of, or in the exercise of reasonable care should have had knowledge of the threat of sex trafficking at the Baton Rouge and Atlanta ESAs. Despite its actual and constructive knowledge, HVM negligently failed to protect invitees, including Plaintiff, from the risks of sex trafficking.

516. Alternatively, ESA Management and HVM are also liable in negligence to Plaintiff under two other distinct theories of liability: (1) Agency; and (2) Alter Ego. In support of those theories of liability, Plaintiff Jane Doe 3 repeats and incorporates the allegations set forth in paragraphs 499–502, above, as if fully set forth herein.

517. As a direct and proximate result of the actions and/or inactions of ESA Defendants—ESA, ESA Management, ESA Portfolio, ESA Operating, and

HVM—Jane Doe 3 suffered substantial physical, emotional, and psychological harm and other damages in an amount to be proven at trial.

518. The wrongful actions of the ESA Defendants—ESA, ESA Management, ESA Portfolio, ESA Operating, and HVM—constitute willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, rendering them liable to Jane Doe 3 for punitive damages pursuant to O.C.G.A. § 51-12-5.1.

519. Plaintiff is entitled to an award of punitive damages without limitation or cap because the actions of the ESA Defendants—ESA, ESA Management, ESA Portfolio, ESA Operating, and HVM—and their employees were willful and wanton and showed an entire want of care, which raises the presumption of a conscious indifference to consequences.

520. The ESA Defendants', ESA, ESA Management, ESA Portfolio, ESA Operating, and HVM, actions evidence a species of bad faith, were and are stubbornly litigious, and have caused Plaintiff undue expense. Thus, Plaintiff is entitled to recover the necessary expenses of litigation, including an award of reasonable attorney's fees and expenses required by this action, pursuant to O.C.G.A. § 13-6-11 and/or O.C.G.A. § 9-11-68(e), as well as any other statutory or common law basis.

Respectfully Submitted this 8th day of May, 2020.

/s/ John E. Floyd
John E. Floyd
Georgia Bar No. 266413
floyd@bmelaw.com
Manoj S. Varghese
Georgia Bar No. 734668
varghese@bmelaw.com
Tiana S. Mykkeltvedt
Georgia Bar No. 533512
mykketlvedt@bmelaw.com
Amanda Kay Seals
Georgia Bar No. 502720
seals@bmelaw.com
Michael R. Baumrind
Georgia Bar No. 960296
baumrind@bmelaw.com

BONDURANT, MIXSON & ELMORE, LLP
1201 West Peachtree Street, N.W., Suite 3900
Atlanta, Georgia 30309
(404) 881-4100 – Telephone
(404) 881-4111 – Facsimile

Jonathan S. Tonge
jtonge@atclawfirm.com
Georgia Bar No. 303999
Patrick J. McDonough
Georgia Bar No. 489855
pmcdonough@atclawfirm.com
Trinity Hundredmark
Georgia Bar No. 140808
thundred@atclawfirm.com

ANDERSEN, TATE & CARR, P.C.
One Sugarloaf Centre
1960 Satellite Boulevard, Suite 4000
Duluth, Georgia 30097
(770) 822-0900 – Telephone
(770) 822-9680 – Facsimile

*Attorneys for Plaintiff Jane Doe 3*

# CERTIFICATE OF SERVICE

I hereby certify that on May 8, 2020, the foregoing SECOND AMENDED

COMPLAINT was filed with the Clerk of Court using the EM/ECF system

which will send e-mail notification to all counsel of record.

This 8th day of May 2020.

/s/ John E. Floyd
John E. Floyd
Georgia Bar No. 266413

BONDURANT, MIXSON & ELMORE, LLP
1201 West Peachtree Street, N.W.
Suite 3900
Atlanta, GA 30309
(404) 881-4100- Telephone
(404) 881-4111 – Facsimile

#3036874v2